STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

DAVID COUNTRYMAN (CABN 226995)
CHRIS KALTSAS (NYBN 5460902)
CLAUDIA A. QUIROZ (CABN 254419)
WILLIAM FRENTZEN (LABN 24421)
Assistant United States Attorneys

  450 Golden Gate Avenue, Box 36055
  San Francisco, California 94102-3495
  Telephone: (415) 436-436-7428
  FAX: (415) 436-7234
  claudia.quiroz@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CV 20-7811 RS |
| Plaintiff, | **NOTICE OF MOTION AND MOTION TO STRIKE THE CLAIMS OF CLAIMANTS BATTLE BORN INVESTMENTS COMPANY, LLC, FIRST 100, LLC AND 1ST ONE HUNDRED HOLDINGS, LLC** |
| v. | |
| Approximately 69,370 Bitcoin (BTC), Bitcoin Gold (BTG), Bitcoin SV (BSV), and Bitcoin Cash (BCH) seized from 1HQ3Go3ggs8pFnXuHVHRytPCq5fGG8Hbhx | Hearing Date:    August 20, 2021<br>Time:               1:30 p.m.<br>Court:             Hon. Richard Seeborg |
| Defendant. | |
| First 100, LLC, 1st One Hundred Holdings, LLC, and Battle Born Investments Company, LLC, | |
| Claimants. | |

U.S. MOTION TO STRIKE CLAIMS
CV 20-7811 RS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

I.  Introduction ..................................................................................................................2

II.  Factual Background ......................................................................................................2

    A.  Theft of Bitcoin from Silk Road..........................................................................2

III. Procedural History .......................................................................................................3

    A.  Initiation of *In Rem* Forfeiture Action...............................................................3

    B.  Notice of Forfeiture Action..................................................................................4

    C.  Claimants Filed Their Claims on March 16, 2021 ..............................................4

    D.  Additional Materials Provided by Claimants in Support of their Claims .............6

IV. Background on Bitcoin and the Blockchain .................................................................6

    A.  Bitcoin Overview .................................................................................................6

    B.  Reviewing the Bitcoin Public Ledger .................................................................7

    C.  Proving Ownership of a Bitcoin Address ............................................................7

V.  Legal Standard .............................................................................................................8

    A.  The Claim Must Comply with the Requirements in Rule G(5)(a) .......................8

    B.  The Court May Strike a Claim Where the Claimant Lacks Standing.....................9

VI. Argument...................................................................................................................9

    A.  The Battle Born Claimants' Claims are Untimely and Should be Stricken..............9

        1.  Relevant Law on Deadlines in Civil Forfeiture Actions....................................9

        2.  The Factors Endorsed by the Ninth Circuit and Articulated in *$100,348.00* Weigh in Favor of Striking Claimants' Untimely Claims Pursuant to Rule G(8)(c)(i)(A) ..............11

            a.  In addition to Publication by the Government, the Seizure was Well Publicized, and Claimants Had Been Aware of the Wallet Since 2019 But Did Not Notify the Government (First and Sixth Factors) .........................................................11

            b.  The Government Never Encouraged Delay and Provided Proper Notice (Second, Fourth, and Ninth Factors) ......................................................................12

c.   The Claimants Delay Was Not Due to Health Problems (Third Factor)....................12

d.   Allowing Claims to Proceed Would Prejudice the Government (Fifth Factor) ........13

e.   Claimants Have Not Prepared for Trial (Seventh Factor) ..........................................13

f.   Claimant's Reason for Delay is Not Made in Good Faith (Eighth Factor) ..............14

g.   Claimants are not Acting *Pro Se* (Tenth Factor) ......................................................14

h.   Claimants Never Sought an Extension of Time (Eleventh Factor) ..........................15

i.   The Claims are Insufficient Because the Claimants Lacks Standing (Twelfth Factor) ....................................................................................................................16

3.   Courts Regularly Strike Claims on Timeliness Grounds................................................16

4.   Only Extraordinary Circumstances Warrant an Extension...............................................17

B.   Claimants Have No Standing Because Raymond Ngan and His Associates are Not Individual X................................................................................................................18

1.   Raymond Ngan ................................................................................................................18

*2.*   Ngan's Claims of Ownership and Possession of 1HQ3 Appeared to be Another One of His Scams...............................................................................................................19

C.   Raymond Ngan's Bankruptcy Estate Could Not Have Contained the Defendant Property Because a Thief Does Not Have a Legal Interest in Stolen Property ......................................21

D.   A Criminal's Interest in Stolen Property Does Not Become Part of His Bankruptcy Estate Because of the Relation-Back Doctrine...................................................................23

VII.   Conclusion .........................................................................................................25

1

# TABLE OF AUTHORITIES

2

## Federal Cases

3
4

*Barnhill v. Johnson*,
   503 U.S. 393 (1992)....................................................................................................... 21

5
6

*Butner v. United States*,
   440 U.S. 48 (1979)......................................................................................................... 21

7

*Clapper v. Amnesty Int'l USA*,
   133 S. Ct. 1138 (2013).................................................................................................... 8

8
9

*In re Chapman*
264 B.R. 565 (B.A.P. 9th Cir. 2001)............................................................................... 24

10
11

*In re Costas*,
   555 F.3d 790 (9th Cir. 2009) ......................................................................................... 21

12
13

*In re Cwnevada LLC*,
   602 B.R. 717 fn. 45 (Bankr. D. Nev. 2019) ................................................................... 23

14

*In re Elite Auto Dealer, Inc.*,
   2020 WL 6598256 n.9 (D. Nev. July 8, 2020) ............................................................... 22

15
16

*In re N. A. Coin & Currency, Ltd.*,
   767 F.2d 1573 (9th Cir. 1985) ....................................................................................... 22

17
18

*In re Newpower*,
   233 F.3d 922 (6th Cir. 2000) ......................................................................................... 22

19
20

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)......................................................................................................... 9

21

*NML Cap., Ltd. v. Republic of Arg*,
   2015 WL 1186548 (D. Nev. Mar. 16, 2016) .................................................................. 22

22
23

*United States v. 148 Maunalanikai*,
   *Pl.*, 2008 WL 3166799 (D. Haw. Aug. 6, 2008)....................................................... 23,24

24
25

*United States v. 323 Forrest Park*,
   *Dr.*, 521 F. App'x 379 (6th Cir. 2013)............................................................................ 17

26
27

*United States v. 475 Martin Lane*,
   545 F.3d 1134 (9th Cir. 2008) ......................................................................................... 9

28

*United States v. 1979 30-Foot Sea Ray*,
    2000 WL 1889676 (N.D. Ill. 2000) .......................................................................... 15

*United States v. 1982 Yukon Delta Houseboat*,
    774 F.2d 1432 (9th Cir. 1985) ................................................................................ 10

*United States v. 2840 S. Ocean Blvd., Apt. No. 209*
    2017 WL 1533538 (E.D.N.Y. Apr. 21, 2017) ........................................................ 17

*United States v. 5208 Los Franciscos Way*,
    385 F.3d 1187 (9th Cir. 2004) .................................................................................. 9

*United States v. 6449 East Ferry*,
    2006 WL 3097387 ................................................................................................... 15

*United States v. 8110 E. Mohave Rd.,*
    229 G. Supp. 2d 1046 (S.D. Cal. 2002) ................................................................. 23

*United States v. $1,181,895.00*,
    2015 U.S. Dist. 2015 WL 631394 (C.D. Cal. Feb. 12, 2015)................................. 9

*United States v. $1,437.00*,
    242 F. Supp. 2d 193 (W.D.N.Y. 2002).................................................................. 15

*United States v. $6,826*,
    2010 WL 4053602 (D. Vt. Oct. 14, 2010) ............................................................ 15

*United States v. $7,000*,
    583 F. Supp. 2d 725 (M.D.N.C. 2008) .................................................................. 17

*United States v. $11,918.00*,
    2007 WL 3037307 (E.D. Cal. Oct. 17, 2007) ....................................................... 17

*United States v. $12,126.00*,
    337 Fed. A'ppx 818 (11th Cir. 2009) ................................................................ 8,16

*United States v. $13,970.00*,
    2007 WL 1231659 (M.D. Ga. 2007)........................................................................ 8

*United States v. $25,790*,
    2010 WL 2671754 (D. Md. July 2, 2010)............................................................. 11

*United States v. $41,471.00*,
    2016 U.S. Dist. (C.D. Cal. Jan. 5, 2016)……………………………………..……8

*United States v. $43,029*,
    2008 WL 11515688, (N.D. Cal. July 3, 2008) ............................................... 11, 17

*United States v. $100,348.00*,
354 F.3d 1110 (9th Cir. 2004) ................................................................................. passim

*United States v. $102,535.00*,
499 F. App'x 134, 136 (3d Cir. 2012)…………...………………………………..…………13, 16

*United States v. $133,420.00*,
672 F.3d (9th Cir. 2012) ......................................................................................... 9, 21

*United States v. $140,000*,
2010 WL 1704966 (D.N.J. Apr. 26, 2010) ................................................................ 17

*United States v. $144,650*,
2013 WL 6384646 (D.N.J. Dec. 6, 2013) ................................................................. 17

*United States v. $175,918*,
755 F. Supp. 630 (S.D.N.Y. 1991) .......................................................................... 17

*United States v. $230,963.88*,
2000 WL 1745130 (D.N.H. 2000) ........................................................................... 15

*United States v. $487,825.00*
484 F.3d 662 (3d Cir. 2007)....................................................................................... 8

*United States v. $1,546,076.35 in Bank Funds Seized*,
2021 U.S. Dist. (C.D. Cal. Jan. 6, 2021);…………………………..………………………11

*United States v. Cambio Exacto, S.A.*,
166 F.3d 522 (2d Cir.1999)........................................................................................ 9

*United States v. French*,
822 F. Supp. 2d 615 (E.D. Va. 2011) ...................................................................... 23, 24

*United States v. Hooper*,
229 F.3d 818 (9th Cir. 2000) .................................................................................. 23, 24

*United States v. One-Sixth Share*,
326 F.3d 36 (1st Cir. 2003)......................................................................................... 9

*United States v. Real Prop. Known as the Lido Motel*,
135 F.3d 1312 (9th Cir. 1998) .................................................................................. 16

*United States v. Real Prop. Located at 17 Coon Creek Rd., Hawkins Bar California, Trinity Cty.*,
787 F.3d 968 (9th Cir. 2015) ................................................................................... 16

*United States v. Silicon Valley Bank Acct.*,
    549 F. Supp. 2d 940 (W.D. Mich. 2008) ........................................................ 23

*United States v. Thirty-Five Firearms*,
    123 F. App'x 204 (6th Cir. 2005) ................................................................. 16

*United States v. Vehicle 2007 Mack 600 Dump Truck*
    680 F. Supp. 2d 618 (E.D. Mich. 2010) .................................................. 16,17

*United States v. Wilson*,
    659 F.3d 947 (9th Cir. 2011) ....................................................................... 23

*United States v. Zaccagnino*,
    2006 WL 1005042 (C.D. Ill. Apr. 18, 2006) ................................................ 23

**State Cases**

*Robinson v. Goldfield Merger Mines Co.*,
    206 P. 399 (Nev. 1922) ................................................................................ 22

**Federal Statutes**

18 U.S.C. § 983(a)(4)(A) ..................................................................................... 8

18 U.S.C. § 981(f) ............................................................................................. 23

18 U.S.C. §§ 981(a)(1)(A) and 981(b) ................................................................ 4

18 U.S.C. §§ 981(a)(1)(C) ................................................................................... 4

21 U.S.C. § 881(a)(6) .......................................................................................... 4

21 U.S.C. § 853(c) ............................................................................................ 23

**State Statutes**

Nev. Rev. Stat. Ann. § 205.290 ........................................................................ 22

1  TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2       PLEASE TAKE NOTICE that on August 20, 2021, at 1:30 p.m., or as soon thereafter as the

3  matter may be heard, in Courtroom 3 of the above-entitled court located at 450 Golden Gate Avenue,

4  San Francisco, California 94102, the United States of America hereby respectfully moves to strike the

5  Verified Claims of Claimants Battle Born Investments Company, LLC; First 100, LLC; and 1st One

6  Hundred Holdings, LLC.

7       The Motion will be based on this Notice of Motion and Motion, the attached Memorandum of

8  Points and Authorities, the Declaration of IRS-CI Special Agent Jeremiah Haynie, attached hereto as

9  Exhibit "A," the Declaration of Assistant United States Attorney Claudia A. Quiroz, attached hereto as

10  Exhibit "B," along with all exhibits, and all other files and pleadings in this matter.

11

12  DATED:  July 13, 2021                    STEPHANIE M. HINDS
                                        Acting United States Attorney

13

14                                       */s/ Claudia A. Quiroz*

15                                       DAVID COUNTRYMAN
                                     CHRIS KALTSAS

16                                       CLAUDIA A. QUIROZ
                                     WILLIAM FRENTZEN

17                                       Assistant United States Attorneys

18

19

20

21

22

23

24

25

26

27

28

1

<b><u>MEMORANDUM OF POINTS AND AUTHORITIES</u></b>

2

## I.   INTRODUCTION

3        The United States of America hereby moves, pursuant to Supplemental Rule G(8)(c)(i)(A) and

4  (B) of the Federal Rules of Civil Procedure ("the Supplemental Rules"), to strike the claims filed by

5  Claimants Battle Born Investments Company, LLC; First 100, LLC; and 1st One Hundred Holdings,

6  LLC (collectively and hereinafter, "Claimants") for failure to comply with the pleading requirements

7  of Rule G(5) and because they lack standing to bring their claim under Rule G(8)(c)(i)(B).  Striking

8  these claims at this juncture is proper and warranted for three reasons:

9        First, the claims are untimely.  The statutory deadline to file a verified claim was January 26,

10  2021.  Claimants did not file their claim until March 16, 2021.  There is no good cause or justification

11  for Claimants' late filing, and the Court should strike their claims pursuant to Supplemental Rule

12  G(8)(c)(i)(A) on this basis alone.

13        Second, Claimants lack standing because their claims originate from debts owed by an individual

14  named Raymond Ngan, who Claimants incorrectly believe to be Individual X.  Raymond Ngan is in no

15  way connected to Individual X, and nothing ties Ngan or his affiliates to the Defendant Property.

16  Because there is no evidence that Ngan possessed the Defendant Property, these claims lack standing and

17  must be stricken.

18        Third, even if Ngan were involved in the theft of the Defendant Property (which he was not),

19  Claimants lack standing because a thief's title to stolen property is void *ab initio* and can never be part

20  of his bankruptcy estate.  Further, title to the Defendant Property vested in the government pursuant to

21  the relation-back doctrine long before the bankruptcy estate was created, such that the bankruptcy estate

22  could not have contained the Defendant Property.

23        No further opportunities for Claimants to cure their claims would change these facts.  For these

24  reasons, Claimants' claims must be stricken in their entirety.

25

## II.   FACTUAL BACKGROUND

26        ### A.   Theft of Bitcoin from Silk Road

27        From 2011 until October 2013, when it was seized by law enforcement, Silk Road was the most

28

1 sophisticated and extensive criminal marketplace on the Internet.  In 2020, law enforcement officers

2 used a third-party Bitcoin attribution company to analyze Bitcoin transactions executed by Silk Road.

3 From this review they observed that on May 6, 2012, 54 transactions were sent from Bitcoin addresses

4 controlled by Silk Road to two Bitcoin addresses: 1BADznNF3W1gi47R65MQs754KB7zTaGuYZ and

5 1BBqjKsYuLEUE9Y5WzdbzCtYzCiQgHqtPN ("1BAD") totaling 70,411.46 BTC.  *Id.* ⁋ 15.  *See*

6 Declaration of IRS-CI Special Agent Jeremiah Haynie ⁋ 2 ("Haynie Decl.").  On approximately April 9,

7 2013, these addresses sent 69,471.082201 BTC to 1HQ3Go3ggs8pFnXuHVHRytPCq5fGG8Hbhx

8 ("1HQ3").  Dkt. No. 8 ⁋ 17.  As of November 3, 2020, 1HQ3 had a balance of 69,370.22491543 BTC.

9 *See id.* ⁋ 19.

10       Individual X, whose identity is known to the government, was determined to have stolen the

11 Bitcoin from Silk Road and transferred it to 1BAD and subsequently to 1HQ3.  *Id.* ⁋ 21.  Investigators

12 learned that Individual X was able to hack into Silk Road, gain unauthorized and illegal access to it, and

13 thereby steal the illicit cryptocurrency from Silk Road and move it into wallets that Individual X

14 controlled.  The investigation further revealed that Silk Road's creator and operator, Ross Ulbricht,

15 became aware of Individual X's online identity and threatened Individual X for return of the

16 cryptocurrency to Ulbricht.  Individual X did not return the cryptocurrency, and instead kept it.  *Id.* ⁋ 22.

17 **III.   PROCEDURAL HISTORY**

18     **A.   Initiation of *In Rem* Forfeiture Action**

19       On November 5, 2020, the government initiated an *in rem* forfeiture action against

20 approximately 69,370 BTC obtained from 1HQ3, ("Defendant Property"), by filing a Civil Complaint

21 for Forfeiture.  Dkt. Nos. 1, 8 (Amended Complaint).  The Defendant Property was seized on

22 November 3, 2020 from Individual X, who signed a Consent and Agreement to Forfeiture with the

23 U.S. Attorney's Office in this district.  *See* Dkt. No. 8 ⁋ 23.  Individual X consented to the forfeiture of

24 the Defendant Property to the United States government.  *Id.*  That same day, the United States took

25 custody of the Defendant Property from 1HQ3.  *Id.* ⁋ 24.

26       The government has traced the Defendant Property in its entirety to proceeds of criminal

27 activity by Silk Road and Ulbricht.  In February 2015, a federal jury in the Southern District of New

28

York convicted Ulbricht on seven counts including conspiracy to distribute narcotics and money laundering following a four-week trial.[1]  *Id.* ¶ 14.  On May 29, 2015, Ulbricht was sentenced to life in prison in connection with his operation and ownership of Silk Road.[2]

On January 22, 2021, Ulbricht entered into a Settlement Agreement with the government in which he admitted that the Defendant Property was subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 981(b) (funds involved in laundering of criminal proceeds), 981(a)(1)(C) (proceeds traceable to criminal activity), and 21 U.S.C. § 881(a)(6) (property traceable to narcotics trafficking) and consented to its forfeiture to the United States.  Dkt. No. 47.

### B.       Notice of Forfeiture Action

On November 5, 2020, simultaneous with the filing of its Complaint, the government filed a Notice of Forfeiture Action, advising all persons asserting an interest in the Defendant Property and who had received direct notice of the forfeiture action to file a verified claim with the Clerk of the Court pursuant to Supplemental Rule G(5).  Dkt. No. 3.  The government sent direct notice to Ulbricht in prison.  Ulbricht is the only individual known to the government with a potential interest in the Defendant Property and is therefore the only person who received direct notice.

On November 27, 2020, the United States posted Notice of Civil Forfeiture on an official government internet site (www.forfeiture.gov), which notified potential claimants that they had 60 days to file a verified claim with the Court.  Dkt. No. 25 (Declaration of Publication).  The Declaration of Publication stated that the Notice of Civil Forfeiture was posted for at least 30 days starting on November 27, 2020, as required by Supplemental Rule G(4)(a)(iv)(C). *Id.*  Pursuant to the Supplemental Rules, any potential claimants asserting a claim to the Defendant Property were thus required to file claims on or before January 26, 2021.

### C.       Claimants Filed Their Claims on March 16, 2021

On March 16, 2021—four months after the government filed its Complaint in this matter and two months after the deadline to file a claim expired—Claimants, each a Nevada Limited Liability

---

[1] *See United States v. Ross William Ulbricht*, Case No. CR-14-68 (S.D.N.Y.)

[2] *See* https://www.justice.gov/usao-sdny/pr/ross-ulbricht-aka-dread-pirate-roberts-sentenced-manhattan-federal-court-life-prison.

U.S. MOTION TO STRIKE CLAIMS
CV 20-7811 RS

Company, filed two related claims in this matter.  *See* Dkt. Nos. 62, 64.

These claims all originate from a monetary judgment against Raymond Ngan, who the Claimants have incorrectly identified as Individual X.  Specifically, the First 100 Claimants allege that in around March 28, 2017, they obtained a $2,211,039,718.46 judgment in Nevada District Court against an individual who they believe is either Individual X or a person associated with Individual X.  *See* Dkt. No. 62-3 ¶ 2.  Four months later, on July 31, 2017, Ngan filed a Chapter 7 bankruptcy petition in the Bankruptcy Court in the District of Nevada.  *Id.* ¶ 3.  "In response, Claimants, as judgment creditors, brought an adversary proceeding to have such judgment declared nondischargeable[,]" which the Bankruptcy Court did "through a judgment of nondischargeability entered on August 6, 2018."  *Id.* ¶¶ 4-5.  Claimants argue that, as judgment creditors, they are entitled "to unencumbered right, title and ownership of the claims for the approximately 69,370 Bitcoin that were formerly held in an account owned by Individual X, or a party associated with Individual X."  *Id.* ¶¶ 6, 8.

In its claim, Battle Born states that in around March 27, 2018, it entered into an agreement to purchase from the bankruptcy trustee "all assets of the bankruptcy estate, which assets included all disclosed and undisclosed property interests of the bankruptcy debtor, who, upon information and belief, is, or is associated with, Individual X . . . ."  Dkt. No. 62-4 ¶ 3.  The purchase was approved by the bankruptcy court on May 14, 2018.  *Id.* ¶ 4.  In March 15, 2019, the Bankruptcy Court issued a Writ of Assistance directing the United States Marshal ("USMS") to obtain all electronic devices belonging to Ngan.  *Id.* ¶ 5.  The USMS thereafter retrieved certain electronic devices and provided them to Battle Born.  *Id.*  The claim further asserts that "[u]pon a forensic review of the electronic devices seized from [Ngan] . . . evidence was discovered that the Bitcoin belonged to . . . Individual X, or a party associated with Individual X, and was therefore part of the Bankruptcy Claims owned by Claimant Battle Born." [3]

---

[3] Despite the seemingly complex corporate layering, there appears to be a single source behind all of these claims. Jay Bloom is a Las Vegas billionaire who has made part of his fortune through the creation of First 100, LLC, a company that uses an obscure Nevada law to foreclose on HOA homes encumbered by delinquent liens and take ownership of properties while eliminating the lender's mortgage.  *See* https://www.influencive.com/billionaire-jay-bloom-his-accomplishments/.  First 100 is seeking to recover a $2,211,039,717.46 judgment obtained in the bankruptcy proceeding in favor of and against Ngan. *See* Adam Candee, *Nevada Real Estate Investment Firm Receives $2.2 Billion Judgment*, LAS VEGAS SUN, March 29, 2018 (*available at* https://lasvegassun.com/news/2017/mar/29/nevada-real-estate-investment-firm-receives-22-bil/).

*Id.* ¶ 6.  Claimants therefore assert that they have a property interest in, and are "innocent owners" of, the Defendant Property within the meaning of Title 18, United States Code, Section 983(d).

### D.   Additional Materials Provided by Claimants in Support of their Claims

Following the filings of the claims, the parties engaged in a series of meet and confer discussions, during which counsel for the Claimants provided the government with unredacted versions of their filings and a packet of materials in support of their claims.  *See* Declaration of Assistant United States Attorney Claudia A. Quiroz (hereinafter "Quiroz Decl.") at ¶ 2.  These materials included a memorandum outlining Claimants' position along with nine exhibits forming the basis of their claims, including materials that they argue show Ngan had ownership or control over 1HQ3, and from which Claimants have inferred an association with Individual X.  *Id.* ¶ 3.  The memorandum addressed the legal analysis of the claims, the factual basis for the claim to the Bitcoin wallet, a timeline of events, a list of Ngan's associates and affiliates related to the Bitcoin wallet, and a procedural history of Claimants' attempts to collect on Ngan's assets.  *Id.* ¶ 4.   The exhibits consisted of a series of text messages from Ngan's phone; purported agreements and procedures concerning the sale of Bitcoin by Ngan; a screenshot of the 1HQ3 Bitcoin address from a public website; a draft notice of a conditional offer to purchase Bitcoin; draft terms of purchase document concerning the sale of 1,000 Bitcoin; an email between Ngan and another individual concerning this purported sale; and two transcripts relating to the bankruptcy proceedings.  *Id.*  Following receipt of these materials, counsel for the government met and conferred via Zoom with Claimants and their counsel on May 24, 2021.  *Id.* ¶ 7.

## IV.   BACKGROUND ON BITCOIN AND THE BLOCKCHAIN

### A.   Bitcoin Overview

Bitcoin is a type of virtual currency.  Haynie Decl. ¶ 11.  Virtual currency (also known as cryptocurrency or digital currency) is a digital representation of value that can function as a medium of exchange, a unit of account, and/or a store of value.  *Id.*  To send and receive bitcoin, the parties involved in a transaction use Bitcoin "addresses."  *Id.* ¶ 12.  A Bitcoin address is somewhat analogous to a bank account number and is represented as a 26-to-35-character-long case-sensitive string of letters and numbers.  *Id.*  Each Bitcoin address is controlled through the use of a unique, private key.  *Id.*  This

1   key is the equivalent of a password or PIN and is necessary to access the funds associated with a Bitcoin

2   address.  *Id.*  Only the holder of a Bitcoin address' private key can authorize transfers of bitcoin from

3   that address to other Bitcoin addresses.  *Id.*

4         When a sender initiates a Bitcoin transaction, the sender transmits a transaction announcement

5   across the peer-to-peer Bitcoin network.  *Id.*  ¶ 13. To complete a transaction, a sender needs only the

6   Bitcoin address of the receiving party and the sender's own private key.  *Id.*  This information on its own

7   rarely reflects any identifying information about either the sender or the recipient.  As a result, little-to-

8   no personally identifiable information about the sender or recipient is transmitted in a Bitcoin

9   transaction itself.  *Id.*  Once the sender's transaction announcement is verified by the network, the

10  transaction is added to the blockchain, a decentralized public ledger that records every Bitcoin

11  transaction.  *Id.*  The blockchain logs every Bitcoin address that has ever received bitcoin and maintains

12  records of every transaction for each Bitcoin address.  *Id.*

13        While a Bitcoin address owner's identity is generally anonymous within the blockchain (unless

14  the owner chooses to make information about the owner's Bitcoin address publicly available),

15  investigators can often use the blockchain to identify the owner of a particular Bitcoin address.  *Id.*  ¶ 14.

16  Because the blockchain serves as a searchable public ledger of every Bitcoin transaction, investigators

17  can trace transactions to, among other recipients, virtual currency exchanges.  *Id.*

18      **B.**    **Reviewing the Bitcoin Public Ledger**

19        The Bitcoin public ledger can be accessed from any computer connected to the internet simply

20  by searching for it in a search program like Google.  *Id.*  ¶ 15.  The entire Bitcoin public ledger is stored

21  on most of the computers that make up the peer-to-peer network.  *Id.*  Importantly, once a Bitcoin

22  address is used, it becomes traceable by the history of all transactions involving that address.  *Id.*  ¶ 16.

23  Anyone can see the balance and all transactions of any address, which is part of the public ledger.  *Id.*

24      **C.**    **Proving Ownership of a Bitcoin Address**

25        An individual can prove ownership of a Bitcoin address by using the address itself to sign a

26  message via digital signature.[4]  *See id.*  ¶ 17.  The signing mechanism is the primary way of proving that

27  _____

28      [4] *See also* https://coinguides.org/sign-verify-bitcoin-address/ ("Digital signature is a
mathematical way of authenticating documents and digital messages.  The signing mechanism is the

a particular message or a piece of data comes from your end and not from someone else.  *Id.*  By signing a message to a Bitcoin or cryptocurrency address, the signer is demonstrating that they are the owner of the funds that a wallet holds.  *Id.*  In other words, the digital signature acts as proof that someone controls the private keys of a particular address.  *Id.*

## V.    LEGAL STANDARD

### A.    The Claim Must Comply with the Requirements in Rule G(5)(a)

Pleadings in civil forfeiture actions must be filed in accordance with the Supplemental Rules.  *See* 18 U.S.C. § 983(a)(4)(A).  Specifically, to pursue a claim, the claimant must demonstrate, in addition to the usual requirement of establishing Article III standing, *see Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146 (2013), compliance with "the jurisdictional procedural requirements" set forth in Supplemental Rule G(5).  *United States v. $100,348.00*, 354 F.3d 1110, 1126 (9th Cir. 2004).  Many courts refer to the latter as "statutory standing" and have held that it is established through compliance with Rule G.  *See id.*  At any point before trial, "the Government may move to strike the claimant's claim on the grounds that the claim does not comply with Supplemental Rule G(5) . . . or that the claimant lacks standing" pursuant to Supplemental Rule G(8)(c)(i)(A) & (B).  *United States v. $41,471.00*, No. 15-cv-00696, 2016 U.S. Dist. LEXIS 10952, *10 (C.D. Cal. Jan. 5, 2016); s*ee also United States v. $12,126.00,* 337 Fed. A'ppx 818, 820 (11th Cir. 2009); *United States v. $13,970.00*, 2007 WL 1231659 (M.D. Ga. 2007).

As many courts have recognized, there is a substantial danger of false claims in *in rem* actions where the government files an action against the property, and anyone who has notice of the action can file a claim.  Requiring strict compliance with the pleading requirements minimizes the danger of such claims by forcing the claimants to assert their ownership interest under oath.  For that reason, the pleading requirements are not treated as "mere procedural technicalit[ies]." *United States v. $487,825.00*, 484 F.3d 662, 664-65 (3d Cir. 2007).

//

---

way of proving that a particular message or a piece of data comes from your end and not from someone else.  By signing a message to your Bitcoin or crypto currency address you are demonstrating that you are the owner of the funds that a wallet holds . . . and prove that you control the private keys of the particular address.")

**B.      The Court May Strike a Claim Where the Claimant Lacks Standing**

To contest a forfeiture, a claimant must demonstrate both statutory and Article III standing.  *United States v. $1,181,895.00*, 2015 U.S. Dist. LEXIS 17448, 2015 WL 631394, at \*2 (C.D. Cal. Feb. 12, 2015).  Standing is a threshold jurisdictional issue in civil forfeiture cases, *see United States v. Cambio Exacto, S.A.*, 166 F.3d 522, 526-27 (2d Cir. 1999), and the government is entitled to "test" the veracity of the claimant's claim of ownership and interest any time after a claim is filed.  *See United States v. $133,420.00*, 672 F.3d 629, 642 (9th Cir. 2012).  In a civil forfeiture proceeding, standing is satisfied if the claimant can show "a colorable interest in the property, for example, by showing actual possession, control, title, or financial stake."  *United States v. 475 Martin Lane*, 545 F.3d 1134, 1140 (9th Cir. 2008).  The burden for showing standing rests on the party asserting it.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

If the claimant does not have a real interest in the property, there is no "case or controversy," and consequently no basis for the court to exercise jurisdiction under Article III of the Constitution.  *See United States v. 5208 Los Franciscos Way,* 385 F.3d 1187, 1191 (9th Cir. 2004).  The *in rem* nature of civil forfeiture actions creates a substantial danger that claims will be filed by persons with no real interest in the property.  Entirely frivolous claims may be filed by people who have no connection with the forfeiture case, except that they read about it on the Internet.  As the Ninth Circuit has explained, because the danger of false claims in civil forfeiture proceedings is "substantial," courts require more than "conclusory or hearsay allegations of some interest in the forfeited property."  *$100,348,* 354 F.3d at 1118-19.

## VI.     ARGUMENT

### A.      Claimants' Claims are Untimely and Should be Stricken

#### 1.      Relevant Law on Deadlines in Civil Forfeiture Actions

In a civil forfeiture case, the government is the plaintiff and initiates the action by the filing of a verified complaint; the property is the defendant; and the claimant is an intervenor seeking to challenge the forfeiture.  *See United States v. One-Sixth Share*, 326 F.3d 36, 40 (1st Cir. 2003).  Once a complaint for forfeiture is filed, the government must provide notice to potential claimants by publication and, in

some cases, by direct notice.  First, the government must publish notice, which is typically done by posting notice on an official government forfeiture website for at least 30 consecutive days.  *See* Supp. Rule G(4)(a)(iv)(C).  Second, the government "must send notice of the action and a copy of the complaint to any person who reasonably appears to be a potential claimant on the facts known to the government before the end of the time for filing a claim under Rule G(5)(a)(ii)(B)."  Supp. Rule G(4)(b)(i).  The rule also states that "[a] potential claimant who had actual notice of a forfeiture action may not oppose or seek relief from forfeiture because of the government's failure to send the required notice."  Supp. Rule G(4)(b)(v).

Supplemental Rule G(5)(a)(ii) sets the time within which any potential claimants must file claims to the defendant property identified in the complaint, stating in relevant part:

Unless the court for good cause sets a different time, the claim must be filed:

(A) by the time stated in a direct notice sent under Rule G(4)(b); [or]

(B) if notice was published but direct notice was not sent to the claimant or the claimant's attorney, no later than 30 days after final publication of newspaper notice or legal notice under Rule G(4)(a) or no later than 60 days after the first day of publication on an official internet government forfeiture site.

Supp. Rule G(5)(a)(ii).

The purpose of these strict time limitations "is to force claimants to come forward as soon as possible after forfeiture proceedings have been initiated so that all interested parties can be heard and the dispute resolved without delay."  *United States v. 1982 Yukon Delta Houseboat*, 774 F.2d 1432, 1436 (9th Cir. 1985).  Supplemental Rule G(5) does grant district courts discretion to extend these claim deadlines for good cause, but that discretion "is not unbounded," and should only be exercised where "the goals underlying the time restriction and the verification requirement are not thwarted."  *1982 Yukon Delta Houseboat*, 774 F.2d at 1435-36.

The Ninth Circuit has identified certain factors that lower courts should consider in ruling on an untimely claim.[5]  These factors include:  (1) when claimant became aware of the currency's seizure; (2)

---

[5] The Ninth Circuit has also adopted factors articulated by the Fourth and Seventh Circuits, which are also discussed here.

whether the United States Attorney may have encouraged the delay; (3) the claimant's health; (4) whether the claimant was properly served; (5) any prejudice to the government in permitting the claims to go forward; (6) whether the claimant informed the government and the court of its interest before the claims deadline; (7) whether the claimant expended resources preparing for trial; (8) the claimant's good faith; (9) whether the government complied with its procedural rules; (10) whether the claimant was acting *pro se*; (11) whether the claimant petitioned for an enlargement of time; and (12) the sufficiency of the proposed claim. *$100,348.00*, 354 F.3d at 1118. *See also United States v. $1,546,076.35 in Bank Funds Seized*, No. 18-cv-08420, 2021 U.S. Dist. LEXIS 70873, at *5-6 (C.D. Cal. Jan. 6, 2021); *United States v. $43,029*, No. 06-cv-07421, 2008 U.S. Dist. LEXIS 141311, at *8 (N.D. Cal. July 3, 2008).

Courts are particularly strict in enforcing the timeliness requirements. As one court stated, "[t]he intent of Supplemental Rule G(5) plainly is that claimants who fail to timely file forfeit their claims unless they possess an adequate excuse. Allowing a late filing would subvert the strict time limits established by Supplemental Rule G(5) and encourage claimants to litigate every untimely filing in a forfeiture case." *United States v. $25,790*, 2010 WL 2671754, *4 (D. Md. July 2, 2010).

> **2. The Factors Endorsed by the Ninth Circuit and Articulated in *$100,348.00* Weigh in Favor of Striking Claimants' Untimely Claims Pursuant to Rule G(8)(c)(i)(A)**

In this case, timely claims to the Defendant Property had to be filed no later than January 26, 2021, yet Claimants filed their claims seven weeks late. To excuse this untimely filing, the Court must find good cause, which it cannot do under the facts and circumstances present here.

> **a. In Addition to Publication by the Government, the Seizure was Well Publicized, and Claimants Had Been Aware of the Wallet Since 2019 But Did Not Notify the Government (First and Sixth Factors)**

The existence of the Defendant Property was well known. Given its sheer value and the fact that 1HQ3 was one of the most sought-after Bitcoin addresses, its seizure was highly publicized in multiple national news outlets, including the Wall Street Journal, Forbes, The Guardian, and many others. Indeed, the government's seizure of the 69,370 Bitcoin on November 3, 2020 was—and still is—the largest seizure of cryptocurrency in the history of the Department of Justice. Opposing counsel's memorandum and corresponding exhibits clearly show that the 1HQ3 was the Bitcoin address Ngan was

fraudulently attempting to sell—information which they had as early as April 9, 2019.  In this case, there has been no obscuring of the fact that the seized wallet was 1HQ3.  In fact, not only is the 1HQ3 Bitcoin address specified in the Complaint—it is the captioned Defendant.  Claimants had information about the Bitcoin address from Ngan's devices for a year and a half prior to the seizure.  Despite this, Claimants never advised the Court or the government of their interest in the Defendant Property before the claim deadline.  Accordingly, the first and sixth factors weigh in favor of striking Claimants' pleadings.

### b.   The Government Never Encouraged Delay and Provided Proper Notice (Second, Fourth, and Ninth Factors)

The government never encouraged a delay with respect to any of the claimants participating in this action.  At the time of seizure, the government's sole objective was to give notice to the public and known claimants as quickly as possible.  The government provided direct notice to the only individual it knows to have an interest in the Defendant Property—Ross Ulbricht—because it constitutes stolen proceeds of Silk Road and its associated sales of drugs and other illegal goods and services.  The government further adhered to the noticing requirements set forth in Rule G by issuing notice by publication as quickly as possible.

The government (including multiple law enforcement agencies and U.S. Attorney's Offices) has extensively investigated Silk Road, Ulbricht, and related matters for years.  Nothing in the government's investigations has linked Silk Road's criminal proceeds to anyone other than Ulbricht.  Certainly, Ngan was not on the government's radar because he has zero connection to Silk Road, Ulbricht, or Individual X.  Under Claimants' theory, the government would have had to provide notice to all potential victims of any scams involving 1HQ3, which would be absurd and is not what the rules require.

### c.   The Claimants Delay Was Not Due to Health Problems (Third Factor)

With respect to the third factor (physical health), Claimants are corporate entities and health problems cannot be a basis for the failure to file timely claims.

### d.   Allowing Claims to Proceed Would Prejudice the Government (Fifth Factor)

The fifth factor, prejudice to the government, similarly weighs against finding good cause here. The Defendant Property is cryptocurrency.  The inherent and continuous change in the value of Bitcoin

1   prejudices the United States because it adds to the uncertainty of the value of the Defendant Property it

2   is seeking to forfeit.  Indeed, at its highest point in mid-April, Bitcoin reached over $63,000 in value.[6]

3   As of June 26, 2021, the value of Bitcoin fell to under $31,000, representing a drop in value of over fifty

4   percent from its peak just two months prior.[7]  Permitting this case to move forward, especially in light of

5   the substantive issues underpinning the Claimants' claims (described below), would undermine one of

6   Rule G's central goals—to "minimize[] the danger of false claims."  *United States v. $102,535.00*, 499

7   F. App'x 134, 136 (3rd Cir. 2012) (citation omitted).

8         Claimants' continued participation in these proceedings would not only overly complicate the

9   matters before the Court—it would also continue to contribute to the uncertainty of the value of the

10  Defendant Property.  Moreover, permitting the claims to proceed would expose the government and the

11  Court to exactly the type of time-consuming, protracted litigation over the claimant's standing to contest

12  the forfeiture that the pleading requirements were designed to avoid.  Further, as discussed in more

13  detail below, Claimants lack standing to bring their claims for reasons separate from timeliness,

14  rendering their continued participation in this action a general a waste of government and judicial

15  resources.  In that same vein, allowing Claimants to proceed would prejudice the government by inviting

16  other parties with no standing to attempt to intervene, resulting in a waste of judicial resources and

17  significantly adding to the time the government would need to effectively resolve the other timely

18  claims to the Defendant Property.  Accordingly, the fifth factor weighs in favor of striking Claimants'

19  pleadings.

20         **e.      Claimants Have Not Prepared for Trial (Seventh Factor)**

21         Striking the claim is proper pursuant to the seventh factor, given that there is no indication that

22  the Claimants have spent any time preparing for trial.

23  / / /

24  / / /

25  / / /

26

27         [6] *See* https://www.cnbc.com/2021/04/13/bitcoin-hits-new-all-time-high-above-62000-ahead-of-coinbase-debut.html.

28         [7] https://www.coindesk.com/price/bitcoin.

1

2

**f.      Claimant's Reason for Delay is Not Made in Good Faith (Eighth Factor)**

3       Following its meet and confer discussion on May 24, 2021, opposing counsel sent government

4  counsel an email responding to certain points made by the government during that meeting.  *See* Quiroz

5  Decl. ¶ 10 and Ex. 3.  In that email, opposing counsel contested the allegation that their clients' claims

6  are barred for lack of timeliness on three bases:  First, they argued that the government failed to conduct

7  its due diligence because it knew, or should have known, that Claimants "purchased all assets, known or

8  unknown, of Raymond Ngan—which include the contents of the 1HQ wallet . . . [and] should have

9  known, that it was required to provide Battle Born with written Notice of the Civil Asset Forfeiture, and

10  yet it failed to do so."  *See* Quiroz Decl. Ex. 3.  Second, they argued that the government's notice was

11  defective because it contained insufficient data "to reasonably apprise Claimants that their assets had

12  been seized and were subject to forfeiture."  *Id.*  Third, they claimed that because there has been no

13  material activity in the case, the government cannot show prejudice.  *Id.*  These assertions are meritless

14  and do not rise to the level of good cause such that the Court should exercise its discretion to excuse the

15  filing deadline.

16       In their email, counsel also asserted that the government strategically orchestrated the filing of its

17  Complaint in early November so that the Thanksgiving and Christmas holidays would have the effect of

18  minimizing notice to the public.  That assertion is nothing short of ridiculous and appears to be designed

19  to fabricate the Ninth Circuit's second factor—whether the government may have encouraged the delay.

20  The government seized 1HQ3 on November 3, 2020 when Individual X consented to the forfeiture of

21  the Defendant Property.  Acting expeditiously, it filed its Complaint two days later and swiftly provided

22  notice.  These allegations are contrary to acting in good faith.  Accordingly, the eighth factor weighs in

23  favor of striking Claimants' pleadings.

24       **g.      Claimants are not Acting *Pro Se* (Tenth Factor)**

25       This factor also weighs in favor of striking Claimants' pleadings.  Here we are not dealing with

26  *pro se* claimants without access to legal counsel.  To the contrary—Claimants are special purpose

27  vehicles that procure debt for profit and are represented by several well-compensated and seemingly

28

1  experienced counsel.  Further, they are backed by a billionaire entrepreneur with substantial resources

2  who has seemingly spared no expense in suing Ngan and investigating his assets to recover on his

3  investment.

4        Unlike other cases involving *pro se* litigants, there is no excuse for counsel to have filed as late

5  as they did, especially without warning to the government or filing a motion to permit a late claim.

6  Indeed, Counsel for Claimants never attempted to reach out to the government for an enlargement of

7  time, and never indicated their intent to file a claim to the government or the court prior to the filing

8  deadline.  As stated above, materials provided to the government show that forensic analysis of Ngan's

9  devices—which counsel argues revealed Ngan's interest in the Defendant Property—began as early as

10  April 9, 2019, well over *eighteen months* before the filing of this action.  Quiroz Decl. ⁋ 6.

11        Claimants failed to file by the deadline because their counsel did not know the deadline existed.

12  During the meet and confer meeting on May 24, 2021, counsel for the government stated that the filing

13  of their claims was untimely.  Quiroz Decl. ⁋ 8.  The response from opposing counsel was surprise and

14  an acknowledgment that they were not aware of the existence of the deadline.  *Id.*  Counsel for the

15  Claimants then asked for further information relating to that deadline, which government counsel

16  provided via email later the same day.  *Id.*  In that email, the government pointed out the January 26,

17  2021 deadline and attached the Declaration of Publication, which was filed on January 6, 2021 and

18  which clearly provides the statutory requirements for the timing of filing a claim.  *See* Quiroz Decl. ⁋ 8

19  and Ex. 2.  A claimant's attorneys' ignorance of the law does not excuse an untimely filing.[8]

20              **h.    Claimants Never Sought an Extension of Time (Eleventh Factor)**

21        The eleventh factor also weighs against Claimants, as they made no request to extend their time

22  to file a claim, despite being aware of this action before the deadline.  The burden is on Claimants to

23  provide information on when they learned of the action.  Because they initiated their forensic review of

24  Ngan's devices as early as April 9, 2019 (which contained the screenshot of 1HQ3 and the text and

25  email messages they so heavily rely on) and the government's seizure of the 69,370 Bitcoin was highly

26

27        [8] *See United States v. 1979 30-Foot Sea Ray*, 2000 WL 1889676, *1 (N.D. Ill. 2000); *United States v. $230,963.88*, 2000 WL 1745130, *3-4 (D.N.H. 2000); *United States v. $6,826*, 2010 WL

28  4053602, *2 (D. Vt. Oct. 14, 2010; *United States v. 6449 East Ferry*, 2006 WL 3097387, *5-6 (N.D. Okla. 2006; *United States v. $1,437.00*, 242 F. Supp. 2d 193, 196 (W.D.N.Y. 2002).

publicized upon the filing of its Complaint on November 5, 2020, Claimants cannot articulate an adequate basis for their delay without controverting their previous representations.  As stated above, Claimants did not file timely or request an extension of time because they simply did not know the deadline existed, which courts typically do not excuse.

### i. The Claims are Insufficient Because the Claimants Lack Standing (Twelfth Factor)

As explained in detail below, there is no connection between Ngan and Individual X, stolen property cannot be part of a bankruptcy estate, and title to the Defendant Property vested in the government prior to the creation of the bankruptcy estate.  Therefore, the claims lack standing in addition to being untimely and are therefore insufficient.  Accordingly, along with the other factors, the twelfth factor weighs in favor of striking Claimants' claims.

### 3. Courts Regularly Strike Claims on Timeliness Grounds

Courts "have emphasized that forfeiture claimants must strictly adhere to the filing requirements [of Rule G] to perfect statutory standing."  *$102,535.00*, 499 F. App'x at 136.[9]  The Ninth Circuit has similarly stated that standing to contest a forfeiture action can be conditioned on "strict compliance with filing requirements."  *United States v. Real Prop. Located at 17 Coon Creek Rd., Hawkins Bar California, Trinity Cty.*, 787 F.3d 968, 974 (9th Cir. 2015) (internal citations omitted).  This includes making a timely filing pursuant to Supplemental Rule G(5)(ii).  The timely filing of a claim is vital because it "allows the court to hear all interested parties and to resolve the dispute without delay," and of particular importance here, "it also minimizes the danger of false claims."  *$102,535.00*, 499 F. App'x at 136.  Rule G(8)(c)(1) provides that the government may move to strike a claim for failing to comply with Rule G(5) or because the claimant lacks standing.  *Id. at* 973.

Several courts have strictly enforced the mandate set forth in Rule G.  For example, in *United States v. Vehicle 2007 Mack 600 Dump Truck*, the court concluded that a claimant's filing of a claim

---

[9] *See also United States v. $12,126.00*, 337 F. Spp'x 818, 820 (11th Cir. 2009) ("We have emphasized that claimants must strictly adhere to the procedural requirements of the Supplemental rules to achieve statutory standing to contest a forfeiture action.");  *United States v. Thirty-Five Firearms*, 123 F. App'x 204, 206 (6th Cir. 2005); *United States v. Real Prop. Known as the Lido Motel*, 135 F.3d 1312, 1317 (9th Cir. 1998).

forty days after the expiration of the claims period merited striking the claim.  680 F. Supp. 2d 618, 824-825 (E.D. Mich. 2010).  Although the government attempted direct notice and notice by publication in that case, the court's reasoning is instructive.  Specifically, the court relied on the putative claimant's failure to present any "mitigating factors," or "evidence of a good faith attempt to file a timely claim," as well as the lack of evidence indicating the claimants' reliance on "some misinformation provided by the Government."  *Id.* at 824.  The court further cited "[t]he policies favoring timely disposition of assets, judicial economy, and finality of judgements" which "support application of a rule of strict compliance."  *Id.* (quoting *United States v. $11,918.00*, 2007 WL 3037307, at *7 (E.D. Cal. Oct. 17, 2007).[10]

### 4.   Only Extraordinary Circumstances Warrant an Extension

In *United States v. 2840 S. Ocean Blvd., Apt. No. 209*, a claimant failed to file a claim or an answer within the requisite time after provision of notice.  2017 WL 1533538 at *2 (E.D.N.Y. Apr. 21, 2017).  The Court noted that it had "discretion from the strict compliance ordinarily required by the Supplemental Rules," but that "such leniency [was] not warranted under [those] circumstances."  *Id.* Notwithstanding that claimant's *pro se* status, the court explained that "departing from the strict compliance standard is appropriate when, for example, 'claimants have timely placed the court and government on notice of their interest in the property and intent to contest the forfeiture, recognizing both the good-faith effort put forth and the lack of prejudice to the government under such circumstances.'"  *Id.* (quoting *United States v. $175,918*, 755 F. Supp. 630, 633 (S.D.N.Y. 1991)).  No such circumstances are present here.

In *$43,029*, a court in this district similarly declined to extend its discretion to permit a forfeiture case to proceed after the late filing of a complaint.  There, the claimant filed an answer to a forfeiture complaint over fifteen months late.  2008 WL 11515688, at *4.  The court concluded that the exercise of discretion to permit a late filing under the factors set forth in *$100,348* was inappropriate in light of the claimant's knowledge of the seizure of the property; his good health; the lack of evidence as to the

---

[10] *See also United States v. 323 Forrest Park Dr.*, 521 F. App'x 379, 384-85 (6th Cir. 2013) (striking pro se claim filed 2 days late); *United States v. $140,000*, 2010 WL 1704966 (two days late) (D.N.J. Apr. 26, 2010); *United States v. $7,000*, 583 F. Supp. 2d 725, 735 (three months late) (M.D.N.C. 2008). *United States v. $144,650*, 2013 WL 6384646 (D.N.J. Dec. 6, 2013) (one month late).

government's contributions to the delay; the claimant's failure to request an extension; and the claimant's failure to notify the government of his interest in the defendant property until well after the claims deadline had passed.  *Id.* at *4-5.  The court so held notwithstanding the claimant's purported lack of ability with the English language; difficulty in accessing resources in prison; and his *pro se* status.  *Id.*

The Court should strike the Claimants' claims forthwith—the facts present here do not warrant (or deserve) the Court's exercise of discretion to allow the claims to proceed, and doing so may thwart the goals underlying the limitation on filing claims.  *See $100,348.00*, 354 F.3d at 1117-18.  Because Claimants cannot demonstrate good cause for their late filings, the Court should follow the cases strictly applying Rule G and strike their claims.  If the Court elects to exercise its discretion and permits the claims to proceed notwithstanding their failure to follow the pleading requirements, other defects in Claimants' claim prove fatal to their cause.

## B.   Claimants Have No Standing Because Raymond Ngan and His Associates are Not Individual X

While the government sympathizes with Claimants' desire to recover on Bloom's investment and collect on the bankruptcy court's judgment, the reality is that they are looking in the wrong place. Raymond Ngan is not Individual X.  Haynie Decl. ¶ 4.  Neither are any of the 12 of Ngan's associates identified by Claimants' counsel.  *Id.* ¶ 5.  Individual X is in no way connected to the bankruptcy debtor from which Claimants are trying to recover.  As such, Claimants lack standing to bring their claims.

### 1.   Raymond Ngan

Who is Raymond Ngan?  By all information, he appears to be a swindler and a scammer.  In March 2017, Bloom won a record $2.2 billion judgment in Nevada District Court against Ngan, reportedly a Cambodian-born billionaire who had reneged on deals to provide $160 million in promised funding for a business venture.[11]  This award stemmed from a lawsuit filed by First 100 against Ngan.

---

[11] *See* Adam Candee, *Nevada Real Estate Investment Firm Receives $2.2 Billion Judgment*, Las Vegas Sun, March 29, 2018 (*available at* https://lasvegassun.com/news/2017/mar/29/nevada-real-estate-investment-firm-receives-22-bil/) ("According to court records, Ngan largely ignored for months a civil suit brought in June by First 100 LLC alleging he reneged on multiple agreements to provide backing to grow the company into a national outfit.")

Plaintiffs in the suit contended Ngan agreed to three separate funding agreements totaling $160 million to help scale up First 100.  *Id.*  Despite dozens of assurances of his commitments via text message to First 100 directors Jay Bloom and Chris Morgando from July 2015 to April 2016, Ngan never produced any money.[12]  *Id.*

Ngan purported to be a child refugee to the United States from a Cambodian concentration camp who attended the Massachusetts Institute of Technology at 14 years old.  *Id.*  He also claimed "to have amassed billions of dollars managing funds for Middle Eastern foreign governments and helping to found a major Asian retail business."  *Id.*  Ngan reportedly infuriated the Nevada court with his failure to appear or participate in the case.  *Id.*  ("In his ruling to strike Ngan's answer to the suit and enter judgment, [the judge] called Ngan's behavior 'egregious' and admitted his own 'exasperation.'")[13]

### 2.  Ngan's Claims of Ownership and Possession of 1HQ3 Appeared to be Another One of His Scams

Since 2013, 1HQ3 has been one of the most sought-after Bitcoin addresses in history given the large number of bitcoins it held for years.  Haynie Decl. ⁋ 6.  On November 2, 2020, it was number five among the top 100 richest Bitcoin addresses.  *Id.* and Exhibit 1 to Haynie Decl. (screenshot from a publicly available website showing 1HQ3 as the fifth richest Bitcoin address on November 2, 2020, with a balance of 69,370 BTC.)  The lure and notoriety of 1HQ3 has made it a target and/or subject of numerous scams for years.  Haynie Decl. ⁋ 7.  Numerous individuals have claimed possession of its private key, advertising it in online forums for sale.  *See id.* ⁋⁋ 7-9 (listing specific examples of scams involving 1HQ3).

An individual can prove ownership of a Bitcoin address by using the address itself to sign a message via digital signature.  Haynie Decl. ⁋ 17.  The signing mechanism is the primary way of

---

[12] Bloom reportedly became acquainted with Ngan in April 2015.  "Ngan negotiated at separate times in the following months to buy a majority stake in First 100 for $100 million and to purchase a pool of delinquent liens in Florida for $50 million."  *Id.*  Despite dozens of assurances of his commitments via text message to Bloom and Morgando from July 2015 to April 2016, Ngan never produced any money.

[13] In bankruptcy court, Ngan claimed his only asset was a checking account holding about $500.  *See* Keith Griffith, *Court Documents Suggest Identity of Silk Road Hacker Individual X*, Daily Mail, April 12, 2021 (*available at* https://www.msn.com/en-us/news/crime/court-documents-suggest-identity-of-silk-road-hacker-individual-x/ar-BB1fzZct).

1   proving that a particular message or a piece of data comes from someone's end and not from someone

2   else.  *Id.*  By signing a message to a Bitcoin or cryptocurrency address, the signer is demonstrating that

3   they are the owner of the funds that a wallet holds.[14]  *Id.*  The digital signature acts as proof that

4   someone controls the private keys of a particular address.

5         There is no evidence that Ngan ever possessed, owned, or controlled 1HQ3.  Exhibit 5, the

6   document provided by counsel for Claimants as "proof" that Ngan owned or controlled 1HQ3 (Quiroz

7   Decl. Ex. 1; Haynie Decl. Ex. 2) is nothing more than a screenshot of a Bitcoin address available to the

8   public on the top 10 richest Bitcoin address list.  *Id.* ¶ 19.  Nothing in that exhibit demonstrates proof of

9   ownership or control in any way.  *Id.*  By way of illustration, Special Agent Haynie does not have

10  control over 35hK24tcLEWcgNA4JxpvbkNkoAcDGqQPsP (hereafter "35hK") the richest Bitcoin

11  address as listed on Exhibit 1 to his declaration; however he (and anyone) can input that address into the

12  same website (blockchain.com) and generate a similar screenshot to Claimants' Exhibit 5.  *See id.* and

13  Ex. 3.  This is not proof that SA Haynie has ownership, possession, or control over 35hK and those in

14  the Bitcoin community would scoff at anyone suggesting as much.  *Id.* ¶ 19.  Indeed, Exhibit 5 was

15  extracted by doing nothing more than using a search function on blockchain.com.[15]  *Id.* ¶ 20.  If Ngan

16  legitimately had access to 1HQ3's private key, he could have signed a message with it.  Anyone doing

17  proper due diligence on a sale like Ngan supposedly proposed would have insisted on this rather than

18  rely on a screenshot of a public lookup of an address listed on the top 10 richest bitcoin address list.

19        It is quite remarkable that entities as familiar with, and aggrieved by, Ngan's lies and

20  misrepresentations as the Claimants—and who sued him as a result of those precise lies and

21

22      [14] For example, following the notorious Twitter hack in July of 2020 that compromised
approximately 130 Twitter accounts pertaining to politicians, celebrities, and musicians, IRS-CI special

23  agents seized the bitcoin received by the hackers through the scam and it is expected to be returned to
their rightful owners.  Haynie Decl. ¶ 18.  In the case of one victim, who needed to prove ownership of

24  the Bitcoin address he used to send funds to the scammers, the victim verified ownership of the Bitcoin
address by using the address to digitally sign a message.  *Id.*  This is how ownership of a Bitcoin address

25  is usually verified, not by simply providing a screenshot of a well-known address on a blockchain
explorer site.  *Id.*

26      [15] The link to

27  https://www.blockchain.com/btc/address/1HQ3Go3ggs8pFnXuHVHRytPCq5fGG8Hbhx is explicitly
stated in the footer of the exhibit; also, the document itself contains links to the website, which can be

28  accessed by any member of the public with an Internet browser.

1   misrepresentations—so heavily rely on his representations in texts and emails to others to convince the

2   government (and the Court) that Ngan's assertions of ownership of 1HQ3 are the truth.  The other

3   documents provided by opposing counsel—a draft Bitcoin Purchase and Profit Sharing agreement, notes

4   of Bitcoin sale procedures, emails discussing this purported purchase, a notice of conditional offer prior

5   to sale, and a letter of intent from the purported buyer—similarly prove nothing other than Ngan's

6   ability to orchestrate elaborate scams and deceive people.  The sale of that Bitcoin never happened

7   because neither Ngan nor his associates had possession or control over 1HQ3.  Just like his

8   representations to Bloom, it was all a lie.  Now Bloom wants to recover on his investment by demanding

9   immediate transfer of the Defendant Property based on the thinnest evidence.  Because there is no

10  relationship between his bankruptcy debtor and Individual X, Claimants' assertions do not rise to the

11  level of a colorable claim and must therefore be stricken.

12  ### C.   Raymond Ngan's Bankruptcy Estate Could Not Have Contained the Defendant Property Because a Thief Does Not Have a Legal Interest in Stolen Property

13

14          Claimants cannot demonstrate a valid ownership or possessory interest in the Defendant Property

15  and therefore lack standing to bring their claims.  *See United States v. $133,420.00*, 672 F.3d 629, 637-

16  38 (9th Cir. 2012).  Claimants assert that their interest in the Defendant Property arises from their

17  interest in Ngan's bankruptcy estate.  It is accordingly essential to determine whether the bankruptcy

18  estate ever maintained an interest in the Defendant Property.

19          "Congress has generally left the determination of property rights in the assets of a bankrupt's

20  estate to state law."  *In re Costas*, 555 F.3d 790, 792-93 (9th Cir. 2009) (quoting *Butner v. United States*,

21  440 U.S. 48, 54 (1979)).  Any determination of what constitutes an "interest in property" accordingly

22  requires evaluation under state law in the absence of a controlling federal interest.  *Id.* (quoting *Barnhill*

23  *v. Johnson*, 503 U.S. 393, 398 (1992)).  According to the claims, each claimant is a Nevada limited

24  liability company and the bankruptcy estate was formed in Nevada.  The property interests attributable

25  to this bankruptcy estate are therefore provided for under Nevada law.

26          In evaluating the interests of the bankruptcy estate, the court must consider how property came

27  into the possession of the debtor to determine the validity of title to the property.  The Defendant

28

1   Property constitutes proceeds of narcotics trafficking, among other unlawful activities.  In addition to the

2   illegal activity from which it was generated, the Defendant Property was stolen from Silk Road.  Thus,

3   even assuming Ngan was Individual X (which he is not), the Defendant Property could not become a

4   part of the bankruptcy estate because it was stolen.  *See* Dkt. No. 8 ¶ 16.

5       "[T]he proposition, long established at common law, [is] that a thief has no title to the property

6   he steals." *In re Elite Auto Dealer, Inc.*, 2020 WL 6598256, *7 n.9 (D. Nev. July 8, 2020) (quoting *In re*

7   *Newpower*, 233 F.3d 922, 929 (6th Cir. 2000)).  This longstanding principle is codified in Nevada law,

8   which provides that:

9         All property obtained by larceny, robbery, burglary or embezzlement and found in the
        possession of the thief or embezzler thereof, or in the possession of any receiver or

10       wrongful possessor of stolen property, shall be restored to the *owner*.

11   Nev. Rev. Stat. Ann. § 205.290 (emphasis added).  Accordingly, under Nevada law and at common law,

12   an individual who obtains property through theft has no enforceable title in that property.  *In re Elite*

13   *Auto Dealer, Inc.*, 2020 WL 6598256 at *7 ("It is axiomatic that a party cannot obtain an enforceable

14   legal right in property obtained illegally") (citing *In re Newpower*, 233 F.3d at 922 (embezzled funds

15   never became part of a bankruptcy estate)); *NML Cap., Ltd. v. Republic of Arg*, 2015 WL 1186548, at *1

16   (D. Nev. Mar. 16, 2016) (quoting *Robinson v. Goldfield Merger Mines Co.*, 206 P. 399, 401 (Nev.

17   1922)).  The Ninth Circuit has held that, in the context of bankruptcy proceedings, "[b]ankruptcy

18   trustees have been held to have no interest in property acquired by fraud of bankrupts, as against the

19   rightful owners of the property." *In re N. A. Coin & Currency, Ltd.*, 767 F.2d 1573, 1576 (9th Cir.

20   1985) (citations omitted).

21       Accordingly, even assuming Ngan was ever in possession of the Defendant Property, he would

22   not have held legal title to it because he would have obtained it through theft.  Any subsequent transfer

23   of the Defendant Property would be null and void because in cases where property is stolen, there is no

24   good title to pass along to a subsequent purchaser of the property.  *See* Restatement (Second) Torts, §

25   229, comment d ("[A] purported purchaser, an attaching creditor, a pledgee, a lessee, or a donee of a

26   thief acquires no legal interest in the goods pursuant to such a transaction").  Thus, even if Ngan had

27   possessed the Defendant Property, he would not have had a property interest in it and thus could never

28

have been part of his bankruptcy estate.  As such, Battle Born's purchase of Ngan's bankruptcy estate conferred to it no right to the Defendant Property.

### D.   A Criminal's Interest in Stolen Property Does Not Become Part of His Bankruptcy Estate Because of the Relation-Back Doctrine

Codified in both 18 U.S.C. § 981(f) and 21 U.S.C. § 853(c), "the 'relation back' doctrine vests all forfeited property in the United States upon the commission of the act giving rise to forfeiture.'" *United States v. French*, 822 F. Supp. 2d 615, 619 (E.D. Va. 2011) (citing 21 U.S.C. 853(c)).  As such, because a debtor in possession of property subject to forfeiture lacks an ownership interest in property subject to forfeiture, the trustee of his bankruptcy estate also lacks an ownership interest.  *See United States v. Hooper*, 229 F.3d 818, 822 (9th Cir. 2000);[16] *United States v. Zaccagnino*, 2006 WL 1005042, *4 (C.D. Ill. Apr. 18, 2006); *French*, 822 F. Supp. 2d at 618-19; *United States v. Silicon Valley Bank Acct.*, 549 F. Supp. 2d 940, 958 (W.D. Mich. 2008); *see also In re Cwnevada LLC*, 602 B.R. 717, 747 n.45 (Bankr. D. Nev. 2019).  The purpose of the relation back doctrine is to prevent criminal proceeds from being distributed (or, in this case, stolen) in a fashion to prevent forfeiture of those proceeds. *United States v. Wilson*, 659 F.3d 947, 953 (9th Cir. 2011).

In *Zaccagnino,* the defendants engaged in a scheme to defraud investors from June 1997, through April 9, 2002.  2006 WL 1005042, at *1.  On November 22, 1999, a defendant wire transferred $1 million to an account in Switzerland.  *Id*. at *2.  On April 9, 2002, the defendant filed bankruptcy in the Middle District of Florida.  On January 26, 2003, the United States filed an indictment and sought forfeiture of the $1 million.  On March 4, 2005, the Bankruptcy Court entered summary judgment in favor of the Bankruptcy Trustee and found that the funds in the Swiss bank were property of the bankruptcy estate.  *Id*. at *3.  On April 1, 2005, the defendant pled guilty to multiple counts of the superseding indictment and admitted the forfeiture allegations.  *Id*. at *4.  On May 16, 2005, the Court entered a Preliminary Order of Forfeiture as to the $1 million in the Swiss bank account.  In July 2005, the Bankruptcy Trustee filed a third-party claim to the $1 million in the criminal forfeiture action.  *Ibid*.

---

[16] Although *Hooper*'s relies on the criminal forfeiture relation-back doctrine, courts have relied on *Hooper* in civil cases as well. *See United States v. 148 Maunalanikai Pl.*, 2008 WL 3166799, *9-10 (D. Haw. Aug. 6, 2008); *United States v. 8110 E. Mohave Rd.,* 229 G. Supp. 2d 1046, 1048-49 (S.D. Cal. 2002).

In response, the government argued that this $1 million was "never properly part of the bankruptcy estate because of the relation-back doctrine." *Id*. at *8. The district court denied the trustee's claim, holding that:

> [T]he relation-back doctrine requires the Court to find that the Government's interest vested on November 22, 1999, the date that the money was transferred to Switzerland, two and a half years before the NMM bankruptcy estate was created. Accordingly, the Court finds that the Bankruptcy Trustee's claim to the $1 million being held in Switzerland does not have merit and the Government's motion to deny the claim is granted.

*Id*. at *10.

The Eastern District of Virginia reached a similar result in *French*. There, the defendant pled guilty to wire fraud and money laundering charges. 822 F. Supp. 2d at 616-17. Two months after the plea (but before sentencing), a third party filed an involuntary Chapter 7 bankruptcy petition against the defendant. *Id*. at 617. Sentencing occurred approximately one week after the local Bankruptcy Court had entered an order of relief and appointed a trustee for the defendant's estate, which is when the district court entered the relevant order of forfeiture. *Id*. The district court concluded, however, that notwithstanding the entry of an order of relief prior to the entry of an order of forfeiture, the relation back doctrine deprived the bankruptcy estate of the forfeitable property. *Id*.

In *In re Chapman*, the Bankruptcy Appellate Panel of the Ninth Circuit concluded that a civil forfeiture proceeding could continue notwithstanding (1) the continuous execution of the bankruptcy code's automatic stay, and (2) the fact that a forfeiture proceeding may deprive a bankruptcy estate of some of the defendant's property. 264 B.R. 565, 572 (B.A.P. 9th Cir. 2001). The Panel's recognition that civil forfeiture proceedings could legally result in the deprivation of property from the estate by operation of the relation-back doctrine is significant, particularly in cases involving the proceeds of crime. In *Hooper*, the Ninth Circuit noted that "[p]roceeds of crime . . . do not precede the crime." 229 F.3d at 822. The court noted that, as a result of that maxim, overcoming the relation-back doctrine would be extremely difficult for any claimant as proceeds of crime tend to automatically vest in the government upon the execution of the criminal activity, depending on the forfeiture statute being interpreted. *Id.* at 822-23.

1  Here, the "act[s] giving rise to forfeiture" occurred on or before May 6, 2012, when Individual X

2  stole the forfeitable criminal proceeds generated by Silk Road, five years before Ngan filed for

3  bankruptcy.  As such, the Defendant Property was never properly part of the bankruptcy estate—indeed,

4  it vested in the United States at the time the criminal activity was complete.  As the Defendant Property

5  vested in the United States long before Battle Born purchased Ngan's bankruptcy estate, Claimants have

6  no claim of ownership or possessory interests in the Defendant Property.

7  **VII.   CONCLUSION**

8  The claims at issue here are untimely and lack standing.  Claimants are unable to provide a

9  legitimate reason why they failed to make a timely filing.  Furthermore, there is no relationship

10 between Ngan and Individual X.  Ngan appears to be nothing more than a scammer, which the history

11 of his dealings with the Claimants alone proves.  Additionally, Ngan's bankruptcy estate could not

12 have contained the Defendant Property because a thief does not have a legal interest in stolen

13 property.  For these reasons, Claimants lack standing to bring their claims.  Permitting the claims to

14 proceed would expose the government and the Court to exactly the type of time-consuming, protracted

15 litigation over the claimant's standing to contest the forfeiture that the pleading requirements were

16 designed to avoid.  Given the facts set forth herein, Claimants cannot cure the defects in their claim

17 and allowing them to do so would be futile.  Accordingly, the Court should grant the government's

18 motion to strike Claimants' claims forthwith.

19

20 DATED:  July 13, 2021                    Respectfully submitted,

21                                          STEPHANIE M. HINDS
                                            Acting United States Attorney

22
                                            */s/ Claudia A. Quiroz*
23                                          DAVID COUNTRYMAN
                                            CHRIS KALTSAS
24                                          CLAUDIA A. QUIROZ
                                            WILLIAM FRENTZEN
25                                          Assistant United States Attorneys

26

27

28