STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

DAVID COUNTRYMAN (CABN 226995)
CHRIS KALTSAS (NYBN 5460902)
CLAUDIA A. QUIROZ (CABN 254419)
WILLIAM FRENTZEN (LABN 24421)
Assistant United States Attorneys

> 450 Golden Gate Avenue, Box 36055
> San Francisco, California 94102-3495
> Telephone: (415) 436-436-7428
> FAX: (415) 436-7234
> claudia.quiroz@usdoj.gov

Attorneys for United States of America

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>   v.<br><br>Approximately 69,370 Bitcoin (BTC), Bitcoin Gold (BTG), Bitcoin SV (BSV), and Bitcoin Cash (BCH) seized from 1HQ3Go3ggs8pFnXuHVHRytPCq5fGG8Hbhx<br><br>      Defendant.<br>_____<br>ILIJA MATUSKO,<br><br>      Claimant.<br>_____ | CASE NO. CV 20-7811 RS<br><br>**NOTICE OF MOTION AND MOTION TO STRIKE THE VERIFIED CLAIM OF CLAIMANT ILIJA MATUSKO**<br><br>Hearing Date:     September 9, 2021<br>Time:     1:30 p.m.<br>Court:     Hon. Richard Seeborg |

# TABLE OF CONTENTS

I.   Introduction ..................................................................................................................2

II.  Factual Background .......................................................................................................3

    A.  Silk Road and Ross Ulbricht ...................................................................................3

    B.  Theft of Bitcoin from Silk Road in 2012 .................................................................6

    C.  Takedown and Seizure of Silk Road Website in 2013 ..............................................6

    D.  The United States Attorney's Office for the Southern District of New York Provided Notice
        to All Potential Claimants of Silk Road Assets Starting on October 18, 2013……………..……8

    E.  Ulbricht's Indictment and Conviction ....................................................................9

    F.  Both Individual X and Ulbricht Consented to Forfeiture of the 69,370 BTC ..........9

III. Procedural History .......................................................................................................9

    A.   Initiation of *In Rem* Forfeiture Action ...................................................................9

    B.   Notice of Forfeiture Action ...................................................................................10

    C.   Matusko's Claim ..................................................................................................10

  IV. Legal Standard ...........................................................................................................11

    A.  The Claim Must Comply with the Requirements of Rule G(5)(a) ...........................11

    B.  The Court May Strike a Claim Where the Claimant Lacks Standing........................12

V. Argument ......................................................................................................................13

    A.  Matusko Lacks Standing to Bring His Claim Because His 48 BTC was Not Stolen by
        Individual X and is Not Contained in the Defendant Property.................................13

    B.  Matusko's Claim is Untimely .................................................................................16

       1.   Relevant Law on Deadlines in Civil Forfeiture Actions...................................16

       2.   The Factors Endorsed by the Ninth Circuit and Articulated in *$100,348.00* Weigh in
          Favor of Striking Claimants' Untimely Claims Pursuant to Rule G(8)(c)(i)(A) ..............17

          a.   In addition to Publication by the Government, the Seizure was Well Publicized, and
             Matusko Should Have Filed His Claim in the Southern District of New York by
             December 17, 2013 (First and Sixth Factors)...........................................................18

b.  The Government Never Encouraged Delay and Provided Proper Notice (Second, Fourth, and Ninth Factors) ...................................................................................19

c.  Matusko's Delay Was Not Due to Health Problems (Third Factor) ..........................20

d.  Allowing Matusko's Claim to Proceed Would Prejudice the Government (Fifth Factor) ...............................................................................................................................20

e.  Matusko Has Not Prepared for Trial (Seventh Factor) .............................................21

f.  Claimant's Reason for Delay is Not Made in Good Faith (Eighth Factor) ...............21

g.  Matusko is not Acting *Pro Se* (Tenth Factor) ..........................................................22

h.  Matusko Never Sought an Extension of Time (Eleventh Factor) .............................22

i.  The Claim is Insufficient Because Matusko Lacks Standing (Twelfth Factor) .........22

3.  Courts Regularly Strike Claims on Timeliness Grounds .................................................23

4.  Only Extraordinary Circumstances Warrant an Extension..............................................24

VI. Conclusion ...............................................................................................................................25

1

## TABLE OF AUTHORITIES

2

### Federal Cases

3

4
*Clapper v. Amnesty Int'l USA*,
    133 S. Ct. 1138 (2013) ............................................................................................................... 11

5
*Lujan v. Defenders of Wildlife*,
6
    504 U.S. 555 (1992) ................................................................................................................... 12

7
*United States v. 323 Forrest Park*,
    Dr., 521 F. App'x 379 (6th Cir. 2013) ..................................................................................... 23
8

9
*United States v. 475 Martin Lane*,
    545 F.3d 1134 (9th Cir. 2008) .................................................................................................. 12

10
*United States v. 1982 Yukon Delta Houseboat*,
11
    774 F.2d 1432 (9th Cir. 1985) .................................................................................................. 17

12
*United States v. 2840 S. Ocean Blvd., Apt. No. 209*,
13
    2017 WL 1533538 (E.D.N.Y. Apr. 21, 2017). ..........................................................................24

14
*United States v. 5208 Los Franciscos Way*,
    385 F.3d 1187 (9th Cir. 2004) .................................................................................................. 12
15

16
*United States v. $1,181,895.00*,
    2015 U.S. Dist. LEXIS 17448, 2015 WL 631394 (C.D. Cal. Feb. 12, 2015) ....................................... 12

17
*United States v. $7,000*,
18
    583 F. Supp. 2d 725 (M.D.N.C. 2008) ..................................................................................... 23

19
*United States v. $11,918.00*,
20
    2007 WL 3037307 (E.D. Cal. Oct. 17, 2007) ........................................................................... 23

21
*United States v. $12,126.00*,
    337 Fed. A'ppx 818 (11th Cir. 2009) ................................................................................ 11, 23
22

23
*United States v. $13,970.00*,
    2007 WL 1231659 (M.D. Ga. 2007) ......................................................................................... 11

24
*United States v. $25,790*,
25
    2010 WL 2671754 (D. Md. July 2, 2010) ........................................................................... 17, 18

26
*United States v. $43,029*,
    U.S. Dist. LEXIS 141311 (N.D. Cal. July 3, 2008)...........................................................17, 24
27

28

*United States v. $100,348.00,*
354 F.3d 1110 (9th Cir. 2004) .......................................................................... 11, 12, 17, 24

*United States v. $102,535.00,*
499 F. App'x 134 (3rd Cir. 2012) ................................................................................ 21, 23

*United States v. $133,420.00,*
672 F.3d 629 (9th Cir. 2012) ................................................................................. 12, 13, 14

United States v. $140,000,
2010 WL 1704966 (D.N.J. Apr. 26, 2010) ............................................................................ 23

*United States v. $144,650,*
2013 WL 6384646 (D.N.J. Dec. 6, 2013) ............................................................................. 23

*United States v. $175,918,*
755 F. Supp. 630 (S.D.N.Y. 1991) .................................................................................... 24

*United States v. $487,825.00,*
484 F.3d 662 (3d Cir. 2007)........................................................................................... 12

United States v. Cambio Exacto, S.A.,
166 F.3d 522 (2d Cir. 1999)........................................................................................... 12

*United States v. One-Sixth Share,*
326 F.3d 36 (1st Cir. 2003) ........................................................................................... 16

*United States v. Real Prop. Known as the Lido Motel,*
135 F.3d 1312 (9th Cir. 1998) ......................................................................................... 23

*United States v. Real Prop. Located at 17 Coon Creek Rd., Hawkins Bar California, Trinity Cty.,*
787 F.3d 968 (9th Cir. 2015) .......................................................................................... 23

*United States v. Thirty-Five Firearms,*
123 F. App'x 204 (6th Cir. 2005) ...................................................................................... 23

*United States v. Vehicle 2007 Mack 600 Dump Truck,*
680 F. Supp. 2d (E.D. Mich. 2010)………...…....................................................................23

*United States v. 2840 S. Ocean Blvd.*, Apt. No. 209,
2017 WL 1533538…………………………………………………………………………………24

**Federal Statutes**

18 U.S.C. § 981....................................................................................................... 8

18 U.S.C. § 981(b) .................................................................................................. 10

18 U.S.C. § 1956(a)(1) ............................................................................................. 9

18 U.S.C. § 983(a)(4)(A) .................................................................................... 11, 21

18 U.S.C. § 1030(a)(2) ............................................................................................. 9

18 U.S.C. § 1956 ..................................................................................................... 7

18 U.S.C. § 981(a)(1)(A) .................................................................................... 7, 10

18 U.S.C. § 981(a)(1)(C) ........................................................................................ 10

21 U.S.C. § 841(a)(1) ............................................................................................... 9

21 U.S.C. § 881(a)(6) ............................................................................................. 10

21 U.S.C. § 841 ....................................................................................................... 9

21 U.S.C. § 843 ....................................................................................................... 9

21 U.S.C. § 846 ....................................................................................................... 9

1    TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2         PLEASE TAKE NOTICE that on September 9, 2021, at 1:30 p.m., or as soon thereafter as the

3    matter may be heard, in Courtroom 3 of the above-entitled court located at 450 Golden Gate Avenue,

4    San Francisco, California 94102, the United States of America hereby respectfully moves to strike the

5    Verified Claim of Claimant Ilija Matusko.

6         The Motion will be based on this Notice of Motion and Motion, the attached Memorandum of

7    Points and Authorities, the Declaration of IRS-CI Special Agent Jeremiah Haynie, attached hereto as

8    Exhibit "A," the Declaration of Assistant United States Attorney Claudia A. Quiroz, attached hereto as

9    Exhibit "B," along with all exhibits, and all other files and pleadings in this matter.

10

11   DATED:  July 28, 2021                          STEPHANIE M. HINDS
                                                     Acting United States Attorney
12

13                                                    _/s/ Claudia A. Quiroz_____
                                                     DAVID COUNTRYMAN
14                                                   CHRIS KALTSAS
                                                     CLAUDIA A. QUIROZ
15                                                   WILLIAM FRENTZEN
                                                     Assistant United States Attorneys
16

17

18

19

20

21

22

23

24

25

26

27

28

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION

3        The United States of America hereby moves, pursuant to Supplemental Rule G(8)(c)(i)(A) and

4   (B) of the Federal Rules of Civil Procedure ("the Supplemental Rules"), to strike the verified claim and

5   statement of interest filed by Claimant Ilija Matusko for failure to comply with the pleading

6   requirements of Rule G(5) and because he lacks standing to bring his claim under Rule G(8)(c)(i)(B).

7        Matusko—the ninth claimant seeking to obtain a portion of Silk Road's criminal proceeds in

8   this matter—argues that in December 2011, he transferred 48 bitcoins (BTC) he lawfully purchased for

9   €150 Euros to a Bitcoin wallet associated with his user account on the Silk Road website.  Matusko

10  asserts that he never purchased anything from Silk Road and thus his 48 BTC remained idle in his

11  account until law enforcement took down the Silk Road website and seized its servers and assets in

12  October 2013.  Aware of the highly publicized law enforcement action at the time but purportedly

13  unaware of any rights under U.S. law to make a claim for his 48 BTC, he did not seek to recover his

14  bitcoin until May 2021, after seeking advice from counsel (and after Bitcoin hit its all-time-highest

15  value of $64,374 USD per bitcoin on April 14, 2021).  Matusko's claim fails on two grounds:

16       First, Matusko lacks standing to bring his claim because his 48 BTC are not part of the

17  Defendant Property at issue in this case.  Individual X stole the 70,411.46 BTC from Silk Road in May

18  2012, long before the government takedown of Silk Road in October 2013.  Individual X did not hack

19  Matusko's account or steal his BTC.  In fact, the BTC Individual X stole came from the general pool of

20  Silk Road bitcoin and not from any particular user accounts, meaning that no user balances were

21  impacted by the hack.  Indeed, database records show that Matusko's account had a balance of 47.52

22  BTC[1] for the seventeen months between Individual X's hack and the Silk Road takedown in October

23  2013.  This means that Matusko could have withdrawn his bitcoin at any time after the theft by

24  Individual X.  Matusko recognizes that he lost his bitcoin when law enforcement took down Silk Road,

25  yet somehow claims that he is entitled to recover 48 BTC from the Defendant Property.  Because he

26

27     _____
        [1] Matusko has rounded up this amount to 48 BTC.  For purposes of this motion and for
28  simplicity's sake, the government will similarly round up the amount (even though it accounts for a
    difference of approximately $18,000 USD).

U.S. MOTION TO STRIKE CLAIM OF ILIJA MATUSKO
CV 20-7811 RS

lacks standing to bring his claim, Matusko's claim must be stricken.

Second, Matusko's claim fails because it is untimely.  As it relates to this matter, Matusko's claim is over five months late because the statutory deadline to file a verified claim was January 26, 2021, yet he did not file his claim until July 2, 2021.  In reality, however, Matusko's claim is seven and a half years late and brought in the wrong jurisdiction.  Matusko lost access to his Silk Road account and corresponding balance of 48 BTC in October 2013.  He asserts that the United States never notified him of his rights in the 2013 forfeiture action via direct notice or any other publication.  However, the United States Attorney's Office for the Southern District of New York—who prosecuted Silk Road's creator and operator Ross Ulbricht and filed a corresponding civil forfeiture action for all assets of Silk Road including all bitcoins residing on its servers—did in fact give notice to all potential claimants by publishing a Notice of Forfeiture in the www.forfeiture.gov website for 30 days.  Accordingly, the deadline to file a claim for any Silk Road assets was December 17, 2013.  If Matusko wanted to file a claim for 48 BTC, he should have done so by December 17, 2013 and in the Southern District of New York.  Even if his claim was somehow proper in this district, there is no justification for filing five months late when proper notice was given.  Accordingly, the Court should strike Matusko's claim pursuant to Supplemental Rule G(8)(c)(i)(A) as untimely.

Given the nature of Matusko's claim, there is nothing he can do to cure these defects.  Because no other opportunities will change these facts, Matusko's claim must be stricken forthwith.

## II.    FACTUAL BACKGROUND

### A.    Silk Road and Ross Ulbricht

From its inception in 2011 until October 2013, when it was seized by law enforcement, the Silk Road hidden website ("Silk Road") was the most sophisticated and extensive criminal marketplace on the Internet, serving as a sprawling black-market bazaar where unlawful goods and services, including illegal drugs of virtually all varieties, were bought and sold regularly by the site's users.  *See* Declaration of IRS-CI Special Agent Jeremiah Haynie ⁋ 2 (hereinafter "Haynie Decl.") (attached hereto as Exhibit A).  During its two-and-a-half years in operation, Silk Road was used by thousands of drug dealers and other unlawful vendors to distribute hundreds of kilograms of illegal drugs and other illicit goods and services

to well over 100,000 buyers, and to launder hundreds of millions of dollars deriving from these unlawful transactions.  *Id.  See also id.*  ¶¶ 3-5 (describing the types of drugs and other criminal goods and services sold on the website).  Silk Road was owned and operated by its creator Ross William Ulbricht, a/k/a "Dread Pirate Roberts," a/k/a "DPR," a/k/a "Silk Road" (hereinafter "Ulbricht").  *Id.* ¶ 6.

The only form of payment accepted on Silk Road was bitcoin.  Haynie Decl. ¶ 7.  Upon registering an account with Silk Road, users were assigned a Bitcoin address.  *Id.*  Bitcoin sent to the user's Bitcoin address was credited to the user's account.  *Id.*  According to the Silk Road wiki web page, Silk Road used a "tumbler" to send "all payments through a complex, semi-random series of dummy transactions, . . . making it nearly impossible to link your payment with any coins leaving the site." *Id.*  In other words, if a buyer made a payment on Silk Road, the tumbler obscured any link between the buyer's Bitcoin address and the vendor's Bitcoin address where the bitcoin end up—making it fruitless to use the Blockchain to follow the money trail involved in the transaction, even if the buyer's and vendor's Bitcoin addresses are both known.  *Id.*  The only function served by Silk Road's implementation of such "tumblers" is to assist with the laundering of criminal proceeds.  *Id.*  All told, Silk Road generated sales revenue totaling over 9.5 million BTC, and collected commissions from these sales totaling over 600,000 BTC.  *Id.*  The figures were, at the time of Ulbricht's initial charges by complaint, equivalent to approximately $1.2 billion USD in sales and approximately $80 million USD in commissions.[2]  *Id.*

All of those bitcoins were subject to forfeiture as proceeds of the illegal activity conducted on Silk Road.  As the government noted in its sentencing memorandum for Ulbricht in the Southern District in New York:

> Silk Road was an online black market of unprecedented scope. By the time it was shuttered in October 2013, over 13,000 offerings were listed on its homepage for illegal drugs of every conceivable variety. A wide variety of other illicit goods and services were sold on the site as well, including fake IDs and passports, computer-hacking tools and services, counterfeit goods and pirated media, criminal guidebooks and instruction manuals, and money laundering services. In total, over 1.5 million transactions were conducted over Silk Road, involving over 100,000 buyer

---

[2] Under a current valuation of $40,058.10 USD Bitcoin as of July 28, 2021, that would be equivalent to approximately $380 billion USD in sales and approximately $24 billion USD in commissions.

accounts and nearly 4,000 seller accounts. Those transactions had a total value of nearly $214 million in U.S. currency. Nearly 95 percent of those sales were for illegal drugs – including at least $8.9 million in sales of heroin, $17.3 million in sales of cocaine, and $8.1 million in sales of methamphetamine. The buyers and sellers involved in these transactions were spread across the world, from Argentina to Australia, from the United States to the Ukraine.

Ulbricht specifically designed Silk Road for the purpose of facilitating black-market transactions. He hosted the site on the Tor network to enable users to conduct business anonymously. He implemented a Bitcoin-based payment system to enable them to make payments and cash out proceeds without leaving behind a traditional money trail. He provided instruction on "stealth" shipping methods and other ways to evade detection by law enforcement. And he created a slick user interface aimed at making the illicit commerce on the site as simple and frictionless as ordinary online shopping.

*See United States v. Ross William Ulbricht*, Case No. CR-14-68, Dkt. No. 256 at 2 (S.D.N.Y.) (internal citations omitted) (hereinafter "SDNY Sentencing Memo").

Ulbricht controlled and oversaw all aspects of Silk Road.  Haynie Decl. ¶ 6.  He maintained the computer infrastructure and programming code underlying the Silk Road website; he determined vendor and customer policies, including deciding what could be sold on the site; he managed a small staff of online administrators who assisted with the day-to-day operations of the site; and he alone controlled the massive profits generated from the operation of the business.  *Id.*  The contents of the Silk Road web server included Ulbricht's own user account page, which reflected, among other things, his history of Bitcoin transactions on the site.  *Id.*  Ulbricht's transaction history reflects that he received a continuous flow of Bitcoins into his Silk Road account.  For example, on July 21, 2013 alone, Ulbricht received approximately 3,237 separate transfers of Bitcoins into his account.  *Id.*  Virtually all of those transactions were labeled "commission" in the "notes" appearing next to them, indicating that the money represented commissions from Silk Road sales.  *Id.*  Ulbricht's account page further displayed the total amount of bitcoins deposited in his Silk Road account, which, as of July 23, 2013, equaled more than $3.4 million.  *Id.*  Thus, it is clear that Ulbricht received a steady stream of commissions from Silk Road in the form of bitcoins.  The government's investigation in that case did not uncover any legitimate sources of income for Ulbricht at the time of his arrest.  *Id.*

Ulbricht created an escrow system for the website, "enabling him to collect payment from his customers remotely." SDNY Sentencing Memo at 4. He collected commissions automatically on every Silk Road sale, and prominently banned users from transacting business "out-of-escrow" in order to avoid these commissions—a prohibition that he and his support staff continually enforced. *Id.* at 15 (citing trial transcript). Ulbricht created this "escrow service—essentially himself—to hold the Bitcoins of a customer until the drugs arrived in good condition, so the customer had some recourse if the pills or powder didn't show up as expected." NATHANIEL POPPER, DIGITAL GOLD 72 (HarperCollins Publishers, 1st ed. 2016).

**B.     Theft of Bitcoin from Silk Road in 2012**

On May 6, 2012, Individual X, whose identity is known to the government, hacked Silk Road and stole 70,411.46 BTC from Bitcoin addresses controlled by the website. Specifically, Individual X used a vulnerability that allowed Individual X to withdraw funds from Silk Road without authorization. Haynie Decl. ⁋ 9. Individual X then sent the stolen Bitcoin to two Bitcoin wallet addresses that Individual X controlled: 1BADznNF3W1gi47R65MQs754KB7zTaGuYZ ("1BAD") and 1BBqjKsYuLEUE9Y5WzdbzCtYzCiQgHqtPN ("1BBq"). *Id.* The transfers to 1BAD and 1BBq came from the general pool of Silk Road bitcoin and not from any particular user accounts. *Id.*

On approximately April 9, 2013, Individual X sent 69,471.082201 BTC to 1HQ3Go3ggs8pFnXuHVHRytPCq5fGG8Hbhx ("1HQ3").[3] Dkt. No. 8 (Amended Complaint) ⁋ 17. Ulbricht became aware of Individual X's online identity and threatened Individual X for return of the cryptocurrency to Ulbricht. Individual X did not return the cryptocurrency, and instead kept it. *Id.* ⁋ 22.

**C.     Takedown and Seizure of Silk Road Website in 2013**

On October 1, 2013, Ulbricht was arrested in San Francisco, California and charged in the Southern District of New York via a criminal Complaint with narcotics trafficking conspiracy, computer hacking conspiracy, and money laundering conspiracy.[4] Haynie Decl. ⁋ 8. Having located a server

---

[3] As of November 3, 2020, 1HQ3 had a balance of 69,370.22491543 BTC. *See id.* ⁋ 19.

[4] Ulbricht had moved to San Francisco, within the Northern District of California, prior to his arrest and was operating Silk Road from the Northern District of California. After his arrest he was processed through the United States District Court for the Northern District of California before being removed to the Southern District of New York for prosecution. At the time of his arrest, Ulbricht was

1   containing the corresponding authentication key for the Silk Road website on the Tor network, law

2   enforcement simultaneously took down the website and seized its servers, including all bitcoins

3   contained in wallets residing within them.  *Id.*

4        The following day, on October 2, 2013, the United States commenced a civil action in the

5   Southern District of New York by filing a verified complaint seeking, among other things, forfeiture of

6   the Silk Road hidden website, any and all bitcoins contained in wallet files residing on Silk Road

7   Servers, and all property traceable thereto ("Defendants in Rem").  *See United States v. Any And All*

8   *Assets of Silk Road, Including But Not Limited To The Silk Road Hidden Website And Any And All*

9   *Bitcoins Contained In Wallet Files Residing On Silk Road Servers, Including The Servers Assigned The*

10  *Following Internet Protocol Addresses [] And All Property Traceable Thereto*, Case No. CV-13-06919,

11  Dkt. No. 4 (S.D.N.Y. Oct. 2, 2013) (hereinafter "SDNY Civil Forfeiture Action").  The complaint

12  sought forfeiture of the Defendants in Rem pursuant to Title 18, United States Code, Section

13  981(a)(1)(A), on the grounds that they constituted property involved in money laundering transactions,

14  in violation of 18 U.S.C. § 1956.  *Id.*  The complaint also sought the imposition of civil money

15  laundering penalties.  *Id.*

16       On October 1, 2013, the day of Ulbricht's arrest and the day prior to filing the forfeiture

17  complaint, the government filed a letter with the Court requesting the unsealing of the civil complaint,

18  the protective order, and any other documents in the civil forfeiture case.  SDNY Civil Forfeiture

19  Action, Dkt. No. 3.  In that letter, the government stated the following: "Ulbricht has now been arrested

20  in San Francisco on the charges in the Criminal Complaint.  The seizure of the Silk Road website and

21  the Bitcoins contained on Silk Road's servers is now underway, and is anticipated to be completed by

22  6:00 a.m. on October 2, 2013."  *Id.* at 1.  Recognizing the impact that this seizure would have on the

23  website's users, the government added the following in its letter:

24            *The seizure of the Silk Road website will affect tens of thousands of the*
             *website's users worldwide.*  Upon seizing the Silk Road website, the
25           United States will post a notice on the website, stating that the website has
             been seized pursuant to a court order.  *In order to allow the many users of*

26  _____

27  using a laptop, which was seized in connection with his arrest.  A subsequent search of his residence
    revealed several pieces of computer hardware belonging to him.  Federal law enforcement agents
28  recovered from the computer hardware a Bitcoin wallet containing approximately 144,336 Bitcoins.

1           *this illegal website, and the public generally, to understand why this*
2           *website has been shut down*, the United States wishes to make public the
        Civil Complaint and Protective Order.

3   *Id.* at 1-2 (emphasis added).

4       **D.**    **The United States Attorney's Office for the Southern District of New York Provided**
                **Notice to All Potential Claimants of Silk Road Assets Starting on October 18, 2013**
5

6          On October 18, 2013, the United States Attorney's Office for the Southern District of New York

7   published a Notice of Forfeiture in the www.forfeiture.gov website for 30 days, which was attached to

8   its Declaration of Publication filed on January 2, 2014.  *See* Declaration of Claudia A. Quiroz

9   (hereinafter "Quiroz Decl.") (attached hereto as Exhibit B) at Exhibit 1 (SDNY Civil Forfeiture Action,

10  Dkt. No. 13).  The notice listed the property against which the government filed a verified Complaint for

11  Forfeiture pursuant to 18 U.S.C. 981.  *Id.* at 3.  This included "[a]ny and all assets of Silk Road,

12  including but not limited to Silk Road Hidden Website," "[a]ny and all assets of Silk Road, including

13  but not limited to any and all Bitcoins contained in wallet files residing on Silk Road servers, including

14  the servers assigned to" six different Internet Protocol Addresses; and "[a]ny and all assets of Silk Road,

15  including but not limited to 27,618.69843, Silk Road Market Place Bitcoins as of block chain Account

16  Number 262280 which was seized on or about October 02, 2013."  *Id.*  The notice further stated that

17  "[a]ny person claiming a legal interest in the Defendant Property must file a verified Claim with the

18  court within 60 days from the first day of publication (October 18, 2013) of this Notice on this official

19  government internet web site . . . ."  *Id.*  The Notice of Publication was available on the

20  www.forfeiture.gov website for 24 hours per day between October 18, 2013 and November 16, 2013.[5]

21  *Id.* at 4.  Accordingly, pursuant to Rule G(5)(a)(ii)(C), the deadline to file a claim for any of those assets

22  was December 17, 2013, more than seven years prior to the date Matusko filed his claim.

23

24

25        [5] The government filed a separate and subsequent Notice of Forfeiture in the www.forfeiture.gov
   website for 30 additional days starting on November 8, 2013 through December 7, 2013 for the property
26  seized from Ulbricht's computer and residence, including  "all proceeds of all Bitcoins on Ulbricht's
   computer hardware traceable to the operation of Silk Road with public Key:
27  1FfmbHfnpaZjKFvyi1okTjJJusN455paPH which was seized on or about October 25, 2013 at 2825
   Diamond Street, San Francisco, CA."  SDNY Civil Forfeiture Action, Dkt. No. 14.

28  U.S. MOTION TO STRIKE CLAIM OF ILIJA MATUSKO
   CV 20-7811 RS

1    Ulbricht was the only individual to file a verified claim for the Bitcoin seized from his computer

2    wallet.  *See* SDNY Civil Forfeiture Action, Dkt. No. 11.  No claims were filed for the bitcoin seized in

3    connection with the Silk Road website takedown, which would have included the bitcoin in individual

4    user and vendor accounts.

5    On January 15, 2014, the District Court in the Southern District of New York entered a Partial

6    Judgment by Default and Order of Forfeiture ordering the forfeiture of the Silk Road website and "any

7    and all Bitcoins contained in the wallet files residing on Silk Road servers" (i.e., the "Silk Road Server

8    Bitcoins").  *See* SDNY Civil Forfeiture Action, Dkt. No. 19.

9    **E.      Ulbricht's Indictment and Conviction**

10    Ulbricht was subsequently indicted by a federal grand jury on February 4, 2014, for narcotics

11    trafficking conspiracy (21 U.S.C. § 841(a)(1)), engaging in a continuing criminal enterprise (21 U.S.C.

12    §§ 841, 843, and 846), computer hacking conspiracy (18 U.S.C. § 1030(a)(2)), and money laundering

13    conspiracy (18 U.S.C. 1956(a)(1)) in connection with his operation of the Silk Road website.  *United*

14    *States v. Ross William Ulbricht*, Case No. CR-14-68 (S.D.N.Y.).  In February 2015, a federal jury

15    convicted Ulbricht on seven counts including conspiracy to distribute narcotics and money laundering

16    following a four-week trial.  Dkt. Nos. 1, 8 ¶ 14.  On May 29, 2015, Ulbricht was sentenced to

17    double life imprisonment plus forty years, without the possibility of parole, in connection with his

18    ownership and operation of Silk Road. [6]

19    **F.      Both Individual X and Ulbricht Consented to Forfeiture of the 69,370 BTC**

20    On November 3, 2020, Individual X signed a Consent and Agreement to Forfeiture with the U.S.

21    Attorney's Office, Northern District of California.  Dkt. No. 8 ¶ 23.  In that agreement, Individual X,

22    consented to the forfeiture of the Defendant Property to the United States government.  *Id.*  That same

23    day, the United States took custody of the Defendant Property from 1HQ3.  *Id.* ¶ 24.

24    **III.    PROCEDURAL HISTORY**

25    **A.      Initiation of *In Rem* Forfeiture Action**

26    On November 5, 2020, the government initiated an *in rem* forfeiture action against

27

28    [6] *See* https://www.justice.gov/usao-sdny/pr/ross-ulbricht-aka-dread-pirate-roberts-sentenced-manhattan-federal-court-life-prison.

approximately 69,370 BTC obtained from 1HQ3, ("Defendant Property"), by filing a Civil Complaint for Forfeiture in this district.  Dkt. Nos. 1, 8 (Amended Complaint).  The government has traced the Defendant Property in its entirety to proceeds of criminal activity by Silk Road and Ulbricht.  *Id.*

On January 22, 2021, Ulbricht entered into a Settlement Agreement with the government in which he admitted that the Defendant Property was subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and 981(b) (funds involved in laundering of criminal proceeds), 981(a)(1)(C) (proceeds traceable to criminal activity), and 21 U.S.C. § 881(a)(6) (property traceable to narcotics trafficking) and consented to its forfeiture to the United States.  Dkt. No. 47.

### B.      Notice of Forfeiture Action

On November 5, 2020, simultaneous with the filing of its Complaint, the government filed a Notice of Forfeiture Action, advising all persons asserting an interest in the Defendant Property and who had received direct notice of the forfeiture action to file a verified claim with the Clerk of the Court pursuant to Supplemental Rule G(5).  Dkt. No. 3.  The government sent direct notice to Ulbricht in prison.  Ulbricht is the only individual known to the government with a potential interest in the Defendant Property and is therefore the only person who received direct notice.

On November 27, 2020, the United States posted Notice of Civil Forfeiture on an official government internet site (www.forfeiture.gov), which notified potential claimants that they had 60 days to file a verified claim with the Court.  Dkt. No. 25 (Declaration of Publication).  The Declaration of Publication stated that the Notice of Civil Forfeiture was posted for at least 30 days starting on November 27, 2020, as required by Supplemental Rule G(4)(a)(iv)(C). *Id.*  Pursuant to the Supplemental Rules, any potential claimants asserting a claim to the Defendant Property were thus required to file claims on or before January 26, 2021.

### C.      Matusko's Claim

Matusko claims that he is the "original, rightful, and innocent owner of at least 48 bitcoins . . . of the 69,370 bitcoins (BTC) seized from . . . 1HQ3."  Dkt. No. 87 ¶ 2.  Matusko argues that he "legally purchased 48 BTC from a third party in Germany for approximately €150 Euros."[7]  *Id.*  In December

_____

[7] As of July 28, 2021, the value of that bitcoin is approximately $1.9 million USD.

1   2011, Matusko opened an account on Silk Road under the username "hanson5" and transferred his 48

2   BTC to the Silk Road address associated with that user account.  *Id.*  According to Matusko, he did not

3   purchase any items from the Silk Road website and his 48 BTC remained idle in his account thereafter.

4   *Id.*  Matusko acknowledges that he was aware of the Silk Road takedown in 2013 and that he "most

5   likely" lost access to his user account and bitcoins at that time, yet he claims he was "unaware of any

6   third-party rights under U.S. law to make a claim for his legally obtain *[sic]* bitcoins."  *Id.* ⁋ 3-5.

7          Matusko also argues that the United States did not "ever notify [him] of his rights in the 2013

8   forfeiture action via direct notice or any other publication of information associated with his Silk Road

9   user account."  *Id.* ⁋ 5.  He also argues that he did not receive direct notice from the government in the

10  present case and claims that "[a]t no time was [he] aware of this civil judicial forfeiture action," even

11  though it was published on www.forfeiture.gov.  Matusko also recognizes that he now seeks recovery of

12  his Bitcoin to take advantage of the cryptocurrency's increased value since 2013.  *Id.* ⁋ 6.

13  **IV.    LEGAL STANDARD**

14         **A.      The Claim Must Comply with the Requirements in Rule G(5)(a)**

15         Pleadings in civil forfeiture actions must be filed in accordance with the Supplemental Rules.

16  *See* 18 U.S.C. § 983(a)(4)(A).  Specifically, to pursue a claim, the claimant must demonstrate, in

17  addition to the usual requirement of establishing Article III standing, *see Clapper v. Amnesty Int'l USA*,

18  133 S. Ct. 1138, 1146 (2013), compliance with "the jurisdictional procedural requirements" set forth

19  in Supplemental Rule G(5).  *United States v. $100,348.00*, 354 F.3d 1110, 1126 (9th Cir. 2004).  Many

20  courts refer to the latter as "statutory standing" and have held that it is established through compliance

21  with Rule G.  *See id.*  At any point before trial, "the Government may move to strike the claimant's

22  claim on the grounds that the claim does not comply with Supplemental Rule G(5) . . . or that the

23  claimant lacks standing" pursuant to Supplemental Rule G(8)(c)(i)(A) & (B).  *United States v.*

24  *$41,471.00*, No. 15-cv-00696, 2016 U.S. Dist. LEXIS 10952, *10 (C.D. Cal. Jan. 5, 2016); *see also*

25  *United States v. $12,126.00,* 337 Fed. A'ppx 818, 820 (11th Cir. 2009); *United States v. $13,970.00*,

26  2007 WL 1231659 (M.D. Ga. 2007).

27         As many courts have recognized, there is a substantial danger of false claims in *in rem* actions

28

where the government files an action against the property, and anyone who has notice of the action can file a claim. Requiring strict compliance with the pleading requirements minimizes the danger of such claims by forcing the claimants to assert their ownership interest under oath. For that reason, the pleading requirements are not treated as "mere procedural technicalit[ies]." *United States v. $487,825.00*, 484 F.3d 662, 664-65 (3d Cir. 2007).

## B. The Court May Strike a Claim Where the Claimant Lacks Standing

To contest a forfeiture, a claimant must demonstrate both statutory and Article III standing. *United States v. $1,181,895.00*, 2015 U.S. Dist. LEXIS 17448, 2015 WL 631394, at *2 (C.D. Cal. Feb. 12, 2015). Standing is a threshold jurisdictional issue in civil forfeiture cases, *see United States v. Cambio Exacto, S.A.*, 166 F.3d 522, 526-27 (2d Cir. 1999), and the government is entitled to "test" the veracity of the claimant's claim of ownership and interest any time after a claim is filed. *See United States v. $133,420.00*, 672 F.3d 629, 642 (9th Cir. 2012). In a civil forfeiture proceeding, standing is satisfied if the claimant can show "a colorable interest in the property, for example, by showing actual possession, control, title, or financial stake." *United States v. 475 Martin Lane*, 545 F.3d 1134, 1140 (9th Cir. 2008). The burden for showing standing rests on the party asserting it. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

If the claimant does not have a real interest in the property, there is no "case or controversy," and consequently no basis for the court to exercise jurisdiction under Article III of the Constitution. *See United States v. 5208 Los Franciscos Way,* 385 F.3d 1187, 1191 (9th Cir. 2004). The *in rem* nature of civil forfeiture actions creates a substantial danger that claims will be filed by persons with no real interest in the property. Entirely frivolous claims may be filed by people who have no connection with the forfeiture case, except that they read about it on the Internet. As the Ninth Circuit has explained, because the danger of false claims in civil forfeiture proceedings is "substantial," courts require more than "conclusory or hearsay allegations of some interest in the forfeited property." *$100,348,* 354 F.3d at 1118-19.

/ / /

/ / /

1

**V.    ARGUMENT**

2

    **A.    Matusko Lacks Standing to Bring His Claim Because His 48 BTC was Not Stolen by Individual X and is Not Contained in the Defendant Property**

3

4
    Matusko cannot demonstrate a valid ownership or possessory interest in the Defendant Property

5
and therefore lacks standing to bring his claim.  *See United States v. $133,420.00*, 672 F.3d 629, 637-38

6
(9th Cir. 2012).  He asserts that his interest in the Defendant Property arises from his Silk Road account

7
balance of 48 BTC, which was wiped out when law enforcement took down the website and seized its

8
servers in October 2013.

9
    When Individual X stole 70,411.46 BTC from Silk Road in May 2012, Individual X withdrew

10
the funds from the general pool of Silk Road bitcoin and not from any particular user accounts.  This

11
means that after these transfers were made, no user balances were impacted, including the balance of

12
hanson5, Matusko's Silk Road moniker.  Haynie Decl. ¶ 9.  Indeed, Matusko's 48 BTC remained in his

13
hanson5 account until Silk Road was taken down and its servers seized in October 2013—almost a year

14
and a half after the Defendant Property left Silk Road.  Matusko therefore does not have a colorable

15
claim to the Defendant Property, particularly because he acknowledges that he lost control over his 48

16
BTC when law enforcement took down Silk Road in October 2013, and not when Individual X hacked it

17
in May 2012.  *See* Dkt. No. 87 ¶ 5.

18
    By way of illustration, Matusko's situation is different from another notable theft of bitcoin from

19
Silk Road, namely that by former U.S. Secret Service Special Agent Shaun Bridges.  Haynie Decl. ¶10.

20
Bridges was involved in the investigation and arrest of a Silk Road moderator.  *Id.*  The moderator

21
provided the investigation team, including Bridges, with his Silk Road administrative login credentials.

22
*Id.*  Bridges used these credentials to reset specific vendor passwords which allowed him to take over the

23
accounts of multiple Silk Road vendors.  *Id.*  Bridges used his access to the vendor accounts to withdraw

24
bitcoin contained within the accounts to Bitcoin addresses he controlled.  *Id.*  The difference here is that

25
Bridges stole bitcoin from specific Silk Road vendor accounts and the balances of those accounts were

26
reduced accordingly within the Silk Road database.  *Id.*  Individual X, on the other hand, stole bitcoin

27
from a pool of Silk Road bitcoin.  *Id.*  Therefore, no particular vendor or user accounts were impacted.

28

*Id.*

Further, after Ulbricht realized that funds had been stolen from particular vendors during the Bridges theft, Ulbricht restored the vendors' balance back to what it was pre-theft. *Id.* ⁋ 11. Conversely, after Individual X stole from Silk Road, Ulbricht did not need to restore account balances because the theft was not from any particular Silk Road account. *Id.* In addition, Ulbricht did not disclose the theft of bitcoin and the theft did not have an impact on the users' ability to withdraw bitcoins for use in transactions on Silk Road. *Id.*

The theft of bitcoin by Individual X had no impact on the hanson5 Silk Road account balance. *Id.* ⁋ 12. A copy of the Silk Road server when it was seized in October 2013 showed that the hanson5 account received 47.52 bitcoin in December 2011. *Id.* The hanson5 Silk Road account had the same balance when the server was seized in October 2013, demonstrating that the account was unaffected when Individual X stole bitcoin from Silk Road in May 2012. *Id.* At any time from December 2011 to October 2013, the owner of the hanson5 account could have withdrawn bitcoin from the account. *Id.*

Silk Road was not a bank—it was a marketplace for narcotics and not a logical place for anyone to store their bitcoin. Although the government does not question Matusko's assertion that he did not purchase any items from Silk Road using his hanson5 account, his deposit of 47.52 BTC was the common first step for all purchasers of illicit goods and services on Silk Road. For illustrative purposes, below is a flowchart depicting Silk Road's payment system, which was entered into evidence at Ulbricht's trial as Exhibit 113A.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

U.S. MOTION TO STRIKE CLAIM OF ILIJA MATUSKO
CV 20-7811 RS

14

Although Silk Road had over 100,000 users, nobody filed a claim to the bitcoin seized when Silk Road was shut down and its servers with all of the bitcoin was seized—including all of Ulbricht's commissions, all of the bitcoin in escrow, and all funds in users' accounts.  The appropriate time for anyone using Silk Road for legitimate purposes to file a claim was on or prior to December 17, 2013, the last day of the Southern District's claims period after Silk Road was shut down.  Matusko accordingly has no standing in this action, as none of the funds he claims ever made it to 1HQ3 and were instead seized as part of the larger forfeiture action advanced by the Southern District of New York.  Thus, if Matusko ever had standing and a valid claim for his bitcoin, he should have brought his claim at that time in the Southern District of New York.

In short, because the bitcoin stolen by Individual X was not stolen from hanson5/Matusko, did not impact Matusko's Silk Road account balance, and did not prevent the withdrawal of funds from Matusko's account, Matusko does not have standing to bring a claim in this action and must therefore be stricken.

/ / /

### B.     Matusko's Claim is Untimely

Matusko filed his claim on July 2, 2021—eight months after the government filed its Complaint in this matter and five months after the deadline to file a claim expired.  *See* Dkt. No. 87.  While Matusko's claim appears to be is untimely by five months, it is actually seven and a half *years* late.

### 1.     Relevant Law on Deadlines in Civil Forfeiture Actions

In a civil forfeiture case, the government is the plaintiff and initiates the action by the filing of a verified complaint; the property is the defendant; and the claimant is an intervenor seeking to challenge the forfeiture.  *See United States v. One-Sixth Share*, 326 F.3d 36, 40 (1st Cir. 2003).  Once a complaint for forfeiture is filed, the government must provide notice to potential claimants by publication and, in some cases, by direct notice.  First, the government must publish notice, which is typically done by posting notice on an official government forfeiture website for at least 30 consecutive days.  *See* Supp. Rule G(4)(a)(iv)(C).  Second, the government "must send notice of the action and a copy of the complaint to any person who reasonably appears to be a potential claimant on the facts known to the government before the end of the time for filing a claim under Rule G(5)(a)(ii)(B)."  Supp. Rule G(4)(b)(i).  The rule also states that "[a] potential claimant who had actual notice of a forfeiture action may not oppose or seek relief from forfeiture because of the government's failure to send the required notice."  Supp. Rule G(4)(b)(v).

Supplemental Rule G(5)(a)(ii) sets the time within which any potential claimants must file claims to the defendant property identified in the complaint, stating in relevant part:

> Unless the court for good cause sets a different time, the claim must be filed:
>
> > (A) by the time stated in a direct notice sent under Rule G(4)(b); [or]
>
> > (B) if notice was published but direct notice was not sent to the claimant or the claimant's attorney, no later than 30 days after final publication of newspaper notice or legal notice under Rule G(4)(a) or no later than 60 days after the first day of publication on an official internet government forfeiture site.

Supp. Rule G(5)(a)(ii).

The purpose of these strict time limitations "is to force claimants to come forward as soon as possible after forfeiture proceedings have been initiated so that all interested parties can be heard and the

dispute resolved without delay." *United States v. 1982 Yukon Delta Houseboat*, 774 F.2d 1432, 1436

(9th Cir. 1985).  Supplemental Rule G(5) does grant district courts discretion to extend these claim

deadlines for good cause, but that discretion "is not unbounded," and should only be exercised where

"the goals underlying the time restriction and the verification requirement are not thwarted." *1982*

*Yukon Delta Houseboat*, 774 F.2d at 1435-

The Ninth Circuit has identified certain factors that lower courts should consider in ruling on an

untimely claim.[8]  These factors include:  (1) when claimant became aware of the currency's seizure; (2)

whether the United States Attorney may have encouraged the delay; (3) the claimant's health; (4)

whether the claimant was properly served; (5) any prejudice to the government in permitting the claims

to go forward; (6) whether the claimant informed the government and the court of its interest before the

claims deadline; (7) whether the claimant expended resources preparing for trial; (8) the claimant's good

faith; (9) whether the government complied with its procedural rules; (10) whether the claimant was

acting *pro se*; (11) whether the claimant petitioned for an enlargement of time; and (12) the sufficiency

of the proposed claim.  *$100,348.00*, 354 F.3d at 1118.  *See also United States v. $1,546,076.35 in Bank*

*Funds Seized*, No. 18-cv-08420, 2021 U.S. Dist. LEXIS 70873, at *5-6 (C.D. Cal. Jan. 6, 2021); *United*

*States v. $43,029*, No. 06-cv-07421, 2008 U.S. Dist. LEXIS 141311, at *8 (N.D. Cal. July 3, 2008).

Courts are particularly strict in enforcing the timeliness requirements in forfeiture actions.  As

one court stated, "[t]he intent of Supplemental Rule G(5) plainly is that claimants who fail to timely file

forfeit their claims unless they possess an adequate excuse.  Allowing a late filing would subvert the

strict time limits established by Supplemental Rule G(5) and encourage claimants to litigate every

untimely filing in a forfeiture case." *United States v. $25,790*, 2010 WL 2671754, *4 (D. Md. July 2,

2010).

**2.      The Factors Endorsed by the Ninth Circuit and Articulated in *$100,348.00*
Weigh in Favor of Striking Claimants' Untimely Claims Pursuant to Rule
G(8)(c)(i)(A)**

In this case, timely claims to the Defendant Property had to be filed no later than January 26,

2021, yet Matusko filed his claims over five months late.  To excuse this untimely filing, the Court must

---

[8] The Ninth Circuit has also further adopted factors articulated by the Fourth and Seventh
Circuits, which are also discussed here.

U.S. MOTION TO STRIKE CLAIM OF ILIJA MATUSKO
CV 20-7811 RS

17

find good cause, which it cannot do under the facts and circumstances present here.  Although

Matusko's claim is actually seven-and-a-half years late and filed in the wrong jurisdiction, his claim

must nonetheless be stricken as untimely even if it were appropriately brought here.

          **a.**    **In Addition to Publication by the Government, the Seizure was Well Publicized, and Matusko Should Have Filed His Claim in the Southern District of New York by December 17, 2013 (First and Sixth Factors)**

      Matusko admits that he was aware of the seizure of his 48 BTC in 2013.  In his claim, he states

that he was "generally aware" of the government's action in 2013 "as it made headlines worldwide."

Dkt. No. 87 ¶ 5.  He also applies this *general awareness* to the fact that he "most likely" lost access to

his user account and "most likely" lost access to his bitcoins at that time.  *Id.*  Matusko absolutely lost

access to his user account and bitcoins when the government shut down Silk Road and seized its servers

in 2013 and would have known this upon attempting to log on to his account.  Indeed, any Silk Road

user who attempted to access the website would have seen this takedown notice placed by law

enforcement in lieu of the homepage following its seizure:



Haynie Decl. ¶ 8.

Certainly, federal prosecutors in the Southern District of New York recognized that the takedown of the Silk Road website would "affect tens of thousands of the website's users worldwide" and asked to make public the Civil Complaint and Protective Order "[i]n order to allow the many users of this illegal website, and the public generally, to understand why this website has been shut down." SDNY Civil Forfeiture Action, Dkt. No. 3 at 1-2. Proper notice was given. The deadline to file a claim was December 17, 2013.

The Silk Road takedown and Ulbricht's arrest were publicized worldwide. A simple Google search for "Silk Road" or "Ulbricht" reveals countless articles starting in 2013 reporting on the issue. Years later, the seizure of the Defendant Property also became well known. Given its sheer value and the fact that 1HQ3 was one of the most sought-after Bitcoin addresses, its seizure was highly publicized in multiple national news outlets, including the Wall Street Journal, Forbes, The Guardian, and many others. The fact that the seizure was associated with Silk Road further enhanced its notoriety. Indeed, the government's seizure of the 69,370 Bitcoin on November 3, 2020 was—and still is—the largest seizure of cryptocurrency in the history of the Department of Justice.

Despite all of this, Matusko never advised the Court or the government of his interest in the Defendant Property before the claim deadline. Accordingly, the first and sixth factors weigh in favor of striking Matusko's pleadings.

> **b.     The Government Never Encouraged Delay and Provided Proper Notice (Second, Fourth, and Ninth Factors)**

The government never encouraged a delay with respect to any of the claimants participating in this action. At the time of seizure, the government's sole objective was to give notice to the public and known claimants as quickly as possible. The government provided direct notice to the only individual it knows to have an interest in the Defendant Property—Ross Ulbricht—because it constitutes stolen proceeds of Silk Road and its associated sales of drugs and other illegal goods and services. The government further adhered to the noticing requirements set forth in Rule G by issuing notice by publication without delay.

1   Matusko states in his claim that the United States did not notify him "of his rights in the 2013

2   forfeiture action via direct notice or any other publication of information associated with his Silk Road

3   user account.  *See* Dkt. No. 87 ⁋ 5.  This statement is incorrect, as the United States Attorney's Office

4   for the Southern District of New York provided adequate notice via publication on a government

5   website.  *See* Quiroz Decl., Ex 1.

6   With respect to the instant action, the government similarly provided adequate notice and

7   followed all relevant procedural rules.  For these reasons, the second, fourth, and ninth factors similarly

8   weigh in favor of striking Matusko's claim.

9   **c.    Matusko's Delay Was Not Due to Health Problems (Third Factor)**

10   With respect to the third factor (physical health), Matusko's health does not appear to be a basis

11   for the failure to file a timely claim.

12   **d.    Allowing Matusko's Claim to Proceed Would Prejudice the Government (Fifth Factor)**

13

14   The fifth factor, prejudice to the government, similarly weighs against finding good cause here.

15   The Defendant Property is cryptocurrency.  The inherent and continuous change in the value of Bitcoin

16   prejudices the United States because it adds to the uncertainty of the value of the Defendant Property it

17   is seeking to forfeit.  Indeed, at its highest point in mid-April, Bitcoin reached over $63,000 in value.[9]

18   By June 26, 2021, the value of Bitcoin fell to under $31,000, representing a drop in value of over fifty

19   percent from its peak just two months prior.[10]  Matusko's continued participation in these proceedings

20   would not only overly complicate the matters before the Court—it would also contribute to the

21   uncertainty of the value of the Defendant Property.

22   Moreover, permitting the claims to proceed would expose the government and the Court to

23   exactly the type of time-consuming, protracted litigation over the claimant's standing to contest the

24   forfeiture that the pleading requirements were designed to avoid.  As discussed above, Matusko lacks

25   standing to bring his claims for reasons separate from timeliness, rendering his continued participation

26

27   [9] *See* https://www.cnbc.com/2021/04/13/bitcoin-hits-new-all-time-high-above-62000-ahead-of-coinbase-debut.html.

28   [10] https://www.coindesk.com/price/bitcoin.

U.S. MOTION TO STRIKE CLAIM OF ILIJA MATUSKO
CV 20-7811 RS

in this action a general a waste of government and judicial resources.  In that same vein, allowing Matusko—a Silk Road account holder—to proceed in this action, would result in prejudice to the government by inviting potentially thousands of other parties with no standing to attempt to intervene, resulting in a waste of judicial resources and significantly adding to the time the government would need to effectively resolve the other timely claims to the Defendant Property.  Indeed, permitting this baseless claim to move forward would further undermine one of Rule G's central goals—to "minimize[] the danger of false claims." *United States v. $102,535.00*, 499 F. App'x 134, 136 (3rd Cir. 2012) (citation omitted).  For these reasons, the fifth factor weighs in favor of striking Matusko's pleadings.

### e.      Matusko Has Not Prepared for Trial (Seventh Factor)

Striking the claim is proper pursuant to the seventh factor, given that there is no indication that Matusko has spent any time preparing for trial.

### f.      Claimant's Reason for Delay is Not Made in Good Faith (Eighth Factor)

On June 1, 2021, Alexander Kugelman, Matusko's counsel, sent an email to Assistant United States Attorney ("AUSA") David Countryman stating that his client had recently learned of the seizure, that he might be making a claim, and that he was hoping to get an update on the current status of the action, including any timeline for filing a claim.  *See* Quiroz Decl., Ex. 2.  AUSA Countryman responded the same day, advising Mr. Kugelman that "[t]he Notice of Civil Forfeiture was posted on November 27, 2020, as required by Supplemental Rule G(4)" and accordingly "pursuant to 18 U.S.C. 983(a)(4)(A), the deadline to file a verified Claim with the Court expired on January 26, 2021." *Id.* AUSA Countryman attached the Declaration of Publication to his email and added that "[a]ny claim filed at this time would be untimely and subject to dismissal." *Id.*

In his email, Kugelman acknowledged that Matusko had just found out about the seizure, which is a clear statement as to why he did not make a claim sooner.  Whether or not it is true that a journalist who had previously published articles on Bitcoin and Silk Road[11] did not learn about the highly

---

[11] *See* https://taz.de/2-Zahlen-mit-Bitcoins/!142670/ (last visited July 23, 2021).  *See also* https://taz.de/Schlag-gegen-Online-Drogenhandel/!5057921/ (last visited July 23, 2021).

publicized seizure of one of the most sought-after Bitcoin addresses in history containing criminal proceeds from a dark net website with which he himself had a user account until eight months after it happened, the fact remains that the government provided adequate notice by publication in this action. Even then, it took Matusko an entire month to submit a four-page claim after his attorney reached out to government counsel, who told him that the deadline had passed and that any claim filed at that time would be untimely and subject to dismissal.

### g.    Matusko is not Acting *Pro Se* (Tenth Factor)

The tenth factor also weighs in favor of striking Matusko's claim.  Here, we are not dealing with a *pro se* claimant without access to legal counsel.  Matusko, who seems to have some knowledge about Bitcoin and Silk Road, is represented by counsel.  Unlike other cases involving *pro se* litigants, there is no excuse for counsel to have filed as late as he did, especially without warning to the government or filing a motion to permit a late claim.  Indeed, when counsel for Matusko reached out to the government it was already too late.

### h.    Matusko Never Sought an Extension of Time (Eleventh Factor)

The eleventh factor also weighs against Matusko, as he made no request to extend his time to file a claim.  The burden is on Matusko to provide information on when they learned of the action.  Given that the government's seizure of the 69,370 Bitcoin was highly publicized, Matusko cannot possibly articulate an adequate basis for his delay, especially after alerting the government that a claim was forthcoming a month before filing it.

### i.    The Claim is Insufficient Because Matusko Lacks Standing (Twelfth Factor)

As explained in detail above, Matusko has no standing to bring a claim in this action because the bitcoin stolen by Individual X was not stolen from his Silk Road account, did not impact his account balance, and did not prevent the withdrawal of funds from his account at any time prior to the October 2013 takedown.  Along with the other factors, the twelfth factor accordingly weighs in favor of striking Matusko's claim.

/ / /

### 3.    Courts Regularly Strike Claims on Timeliness Grounds

Courts "have emphasized that forfeiture claimants must strictly adhere to the filing requirements [of Rule G] to perfect statutory standing." *$102,535.00*, 499 F. App'x at 136.[12]  The Ninth Circuit has similarly stated that standing to contest a forfeiture action can be conditioned on "strict compliance with filing requirements." *United States v. Real Prop. Located at 17 Coon Creek Rd., Hawkins Bar California, Trinity Cty.*, 787 F.3d 968, 974 (9th Cir. 2015) (internal citations omitted).  This includes making a timely filing pursuant to Supplemental Rule G(5)(ii).  The timely filing of a claim is vital because it "allows the court to hear all interested parties and to resolve the dispute without delay," and of particular importance here, "it also minimizes the danger of false claims." *$102,535.00*, 499 F. App'x at 136.  Rule G(8)(c)(1) provides that the government may move to strike a claim because a claimant lacks standing. *Id. at* 973.

Several courts have strictly enforced the mandate set forth in Rule G.  For example, in *United States v. Vehicle 2007 Mack 600 Dump Truck*, the court concluded that a claimant's filing of a claim forty days after the expiration of the claims period merited striking the claim.  680 F. Supp. 2d 618, 824-825 (E.D. Mich. 2010).  Although the government attempted direct notice and notice by publication in that case, the court's reasoning is instructive.  Specifically, the court relied on the putative claimant's failure to present any "mitigating factors," or "evidence of a good faith attempt to file a timely claim," as well as the lack of evidence indicating the claimants' reliance on "some misinformation provided by the Government." *Id.* at 824.  The court further cited "[t]he policies favoring timely disposition of assets, judicial economy, and finality of judgements" which "support application of a rule of strict compliance." *Id.* (quoting *United States v. $11,918.00*, 2007 WL 3037307, at *7 (E.D. Cal. Oct. 17, 2007).[13]

---

[12] *See also United States v. $12,126.00*, 337 F. App'x 818, 820 (11th Cir. 2009) ("We have emphasized that claimants must strictly adhere to the procedural requirements of the Supplemental rules to achieve statutory standing to contest a forfeiture action.");  *United States v. Thirty-Five Firearms*, 123 F. App'x 204, 206 (6th Cir. 2005); *United States v. Real Prop. Known as the Lido Motel*, 135 F.3d 1312, 1317 (9th Cir. 1998).

[13] *See also United States v. 323 Forrest Park Dr.*, 521 F. App'x 379, 384-85 (6th Cir. 2013) (striking pro se claim filed 2 days late); *United States v. $140,000*, 2010 WL 1704966 (D.N.J. Apr. 26, 2010) (two days late); *United States v. $7,000*, 583 F. Supp. 2d 725, 735 (M.D.N.C. 2008) (three months late). *United States v. $144,650*, 2013 WL 6384646 (D.N.J. Dec. 6, 2013) (one month late).

#### 4.      Only Extraordinary Circumstances Warrant an Extension

In *United States v. 2840 S. Ocean Blvd., Apt. No. 209*, a claimant failed to file a claim or an answer within the requisite time after provision of notice.  2017 WL 1533538 at *2 (E.D.N.Y. Apr. 21, 2017).  The Court noted that it had "discretion from the strict compliance ordinarily required by the Supplemental Rules," but that "such leniency [was] not warranted under [those] circumstances." *Id.* Notwithstanding that claimant's *pro se* status, the court explained that "departing from the strict compliance standard is appropriate when, for example, 'claimants have timely placed the court and government on notice of their interest in the property and intent to contest the forfeiture, recognizing both the good-faith effort put forth and the lack of prejudice to the government under such circumstances.'" *Id.* (quoting *United States v. $175,918*, 755 F. Supp. 630, 633 (S.D.N.Y. 1991)).  No such circumstances are present here.

In *$43,029*, a court in this district similarly declined to extend its discretion to permit a forfeiture case to proceed after the late filing of a complaint.  There, the claimant filed an answer to a forfeiture complaint over fifteen months late.  2008 U.S. Dist. LEXIS 141311, at *4.  The court concluded that the exercise of discretion to permit a late filing under the factors set forth in *$100,348* was inappropriate in light of the claimant's knowledge of the seizure of the property; his good health; the lack of evidence as to the government's contributions to the delay; the claimant's failure to request an extension; and the claimant's failure to notify the government of his interest in the defendant property until well after the claims deadline had passed.  *Id.* at *4-5.  The court so held notwithstanding the claimant's purported lack of ability with the English language; difficulty in accessing resources in prison; and his *pro se* status.  *Id.*

The Court should strike Matusko's claim forthwith—the facts present here do not warrant the Court's exercise of discretion to allow the claims to proceed and doing so may thwart the goals underlying the limitation on filing claims.  *See $100,348.00*, 354 F.3d at 1117-18.  Because Matusko cannot possibly demonstrate good cause for his late filing, the Court should follow the cases strictly applying Rule G and strike his claim.  If the Court elects to exercise its discretion and permits Matusko's

1  claim to proceed notwithstanding his failure to follow the pleading requirements, other defects in his

2  claim prove fatal to his cause.

3  ## VI.    CONCLUSION

4          Approximately eight months after the government filed the instant complaint seeking to forfeit

5  69,370 BTC constituting proceeds of thousands of illegal drug sales and property involved in money

6  laundering transactions, and over five months after the deadline to file a claim expired, individuals and

7  corporate entities continue to come forward filing untimely claims for these tainted funds.  Although

8  Matusko argues that he purchased his 48 BTC legitimately and used it for no illegal purpose, he

9  nonetheless deposited it in a criminal marketplace.  While he is but one individual, it is important to

10 note that Silk Road had over 100,000 buyer accounts and nearly 4,000 seller accounts.  Over 1.5

11 million illegal transactions were conducted over Silk Road.  The government recognized in 2013 that

12 the seizure of Silk Road would affect tens of thousands of the website's users worldwide.  It did.

13 Matusko is one of those individuals.  If the Court allows the claim of someone like Matusko—a Silk

14 Road account holder—to proceed, it will signal to each and every individual who had an account with

15 Silk Road that the Defendant Property is fair game and that claims for seized Bitcoin are welcome.

16 For this reason, the Court should grant the government's motion to strike Matusko's claim before

17 exposing the government and the Court to time-consuming, protracted litigation over Matusko's

18 standing to contest the forfeiture, and before additional parties flood the Court with baseless claims.

19

20 DATED:  July 29, 2021                                    Respectfully submitted,

21                                                         STEPHANIE M. HINDS
                                                           Acting United States Attorney

22
                                                           */s/ Claudia A. Quiroz*
23                                                         DAVID COUNTRYMAN
                                                           CHRIS KALTSAS
24                                                         CLAUDIA A. QUIROZ
                                                           WILLIAM FRENTZEN
25                                                         Assistant United States Attorneys

26

27

28