1  STEPHANIE M. HINDS (CABN 154284)
   Acting United States Attorney
2
   HALLIE HOFFMAN (CABN 210020)
3  Chief, Criminal Division

4  DAVID COUNTRYMAN (CABN 226995)
   CHRIS KALTSAS (NYBN 5460902)
5  CLAUDIA A. QUIROZ (CABN 254419)
   WILLIAM FRENTZEN (LABN 24421)
6  Assistant United States Attorneys

7       450 Golden Gate Avenue, Box 36055
        San Francisco, California 94102-3495
8       Telephone: (415) 436-7428
        FAX: (415) 436-7234
9       claudia.quiroz@usdoj.gov

10 Attorneys for United States of America

11                      UNITED STATES DISTRICT COURT

12                     NORTHERN DISTRICT OF CALIFORNIA

13                          SAN FRANCISCO DIVISION

14

15 | UNITED STATES OF AMERICA,                    ) CASE NO. CV 20-7811 RS
                                                  )
16 |         Plaintiff,                           ) **REPLY IN SUPPORT OF MOTION TO STRIKE**
                                                  ) **THE CLAIMS OF CLAIMANTS BATTLE**
17 |    v.                                        ) **BORN INVESTMENTS COMPANY, LLC,**
                                                  ) **FIRST 100, LLC AND 1ST ONE HUNDRED**
18 | Approximately 69,370 Bitcoin (BTC), Bitcoin  ) **HOLDINGS, LLC**
    Gold (BTG), Bitcoin SV (BSV), and Bitcoin    )
19 | Cash (BCH) seized from                       ) Hearing Date:   September 9, 2021
    1HQ3Go3ggs8pFnXuHVHRytPCq5fGG8Hbhx           ) Time:           1:30 p.m.
20                                                ) Court:          Hon. Richard Seeborg
            Defendant.                            )
21                                                )
   First 100, LLC, 1st One Hundred Holdings,     )
22 | LLC, and Battle Born Investments             )
    Company, LLC,                                 )
23                                                )
            Claimants.                            )
24                                                )

25

26

27

28

REPLY IN SUPPORT OF U.S. MOTION TO STRIKE BATTLE BORN'S CLAIM
CV 20-7811 RS

**TABLE OF CONTENTS**

I. Introduction ..................................................................................................................... 1

II. Argument ......................................................................................................................... 2

    A. Claimants Fail to Provide a Legitimate Reason to Justify Their Untimely Claims ................. 2

    B. Claimants' Statement of Facts is Riddled with Inaccuracies and Unsupported Assumptions about Ngan's Possession of 1HQ3 ................................................................................. 6

    C. The Defendant Property Is Drug Money from Silk Road ....................................... 8

    D. Claimants' Challenge to the Source of the Defendant Property is Based on Flawed Assumptions and a Misreading of the Law ............................................................. 9

    E. The Contents of the 1HQ3 Wallet Never Became Part of the Bankruptcy Estate ................. 11

    F. Claimants' Challenge to the Relation Back Doctrine as it Applies to this Case is Deficient and Unsupported by the Facts ................................................................................. 12

    G. Claimants' Discovery Plan .................................................................................. 14

III. Conclusion ..................................................................................................................... 15

# TABLE OF AUTHORITIES

## Federal Cases

*In re Arenas*,
  535 B.R. 845, 851 (B.A.P. 10th Cir. 2015) ............................................................................. 12

*In re Burton*,
  610 B.R. 633, 637-38 (B.A.P. 9th Cir. 2020) ......................................................................... 12

*In re Olson*,
  2018 WL 989263 (B.A.P. 9th Cir. 2018) ................................................................................ 12

*In re Rent-Rite Super Kegs West, Ltd.*,
  484 B.R. 799, 805-806 (D. Colo. 2012) ................................................................................. 12

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988, 1002 (9th Cir. 2018) ......................................................................................... 8

*United States v. $25,790*,
  2010 WL 2671754 (D. Md. July 2, 2010) ................................................................................ 6

*United States v. One 1990 Beechcraft 1900 C Twin Engine Turbo-Prop Aircraft*,
  619 F.3d 1275, 1277 (11th Cir. 2010) ................................................................................... 13

*United States v. Ritchie*,
  342 F.3d 903, 907-08 (9th Cir. 2003) ...................................................................................... 8

## Statutes

18 U.S.C. § 981 ............................................................................................................................ 13

18 U.S.C. § 981(f) ........................................................................................................................ 13

18 U.S.C. § 983(d)(3)(A) ............................................................................................................. 13

18 U.S.C. § 983(d)(6)(A)-(B)……………………………………………………………………13

## I. INTRODUCTION

Claimants Battle Born Investments Company, LLC; First 100, LLC; and 1st One Hundred Holdings, LLC (collectively and hereinafter, "Claimants") come no closer to making a colorable claim in their opposition brief than they did in their verified claims or meet and confer discussions with government counsel. In plain terms, Claimants argue that they are entitled to special treatment with respect to lateness. As to standing, they make argumentative leaps amounting to nothing more than speculative assertions of ownership undermined by the very nature of the Defendant Property as illicit proceeds from a darknet marketplace.

Claimants provide no valid justification for their late filing. In fact, their rationale for asking the Court to give them a pass further militate in favor of dismissing their claims at this juncture. Claimants plainly admit that they did not know what the filing deadline was or even that it existed. To overcome this deficiency, they double down on their *mea culpa*, which actually has the effect of revealing the extent of their negligence in pursuing their claims. There may be situations where a late filing should be excused. This is not one of them.

Claimants also fail to demonstrate standing. Their arguments have evolved radically over a short period of time yet continue to miss the mark. Their claims are based on their purchase of the bankruptcy estate of Raymond Ngan, but there is no evidence that Ngan ever possessed, let alone legally owned, the bitcoin at issue. As an alternate theory, Claimants have argued that 13 different individuals purportedly associated with Ngan may be Individual X. Each of those guesses has been wrong, and there is no indication that those associations—such as being in the same city at the same time as Ngan—would make property stolen by another person the property of Ngan's bankruptcy estate.

The reasoning for this confusing line of argument is readily apparent—Claimants' attempt to discredit the government's conclusion regarding the source of the Defendant Property as originating in Silk Road is the only real avenue they have to overcome their lack of standing. According to the data preserved in Silk Road's servers, seized by the government in the prosecution of Ross Ulbricht and Silk Road in 2013, the Defendant Property in this case originated from the same addresses used by Silk Road users to purchase drugs and other illicit goods and services. In other words, before they were stolen and moved to 1BAD and 1BBq, the seized 69,370 bitcoins ("BTC") were located in wallets that were

subsequently seized and forfeited by the government in Ulbricht's criminal prosecution. This is confirmed by blockchain analysis and Ulbricht's own admission that the Defendant Property consists of proceeds traceable to criminal activity related to Silk Road, including narcotics trafficking and money laundering. Claimants accordingly have no basis for their claims, and the Court should strike them now.

Finally, to avoid unnecessary and protracted litigation, and to the extent that revealing Individual X's identity in a safe manner would assist the Court in evaluating the claims, the government is willing to disclose the identity of Individual X to the Court, *ex parte*, and in camera.[1]

## II.  ARGUMENT

### A.  Claimants Fail to Provide a Legitimate Reason to Justify Their Untimely Claims

Claimants admit that they missed the deadline to file their claims because they did not know what the deadline was or even that a deadline existed. Yet, they advance two main arguments to counteract this insurmountable hurdle, both of which militate in favor of striking their claims.

First, Claimants argue that they were entitled to direct notice, and demand an opportunity to conduct discovery to ascertain what steps the government took to identify them as potential claimants.[2] Ngan is one of dozens of individuals who have claimed ownership of 1HQ3 without having the private key to access or move the funds in the Bitcoin address.[3] All Claimants have connecting Ngan to 1HQ3

---

[1] There are real safety concerns for keeping the identity of Individual X confidential, including threats Individual X received from Ulbricht.

[2] Claimants also blame the government for not mentioning the deadline until the meet and confer on May 24, 2021. *See* Opp'n at 19 ("It was not until two months later, during a virtual meeting to discuss the claims on May 24, 2021, that the Government first mentioned that the claims were late."). Claimants insist on representing the nature of those discussions as settlement discussions. But as Jeffrey Nicholas states in his declaration, Claimants' counsel undertook a "process of compiling supporting documentation and preparing a memo outlining [their] position." Dkt. No 98-1 ¶ 5. A discussion of that compilation and the basis of their claims so that the government could better understand the claims was precisely the reason for the meeting on May 24. There was nothing to settle because at no point have Claimants articulated a claim sufficiently valid to warrant any type of settlement.

[3] Because Bitcoin was designed to cut out intermediaries, holding the private key is critical. Indeed, there is a reason for the phrase "not your keys, not your bitcoin," because it "exemplifies the importance of actually possessing the private key to a Bitcoin address to establish true ownership." Haynie Decl., Dkt. No. 90-1 ¶ 17. Claimants dismiss this reality by arguing that Bitcoin "lacks the traditional means of establishing ownership, or even possession . . . ." Opp'n at 8. But if Ngan was the true owner of 1HQ3, there is no reasonable explanation why other parties would have also had the private key to that address. If that was the case, the 69,370 BTC would not have lasted in 1HQ3 for a second—much less seven years. And if Individual X stole or illegitimately moved the bitcoin in 1HQ3 from Ngan—something not borne out by publicly available information on the blockchain—Ngan would have reported it to law enforcement. But Ngan did no such thing, because that did not occur.

is a screenshot of 1HQ3 from a publicly available website that Ngan sent in a text message to a private party. This screenshot, which could be generated by anybody, is insufficient to establish ownership, possession, or control. How this would trigger a direct notice requirement is incomprehensible.

According to Claimants, nothing in the record "suggests that the Government undertook an investigation concerning the identity of other persons or identities who may have an ownership interest in the 1HQ3 wallet." *See* Opposition Brief ("Opp'n"), Dkt. No. 98 at 13. This is simply incorrect. There is ample evidence of the investigation memorialized in each of the declarations submitted by Special Agent (SA) Haynie in this action. Moreover, the extent of the government's investigation into one of the most sophisticated online criminal marketplaces and subsequent prosecution of its owner cannot be overstated. When the government seized the Silk Road website in 2013, it preserved its servers, which contain the entire transaction history and users of the website. This includes a history of the transactions resulting in 70,411.46 BTC withdrawn from Silk Road on May 6, 2012 which, based on blockchain tracing, ended up in 1HQ3. The subsequent investigation of Silk Road's assets—including 1HQ3—revealed no connection whatsoever to Ngan or Claimants. Indeed, through its extensive investigation, the government found no other individual who would have a claim to the proceeds of Silk Road other than Ross Ulbricht. Claimants' argument that the government failed to conduct a proper investigation is smoke and mirrors, and nothing more than an attempt to conduct irrelevant discovery in this case.

Second, in simple terms, Claimants are asking for special treatment. Blaming the government for not providing direct notice is seemingly designed to circumvent Claimants' negligence in not pursuing timely claims despite—by their own admission—knowing about the 1HQ3 wallet's existence since at least 2019. *See* Opp'n at 11-12 (stating that Battle Born planned to compel Ngan to turn over the contents of 1HQ3 during an evidentiary hearing in the Bankruptcy Action in December 2019). Claimants argue that the value of the asset at issue must factor into the Court's evaluation of whether it should exercise its discretion to allow an untimely claim to proceed. Insofar as this case is concerned, the government wholeheartedly agrees. The value of the Defendant Property underscores Claimants' negligence in failing to make a timely claim. Given the sheer value of the Defendant Property—the seizure of 69,370 BTC from 1HQ3 is the largest seizure of cryptocurrency in the history of the Department of Justice and appears to be the most valuable asset ever seized under the Civil Asset

Forfeiture Reform Act—combined with their knowledge of their purported right to claim this asset, Claimants' failure to file timely claims is inexcusable. Claimants only needed to occasionally track the 1HQ3 wallet through the public blockchain, yet they failed to do even that with an asset valued in the billions of dollars.

There is no justification for a party who has spared no expense in hiring an army of lawyers and investigators not to file a claim for such a valuable asset on time. The Court does have the discretion to allow an untimely claim to proceed despite a failure to comply with the pleading requirements. But this case demonstrates precisely why courts have established a framework to guide courts in determining whether they should exercise that discretion. None of the factors adopted by the Ninth Circuit militate in favor of that exercise of discretion here. Saying "*mea culpa*, we missed the deadline, but give us a chance because it is a lot of money" does not cut it. The government is not aware of any cases or law that confer special rights to a wealthy party so that it can become richer. Under Claimants' argument, a Claimant of modest means who makes a claim for an asset of lower value should not get a pass.

Notably, of the numerous lawyers working for Claimants, one bankruptcy attorney—Ryan Andersen—reportedly "reviewed the docket entries in the forfeiture action on PACER" on January 29, 2021, the day after Jay Bloom reportedly received a text message from his business partner with a link to an article about the government's seizure. Opp'n at 13-14. By his own admission, Andersen did not review the limited entries on the docket. *See* Dkt. No. 98-5 ¶ 10 ("I did not see anything on the docket report to indicate a deadline for claimants to file a claim for the seized Bitcoins. As of January 29, 2021, the docket contained five entries entitled 'certificate of service' and I did not believe that a proof of service form would provide information relevant to the Claimants' claims."). This attempted justification is astounding. On January 29, 2021—the day Andersen reportedly reviewed the docket— there were only 46 docket entries in this matter. Several potential claimants had appeared in the case, which was patently clear on the face of the docket. Docket Entry No. 46, the last entry on the day Andersen reviewed the docket, is an Order granting Ross Ulbricht's *request for an extension of time to file a claim*, a description that was clearly stated in the minute entry. In fact, when Andersen reviewed the docket, the phrase "extension of time to file" appeared in four separate docket minute entries. That Andersen tries to hide behind the purported obscurity of certificates of service without bothering to open

a single one of them and choosing to overlook the fact that multiple claimants had filed motions to extend the time to file their claims is simply inexcusable, particularly when evaluating a potential recovery worth $2 billion dollars. Had Andersen taken a few minutes to look at the docket entries he would have seen that Dkt. No. 25, a three-page document titled "Declaration of Publication" filed on January 6, 2021, contained an attachment on page three stating that "[a]ny person claiming a legal interest in the Defendant Property must file a verified Claim with the court within 60 days from the first day of publication (November 27, 2020) of this Notice on this official government internet web site . . . ." Dkt. No. 25 at 3. Andersen further tries to justify his oversight by stating that his practice "specializes in bankruptcy matters and [he does] not have specific expertise in civil forfeiture." Dkt. No. 98-5 ¶ 10. But no specialty is necessary, much less required, for any lawyer to open a document on PACER and understand the meaning of a simple phrase setting out the framework for a filing deadline.

       To further underscore Claimants' negligence, it is difficult to comprehend how, having the bitcoin deposit address of 1HQ3 available to them as early as December 2019, and "data scientists, forensic experts, private investigators, and attorneys [hired since 2017] to assist Claimants in tracking down [] Ngan's assets . . . to enforce a [$2 billion dollar] judgment against him, and to track down the assets . . ." nobody bothered to keep track of 1HQ3 on the publicly available blockchain. Had they done so even on a semi-regular basis, they would have seen that one of the most valuable bitcoin addresses moved its funds on November 3, 2020, something that was widely reported by multiple global news outlets.[4] Indeed, unrelated parties started commenting on the movement of the 1HQ3 funds in social media minutes after it occurred and before news outlets picked up the story a day later. It is incomprehensible that while uninterested parties were tracking 1HQ3, Claimants did not. Even more astonishing is Claimants' failure to file their claims for nearly seven weeks after learning of the pending action, as well as their failure to file a motion to extend the time to file a claim when discovering their claims were late on May 24, 2021. Opp'n at 14; Dkt. No. 90-2 ¶¶ 7-8.

       Because Claimants have not presented an adequate excuse to their late filing, the Court should

---

[4] There are monitoring services designed to send alerts when a bitcoin address sends or receives bitcoin. One such service is https://cryptocurrencyalerting.com/, which was established in 2018.

dismiss their claims on this basis alone. Allowing their claims to proceed "would subvert the strict time limits established by Supplemental G(5) and encourage claimants to litigate every untimely filing in a forfeiture case." *United States v. $25,790*, 2010 WL 2671754, *4 (D. Md. July 2, 2010). If the Court lets these Claimants, who failed to file a timely claim despite having significant resources at their disposal, and whose justification amounts to nothing more than "we didn't know but we are sorry," then anyone—literally anyone—can come forward to make a claim for the seized Silk Road proceeds, making an unmanageable avalanche of claims a real possibility.

### B. Claimants' Statement of Facts is Riddled with Inaccuracies and Unsupported Assumptions about Ngan's Possession of 1HQ3

At the outset of Claimants' involvement in this matter, they appeared to be quite convinced that Ngan was Individual X or somebody associated with Individual X and structured their claims on that assumption. Having now realized that Ngan is not Individual X, they have shifted their argument to alleging Ngan's "association" with Individual X, no matter how removed. This is evident in their recent "discovery" of "a possible connection between Mr. Ngan and an individual that may be the Government's Individual X—Nikita Kislitsin." Opp'n at 30. Claimants attempt to draw a connection based on the fact that Kislitsin, who was associated with foreign hacking efforts unrelated to this case, "listed Las Vegas as his location on Twitter at roughly the same time Mr. Ngan lived there." *Id.* Nikita Kislitsin is not Individual X and the connection drawn between Ngan and Kislitsin is nothing short of a stretch. *See* Haynie Decl. ¶ 4. The Court should not entertain Claimants' endless guesswork.

As a preliminary matter, it is important to recognize that if the $2 billion judgment was against Ngan, that Ngan was the one who declared bankruptcy, and that Claimants purchased the assets of the bankruptcy estate which included the property interests of Ngan, then the claims should be limited to the property of Ngan and not his associates. To be clear, the government denies that Individual X is even associated with Ngan, but points this out to illustrate the legal impossibility of Claimants' assertions that Ngan's associates may yield a claim to the Defendant Property. Ngan may have had access to cryptocurrency, but that certainly did not include 1HQ3. Even assuming Ngan was prepared to sell Bitcoin, none of the documents Claimants provide even mention 1HQ3 or the specific figure of 69,370 BTC except for the screenshot from the blockchain explorer and sent in a text message with no

additional explanation. *See* Declaration of Jacky Lee, Dkt. No 98-2 Exhibits 1-6, 9-11. Indeed, depending on the document, Ngan was supposed to sell more than 69,370 BTC. *See id.*, Ex. 1 ("1,000,000 BTC"); Ex. 2 ("100,000 BTC"); Ex. 3 ("in excess of 100,000 Bitcoins"); Ex. 9 ("3 million BTC"). The numbers simply do not add up.

Claimants further argue that Ngan "would not have realized any profit unless he actually had possession of the Bitcoin and was able to deposit it into the law firm's escrow account, from where it could be transferred to the buyer." Opp'n 26. There are numerous reasons why someone would claim to have assets they did not have. Indeed, that is the hallmark of criminal activity involving fraud—to lure potential victims by gaining their trust, secure loans without real access to collateral, provide a false sense of legitimacy, etc. The same question can be posed to Jay Bloom—what did Ngan have to gain by offering to invest $160 million in his businesses ventures if he did not have the money? He likely did not have the money, which is why he filed for bankruptcy and disappeared. The same thing happened with the bitcoin "sale"—none of those transactions came to fruition and when Ngan was set to appear in court, he vanished.

Despite all of this and recognizing that a mere screenshot might not be enough, Claimants attempt—based on an inaccurate reading of the government's complaint—to convince the Court that Ngan really did own the Bitcoin in 1HQ3. Specifically, Claimants argue that one of Ngan's associates "deleted fifty-four files from Mr. Ngan's devices—*a number corresponding to the number of wallets that originally held the Bitcoin* that was transferred into the 1HQ3 wallet at issue in this action." Opp'n at 10-11 (emphasis added). Nowhere has the government ever claimed that the contents of 1HQ3 came from 54 different wallets. What the government has said is that law enforcement officers "observed 54 transactions that were sent from Bitcoin addresses controlled by Silk Road." Dkt. No. 8 ¶ 15. Not 54 Bitcoin addresses or 54 Bitcoin wallets—54 *transactions*. This is, at best, a misreading of the government's statements, and betrays a deep misunderstanding of how Bitcoin works.[5] Claimants'

---

[5] Although people often use them interchangeably, there is a significant distinction between a cryptocurrency wallet and an address. A wallet is a collection of private keys and corresponding addresses. Haynie Decl. ¶ 22. It is typically under the control of a single private individual or service. *Id.* An address is a digital destination used to send and receive cryptocurrency funds. *Id.* ¶ 5. It is similar to a physical house address or an email address. Cryptocurrency wallets often contain many addresses. *Id.* A Bitcoin address is a hash of the public key and consists of 26-35 alphanumeric characters. *Id.*

argument also makes no sense because Bitcoin transactions are not saved in a hard drive as separate files when they take place. Haynie Decl. ¶ 11.

### C. The Defendant Property Is Drug Money from Silk Road

The Court does not have to take the government's word for the conclusion that the Defendant Property emanated from Silk Road. Various sources confirm this without the need for discovery.

First, before it was stolen and moved to 1BAD and 1BBq, the 69,370 BTC was located in wallets that were subsequently seized and forfeited by the government in the criminal prosecution of Ross Ulbricht. Haynie Decl. ¶ 25. This is confirmed by Silk Road's own servers, which were seized and reviewed by law enforcement. Haynie Decl. ¶¶ 7, 20, 21, 24. More specifically, Individual X sent the stolen bitcoin to 1BAD & 1BBq in 54 separate transactions. Each of those transactions was funded by multiple bitcoin addresses associated with Silk Road. In total, 1BAD & 1BBq were funded by approximately 3,056 sending addresses. *Id.* ¶ 24. This figure can be obtained by looking at the number of sending addresses for each of those transactions in any blockchain explorer or blockchain analytics software, all of which is publicly available information. *Id.* Of the 3,056 sending addresses, 3,014 were deposit addresses for Silk Road users. The IRS determined this by comparing each of the 3,056 addresses with the addresses stored in the data from the seized Silk Road servers. *Id.* This means that 98 percent of the sending addresses that funded 1BAD & 1BBq, and therefore 1HQ3, were addresses used by Silk Road users to purchase drugs and other illicit goods and services. *Id.*

Second, blockchain analysis provides an indisputable trail of the bitcoins from Silk Road wallets to 1HQ3, where the government took possession of 69,370 BTC. Exhibits 1 and 2 to SA Haynie's declaration, which illustrate the analysis he conducted using blockchain analytics software and is based on immutable transactions recorded on the blockchain, show a link between 1HQ3 and Silk Road.[6] *See* Haynie Decl. ¶¶ Exhibit 16-20, Exs. 1-2. Exhibit 1 illustrates the progression of the Defendant Property from Bitcoin addresses controlled by Silk Road to 1HQ3. SA Haynie used Chainalysis Reactor, an

---

[6] The Court can, and should, consider information from the blockchain as it forms the basis for the Amended Complaint and is derived from the public record. Courts are permitted to evaluate materials attached to complaints and public records "without converting the motion to dismiss into a motion for summary judgment." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018); *United States v. Ritchie*, 342 F.3d 903, 907-08 (9th Cir. 2003) (citations omitted).

investigative software tool that connects cryptocurrency transactions and addresses to real-world entities like Silk Road by using aggregate data. *Id.* ¶¶ 13, 15, 17. By inputting the 1HQ3 address into Reactor, its algorithms automatically created a link between that address and Silk Road, which Chainalysis has identified as a known entity based on several factors and data points. *Id.* ¶ 15. From this information, SA Haynie was able to determine that the ultimate source of the funds in 1HQ3 originated from addresses managed by the same entity—the Silk Road marketplace. *Id.* Exhibit 2 further illustrates that Chainalysis identified and labeled the two seizures of Silk Road funds—the first in October 2013 and the second in November 3, 2020. *Id.* ¶ 19.

Finally, it is the consensus among blockchain analytics companies like DMG Blockchain Solutions ("DMG"), that the bitcoin at issue here originated from Silk Road. *Id.* ¶ 26. On or about November 4, 2020, the day after the government's seizure of the bitcoin at issue and a day before it announced the seizure, Elliptic Co-Founder and Chief Scientist Dr. Tom Robinson wrote, "…through blockchain analysis we can determine that these funds likely originated from the Silk Road." (https://www.elliptic.co/blog/1-billion-silk-road-bitcoins-are-on-the-move). *Id.* ¶ 27. Similarly, on or about November 4, 2020, blockchain analytics company CipherTrace issued a similar article that stated in part, "On November 3, more than 69,370 BTC originating from the Silk Road – one of the first darknet markets – moved for the first time since April 2015…" (https://ciphertrace.com/nearly-1b-from-silk-road-move-for-first-time-since-2015/). *Id.* ¶ 28. This further calls into question Lee's conclusion that "the blockchain transactions show that the Bitcoins came from 58 sources," particularly given his access to blockchain analytics tools and the fact that the origin of the bitcoin at issue here is clear to so many major blockchain analytics companies who have conducted a similar analysis. *See id.* ¶ 19.

### D. Claimants' Challenge to the Source of the Defendant Property is Based on Flawed Assumptions and a Misreading of the Law

Claimants' argument that the Defendant Property came from 54 different Silk Road wallets is the framework for their attempt to undermine the well-known origin of the Defendant Property. This is Claimants' only real option, however, because only by questioning the provenance of the Defendant Property can they respond to the chief reasons that their claims fail, namely, that (1) Ngan's bankruptcy estate could not have contained the defendant Property because a thief does not have a legal interest in

stolen property; and (2) a criminal's interest in stolen property does not become part of his bankruptcy estate because of the relation-back doctrine.

Claimants dismiss the government's position that Individual X stole the bitcoin in 2012, transferred it to 1HQ3 in 2013, and gave it to the government on November 3, 2020 as "farfetched," "implausible," and "impossible." Opp'n at 26. If anything is farfetched, it is Claimants' attempt to discredit the well-known origins of the Defendant Property by submitting the declaration of Jacky Lee, a data scientist with DMG, which furthers Claimants' arguments in no meaningful way and consists of nothing more than a vehicle through which Claimants have introduced irrelevant exhibits into the record. Indeed, nothing submitted with Lee's declaration even mentions 1HQ3 or the specific amount of Bitcoin at issue here except for the online screenshot of 1HQ3 and a text message from Ngan sharing it, which anybody with an Internet connection and access to a cell phone with SMS capabilities could do.

Lee's analysis is incorrect, in part because it hinges on a misrepresentation of the government's statements. According to his Declaration, one of the tasks Lee had was to determine "…where the 69,370 [BTC] in the 1HQ3 wallet came from…" Lee Declaration, Dkt. No. 98-2 ¶ 3. Lee determined that it was "impossible for Individual X to gain these Bitcoins by hacking a single silk road wallet[], because the blockchain transactions show that the Bitcoins came from 58 sources." *Id.* ¶ 17. DMG, has a blockchain analytics product, called "BlockSeer" that Lee used to analyze 1HQ3. *Id.* ¶ 15. It seems implausible that despite its blockchain analytics capabilities, BlockSeer did not identify the 54 transfers as originating from Silk Road, one of the most sophisticated and extensive criminal marketplaces of its time. Haynie Decl. ¶ 7. In fact, based on a Twitter post from @BlockSeer dated December 10, 2015, BlockSeer was aware of Silk Road (*see* https://twitter.com/blockseer/status/674998974940508160). According to DMG's website, "Blockseer is an analytics tool that enables the tracking of cryptocurrency on both the Bitcoin and Ethereum blockchains. It examines cryptocurrency flows through wallets" and performs various functions, including "creating private labels and graphs . . . accessing a more extensive list of labels and clusters and additional analytics tools" and "importing and exporting analytics data such as addresses, transactions, and labels." https://dmgblockchain.com/software-product/. Of the 18 paragraphs in Lee's declaration, only three of them are devoted to his own blockchain analysis. *See* Dkt. No. 98-2 ¶¶ 15-17. The declaration provides no information to show that any meaningful analysis was

conducted, including a description of his methodology or any graphs to illustrate any specific findings.

### E.     The Contents of the 1HQ3 Wallet Never Became Part of the Bankruptcy Estate

Acknowledging a connection between the Defendant Property and Silk Road would eviscerate Claimants' entire claims for a stake in the Bitcoin, which is why they have gone to such lengths to try to undercut that link. Because Claimants assert that their interest in the Defendant Property arises from their interest in Ngan's bankruptcy estate, it is essential to determine whether the bankruptcy estate ever maintained an interest in the Defendant Property. In evaluating the interests of the bankruptcy estate, the court must consider how property came into the possession of the debtor to determine the validity of its title to it. This is precisely why Claimants have manufactured so much doubt and conjecture about the source of the funds. As reiterated herein, the Defendant Property constitutes proceeds of narcotics trafficking and other unlawful activities. In addition, it was stolen from Silk Road. Thus, even assuming Ngan was Individual X—which he is not—the Defendant Property could not become part of the bankruptcy estate because it was stolen and represents the proceeds of crime.

The entirety of Claimants' rebuttal to the argument that a thief does not have a legal interest in stolen property boils down to four sentences riddled with misstatements about the government's position:

> [T]he Government does not suggest that Mr. Ngan stole 1HQ3, or even that he got it from Individual X, who the Government says stole it. Claimants do not yet know how Mr. Ngan obtained 1HQ3, but it could certainly have been from sources unrelated to Individual X or Silk Road. And he could have been a bona fide purchaser of the Bitcoin even if it was unlawfully acquired originally. The claims should not be dismissed based upon the Government's unsupported speculation that Mr. Ngan may have stolen it or did not innocently acquire it.

Opp'n at 27. Claimants are correct that the government does not suggest—or aver—that Ngan stole 1HQ3 or that he got it from Individual X. It is the government's position that Ngan has absolutely nothing to do with 1HQ3 other than invoke its mere existence for some purpose unrelated to this action. Rather, because 1HQ3 consists of proceeds of illicit activity and that it was stolen, it could not have become part of the bankruptcy estate and therefore Claimants have no legitimate claim to it.

Although Claimants also assert that the Defendant Property's origin as stolen Silk Road proceeds is "implausible, if not impossible," Opp'n at 19, this is flatly untrue. First, as noted above, there is no likelihood that Ngan had possession, let alone ownership, of the Defendant Property. Furthermore,

1  nothing about this theft is impossible. Bitcoin thefts of even larger proportions have taken place multiple
2  times, including the theft of approximately 850,000 from the Mt. Gox exchange. Haynie Decl.¶ 18.
3  These transactions are completely unrelated to the number of addresses used in a transfer of
4  cryptocurrency, and those transactions do not generate any documents unto themselves. *Id*. ¶¶ 5-6.
5  Finally, the existence of an unexecuted contract does little more but to cement Ngan's continued
6  attempts to scam others into believing that he could deliver billions of dollars' worth of Bitcoin in a
7  single sale. None of this establishes ownership or even possession.

8        Moreover, the Defendant Property is the proceeds of drug trafficking activity. This, too, excludes
9  the Defendant Property from the bankruptcy estate. Bankruptcy distribution plans that cannot "be
10 executed by lawful means," including the distribution of proceeds obtained in violation of the Controlled
11 Substances Act, are generally "forbidden by law." *In re Arenas*, 535 B.R. 845, 851 (B.A.P. 10th Cir.
12 2015); *see also In re Burton*, 610 B.R. 633, 637-38 (B.A.P. 9th Cir. 2020) (listing cases holding that
13 bankruptcy trustees cannot distribute the proceeds of violations of the Controlled Substances Act). This
14 prohibition is particularly strong in cases where "a trustee would be asked to accept proceeds of a drug-
15 related business, situations where federal law would clearly be violated." *In re Olson*, 2018 WL 989263,
16 at *7 (B.A.P. 9th Cir. 2018) (Tighe, J., concurring); *see also In re Rent-Rite Super Kegs West, Ltd.*, 484
17 B.R. 799, 805-806 (D. Colo. 2012) (concluding that federal courts cannot assist debtors with the
18 distribution of an asset held in violation of the Controlled Substances Act as a matter of principle, and
19 because of the ongoing danger that the asset in question would be subject to civil forfeiture). The
20 bankruptcy trustee and bankruptcy court were asked to do the same thing here—accept the distribution
21 and sale of an estate that included the stolen proceeds of various acts of crime.

22       In sum, Claimants never had ownership or possession of the Defendant Property because it could
23 not be distributed through Ngan's bankruptcy estate as it was derived from drug trafficking and other
24 criminal activity, as well as theft or fraud. As Claimants never could have legally owned or possessed
25 the Defendant Property, they lack standing as a matter of law and the Court should strike their claim
26 instead of allowing them to embark on a fruitless and time-wasting fishing expedition.

27     **F.**    **Claimants' Challenge to the Relation Back Doctrine as it Applies to this Case is Deficient and Unsupported by the Facts**
28

With respect to the government's argument that a criminal's interest in stolen property does not become part of his bankruptcy estate because of the relation-back doctrine, Claimants' state that "the argument assumes too much." Opp'n at 27. What Claimants refer to is the fact that the Defendant Property came from Silk Road. An admission that it did would show that the Defendant Property vested in the United States at the time the criminal activity was complete. Because Silk Road was in operation between 2011 and 2013, this occurred long before Battle Born purchased Ngan's bankruptcy estate.

The "relation back" doctrine renders Claimants' standing arguments fruitless. It derives from 18 U.S.C. § 981(f), which provides that "[a]ll right, title, and interest in property described in subsection (a) of [18 U.S.C. § 981] shall vest in the United States upon commission of the act giving rise to forfeiture under this section." The innocent owner statute provides that the property of a "bona fide purchaser or seller for value" who "did not know and was reasonably without cause to believe that the property was subject to forfeiture" is not subject to forfeiture. 18 U.S.C. § 983(d)(3)(A). The essential elements of an innocent owner claim require claimants to establish that they are "both innocent," "and an owner." *United States v. One 1990 Beechcraft 1900 C Twin Engine Turbo-Prop Aircraft*, 619 F.3d 1275, 1277 (11th Cir. 2010). In this case, title to the Defendant Property vested in the government at the time that the transactions on Silk Road occurred. Dkt. No. 8 ¶ 7. As noted above, all available tracing tools and publications, in addition to the documents on record in this case, indicate that the contents of the 1HQ3 wallet are traceable to Silk Road. Accordingly, all interest in the Bitcoin obtained by and laundered through Silk Road vested in the government before Ross Ulbricht's arrest and trial.

Further, Claimants are not owners of the Defendant Property. An "owner" for purposes of the innocent owner defense "means a person with an ownership interest in the specific property to be forfeited," and does not include general unsecured creditors; bailees; or nominees with "no dominion or control over the property." 18 U.S.C. § 983(d)(6)(A)-(B). Claimants were never owners of the property because the Defendant Property never could have been a part of the bankruptcy estate.

Every available public record, docket entry, and brief is clear—the Defendant Property represents the stolen proceeds of Silk Road, a massive organization responsible for drug trafficking and other crimes. Claimants lack standing as the Defendant Property never became part of the bankruptcy estate, and because the relation back doctrine vested all interests in the property in the United States.

### G. Claimants' Discovery Plan

Claimants' discovery plan makes it clear they intend to engage in protracted discovery about issues unrelated to this case. The fact that their plan includes taking the deposition of Ngan—a man who disappeared years ago and whose whereabouts are unknown—further underscores this. According to their own lawyers, Claimants have already conducted "substantial discovery efforts into Mr. Ngan's assets, including both domestic and international collection efforts" dating back to when "the underlying Nevada state action was filed against him in 2016" and "have incurred several hundred thousand dollars in costs alone" in those efforts. *See* Declaration of Joseph Gutierrez, Dkt. No 98-4 ¶¶ 7, 28, 29. Claimants' intended discovery is improper and deficient for several reasons.

First, Claimants' discovery plan includes at least six discovery items relating to Ngan's associates. *See* Declaration of Rees Morgan, Dkt. No. 98-6 ¶ 6(c-f, h-i). Those discovery efforts belong in the bankruptcy case, not in this action. Second, Claimants' discovery plan assumes the existence of a relationship between Ngan and Individual X. For instance, Claimants anticipate "Document requests and deposition of Agent [] Haynie regarding . . . Ngan's relationship both to Individual X and the 1HQ3 Wallet." *Id.* ¶ 6(b). The government has no evidence of any connection between Individual X and Ngan. Accordingly, requesting documents or depositions on this point will yield nothing. Third, Claimants intend to seek "[d]iscovery into expert reports referenced in Agent [] Haynie's Declaration." *Id.* ¶ 6(g). It is unclear what Claimants refer to here. There is no mention of experts in SA Haynie's declaration, and the word "report" appears only once, followed by a link to a publicly available news article citing to that reference. *See* Dkt. No. 90-1 ¶ 9. Fourth, Claimants intend to request documents and take SA Haynie's deposition on issues he has fully described under penalty of perjury. Specifically, they seek to depose him "regarding any investigation conducted to verify Individual X's claim to the wallet." Morgan Decl. ¶ 6(b). It is unclear what Claimants expect to receive beyond Individual X's consent and SA Haynie's analysis.

Finally, Morgan's Declaration lists a series of anticipated document requests in response to what they characterize as "the Government's assertion that if Mr. Ngan was in possession of the 1HQ3 Wallet then he must have stolen it . . . ." Dkt. No. 98-6 ¶ 7. The government has made no such characterization. To the contrary, the government has consistently stated that Ngan never possessed 1HQ3. To the extent

the government entertained such a theory, it was in response to Claimants' assumptions about Ngan's possession of 1HQ3 and only to demonstrate that even if their assertions were true, their claims would still fail.[7] Accordingly, no discovery is needed on this issue.

This summarizes the extent of Claimants' discovery plan—it forecasts protracted discovery and litigation into irrelevant matters that would undermine the purpose of the rules and eviscerate the gatekeeping functions designed to minimize the danger of false claims.

### III.  CONCLUSION

Claimants' claims are deficient. They offer nothing besides conclusory assertions of ownership and possession of the Defendant Property; a failure to satisfy basic rules; impossible allegations; and constantly changing facts. Claimants have no right to special treatment under the rules—indeed, more so than most, Claimants had the means and the motivation to keep a close eye on the Defendant Property and file a timely claim. Their admitted failure to keep track of a multi-billion asset they thought was theirs should foreclose their claims with respect to timeliness. Moreover, Claimants clearly lack standing as a matter of law—the bankruptcy estate they claim as the font of their ownership claim never could have contained the Defendant Property. The Court must thus strike Claimants' claims. Allowing these claims to proceed and permitting discovery would invite other meritless claims to these—and other— forfeiture proceedings even if they lack a remote connection to property subject to forfeiture.

DATED:  August 24, 2021                           Respectfully submitted,

STEPHANIE M. HINDS
Acting United States Attorney

*Claudia A. Quiroz*_____
DAVID COUNTRYMAN
CHRIS KALTSAS
CLAUDIA A. QUIROZ
WILLIAM FRENTZEN
Assistant United States Attorneys

---

[7] With respect paragraph 8 of Morgan's Declaration, (a) whether the Defendant Property is subject to forfeiture is a legal question that has been fully briefed in this action and not something that could be found in an interview report or determined by the case agents, *see id.* ¶ 8(a); (b) all relevant tracing has been described in detail in various declarations and filings, including SA Haynie's Declaration submitted in support of this brief, *id.* ¶ 8(b); and (c) there is no disconnect between the government's tracing and Silk Road tumblers, *id.* ¶ 8(c). With respect to the last point, see SA Haynie's Declaration ¶¶ 31-33 which provides additional background on this issue.