ALEXANDER KUGELMAN (SBN 255463)
Kugelman Law, P.C.
21 Tamal Vista Blvd., Suite 202
Corte Madera, CA 94925
Telephone: (415) 968-1780
Facsimile: (415) 534-9441
alex@kugelmanlaw.com

Attorney for Claimant
ILIJA MATUSKO

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CV 20-7811 RS |
| Plaintiff, | |
| v. | **OPPOSITION TO MOTION TO STRIKE THE VERIFIED CLAIM OF CLAIMANT ILIJA MATUSKO** |
| Approximately 69,370 Bitcoin (BTC), Bitcoin Gold (BTG), Bitcoin SV (BSV), and Bitcoin Cash (BCH) seized from 1HQ3Go3ggs8pFnXuHVHRytPCq5fGG8Hbhx, | Date:      September 30, 2021<br>Time:      1:30 pm<br>Ctrm:      3 (Via Zoom) |
| Defendant. | The Hon. Richard Seeborg |
| | Trial Date:    None Set |
| ILIJA MATUSKO, | |
| Claimant. | |

**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

## TABLE OF CONTENTS

I     INTRODUCTION ...................................................................... 1

II.    FACTUAL AND PROCEDURAL BACKGROUND ............................................ 2

    A.    Bitcoin Wallets, Public Keys and Private Keys .......................................... 3

    B.    Only Mr. Ulbricht Could Send or Withdraw Bitcoin from the Marketplace ........................................................................... 3

    C.    Mr. Matusko's and His Marketplace User Profile. ................................... 5

    D.    2013 Seizure and Notice of Earlier Forfeiture Action .............................. 5

    E.    The Sources of the 1HQ3 Bitcoin ........................................................... 6

    F.    Mr. Matusko Acted Precipitously to File Verified Claim.......................... 7

III.    MR. MATUSKO'S CLAIM IS TIMELY AND THE GOVERNMENT HAS NOT SATISFIED NOTICE REQUIREMENT FOR MARKETPLACE USERS.......... 7

    A.    Forfeiture Statutes Are to be Strictly Construed Against the Government. ....................................................................... 7

    B.    The Government Never Provided Adequate Notice To Known Claimants................................................................... 8

    C.    Relevant Factors Support Allowing Mr. Matusko's Claim to Proceed. ..................................................................... 10

        i.    Claimant was not aware that he had any rights in the seizure and his counsel informed the U.S. attorney's office that he intended to make a claim even though he was not properly served (First and Sixth Factor). ...................................... 11

        ii.    The government disregarded procedural and notice requirements that encouraged the delay in Mr. Matusko's claim (Second, Fourth, and Ninth Factors). ............................................ 13

        iii.    Mr. Matusko had no health issues inhibited him from making a claim (Third Factor). .................................................... 13

        iv.    Mr. matusko would be prejudiced with his claim were dismissed, not the government (Fifth Factor). ............................ 14

        v.    No Trial Date Has Been Set (Seventh Factor). ............................ 15

        vi.    Mr. Matusko's reason for delay is made in good faith (Eighth Factor). .................................................................. 15

**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

vii.    Mr. Matusko was unrepresented for two months before retaining counsel (Tenth Factor). ................................................................ 15

viii.   Mr. Matusko informally notified the government of the potential claim through counsel (Eleventh Factor). ...................................... 16

ix.     Sufficient claim (Twelfth Factor). ................................................. 16

IV.   MR. MATUSKO'S CLAIM, CONFIRMED BY THE GOVERNMENT, ASSERTS AN INTEREST IN THE BITCOIN ................................................. 17

A.   Standing is Established By Asserting Financial Interest Under Civil Forfeiture's Forgiving Standards ............................................................. 17

B.   Mr. Matusko Alleged a Financial Interest in the Subject Property .......... 18

C.   Special Agent Haynie's Testimony Contradicts the Government's Theory .................................................................................................... 19

D.   The Government Should be Estopped From Challenging Mr. Matusko's Claim Because He Did Not Make Claim in the 2013 Forfeiture Action ...................................................................... 21

V.   CONCLUSION ..................................................................................... 22

## TABLE OF AUTHORITIES

**Cases**                                                                                                     **Pages**

*Austad v. U.S.,*
    386 F.2d 147, 149 (9th Cir. 1967)……………………………………………………...18

*Commodity Futures Trading Comm'n v. McDonnell,*
    287 F. Supp. 3d 213 (E.D.N.Y.), *adhered to on denial of reconsideration*,
    321 F. Supp. 3d 366 (E.D.N.Y. 2018)……………………………………….……...….4

*Doleman v. Meiji Mut. Life Ins. Co.,*
    727 F.2d 1480, 1482 (9th Cir. 1984)……………………………………………….…...18

*Dusenbery v. U.S.,*
    534 U.S. 161, 167 (2002)……………………………………...…………8, 9, 10

*Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs,*
    543 F.3d 586 (9th Cir. 2008)………………………………………………...………18

*Longenette v. Krusing*,
    322 F.3d 758, 765 (3d Cir. 2003)……………………………………………………10

*Ox Labs, Inc. v. Bitpay, Inc.,*
    No. CV 18-5934-MWF (KSX), 2020 WL 1039012 (C.D. Cal. Jan. 24, 2020),
    *aff'd*, 848 F. App'x 795 (9th Cir. 2021)…………………………………….……...……4

*United States v. $100,348.00,*
    354 F.3d 1110, 1118 (9th Cir. 2004)…………………………………....... 11, 12, 13, 15, 16

*United States v. $11,500.00 in U.S. Currency,*
    710 F.3d 1006, 1012 (9th Cir. 2013)……………………………………………...…..18

*United States v. $133,420.00 in U.S. Currency*,
    672 F.3d 629, 637 (9th Cir. 2012)………………………………………………….18, 19

*United States v. $493,850.00 in U.S. Currency,*
    518 F.3d 1159 (9th Cir. 2008)……………………………………………….......…..7

*United States v. 17 Coon Creek Road, Hawkins Bar Cal.,*
    787 F.3d 968 (9th Cir. 2015)…………………………………………….…..11, 17, 18

*United States v. 4492 S. Livonia Rd.,*
    889 F.2d 1258, 1262 (2nd Cir. 1989)…………………………………………....11, 18

*United States v. 5208 Los Franciscos Way,*
    385 F.3d 1187, 1191 (9th Cir. 2004)………………………………………………...17

**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

*United States v. All Assets Held at Bank Julius Baer & Co. (In re Rem)*,
    959 F. Supp. 2d 81 (D.D.C. 2013)……………………………………………..17

*United States v. All Assets Held in Acct. No. XXXXXXXX in name of Doraville Properties Corp.*,
    299 F. Supp. 3d 121 (D.D.C. 2018)………………………………………....17

*United States v. Marolf*,
    173 F.3d 1213, 1217 (9th Cir. 1999)…………………………………...…10

*United States v. One Ford Coach*,
    307 U.S. 219 (1939)………………………………………………………..8

*United States v. Real Prop. Located at 475 Martin Lane, Beverly Hills, CA*,
    545 F.3d 1134, 1140 (9th Cir. 2008)…………………………………….…17

*United States v. Real Properties located at 7215 Longboat Drive (Lot 24)*,
    750 F.3d 968 (8th Cir. 2014)………………………………………………...12

*United States v. Real Property at 2659 Roundhill Dr., Alamo, Cal.*,
    194 F.3d 1020, 1024 (9th Cir. 1999)……………………………………11, 18

*United States v. Ritchie*,
    342 F.3d 903 (9th Cir. 2003)……………………………………….……...…8

*United States v. Twenty-Four Cryptocurrency Accts.*,
    473 F. Supp. 3d 1 (D.D.C. 2020)…………………………………...…1, 8, 9, 10

**Statutes & Rules**

Federal Rules of Civil Procedure Rule 12(c)……………………………………...…17

Federal Rules of Civil Procedure Rule 56……………………………………...……17

Federal Rules of Civil Procedure Rule, Supplemental Rule G(4)(a)-(b)…………….………8
..
Federal Rules of Civil Procedure Rule, Supplemental Rule G(4)(a)(iv)…………………...8

Federal Rules of Civil Procedure Rule, Supplemental Rule G(4)(a)(iv)(C)……………..……...8

**Other Authorities**

*Asset Forfeiture Policy Manual* (U.S. Department of Justice, 2021)………………………...8, 10

U.S. Constitution, Fifth Amendment……………………………………………..9

Satoshi Nakamoto, Bitcoin: *A Peer-to-Peer Electronic Cash System*, Bitcoin.org (2009)
    https://bitcoin.org/en/bitcoin-paper (last visited August 26, 2021)………………….4

**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

*Products,* Silk Road (marketplace), Wikipedia
   https://en.wikipedia.org/wiki/Silk_Road_(marketplace) (last visited Aug. 25, 2021)......6

**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

**I**        **INTRODUCTION**

The government has confirmed Claimant Ilija Matusko's ("Mr. Matusko") Silk Road marketplace (hereinafter the "Marketplace" or "Silk Road") user profile ID, the initial transfer of 48 bitcoin, ending credit of 48 bitcoin, and that Mr. Matusko participated in no illegal Marketplace transactions whatsoever.  The government's actions and representations have constructively established Marketplace users' financial interest in the 69,370 bitcoin seized in November 2020.  Mr. Matusko and each user has a potential financial interest in the seizure, and the government should have directly notified those users of the forfeiture.  Mr. Matusko's verified claim should be evaluated on its merits.

Rather than acknowledge the claim, the government offers two hollow challenges against the claim's timing and Mr. Matusko's standing.  These arguments are dubious in light of the government's failure to notify potential known claimants, contrary to the government's developed record, and inconsistent with established law.

First, Mr. Matusko's claim is timely.  As a Marketplace user, Mr. Matusko has a financial interest in the seized bitcoin and is a potential known claimant requiring direct notice by the government.  *See United States v. Twenty-Four Cryptocurrency Accts.,* 473 F. Supp. 3d 1 (D.D.C. 2020).  It is undisputed that Mr. Matusko sent 48 bitcoin[1] to the address associated with his Marketplace user profile.  Further, those bitcoin were simply pooled with all bitcoin held in the Marketplace's Bitcoin wallet.  Thus, every user had and *still has* a financial interest in the bitcoin sent to the Marketplace's Bitcoin wallet and therefore an interest in both 2013 and 2020 seizures.  However, the government believes no Marketplace user, except Ross Ulbricht ("Mr. Ulbricht"), deserves notice of this forfeiture action as a known claimant.

Now, the government attempts to use its own misfeasance to challenge Mr. Matusko's valid claim.  Any delay in filing his claim is the direct result of the government failure to satisfy notice requirements.  The government has not met its duty, or demonstrated even an attempt, to identify and notify known potential claimants.  Rather, it appears the government unilaterally

---

[1] Mr. Matusko's initial and final credit on his Marketplace user profile was 47.52 bitcoin.  His balance is rounded up to 48 bitcoin here to remain consistent with his initial claim and the government's Motion to Strike.

**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

determined it had no obligation to notify any Marketplace users except Mr. Ulbricht.  Even if the Court deems Mr. Matusko's claim to be late, relevant factors indicate that justice supports allowing Mr. Matusko's verified claim to continue.

Second, Mr. Matusko's claim is valid against any bitcoin maintained by the Silk Road. The government's forfeiture theory relies on sourcing the seized bitcoin from the 1HQ3 wallets back to the Marketplace.  There is a straight line from the seized bitcoin back to Mr. Matusko's 48 bitcoin that was credited to his user profile.  While the government goes to great lengths to discredit Mr. Matusko's claim, he nonetheless has an interest in the seized bitcoin sourced from the Marketplace's wallet because bitcoin is a fungible unit of exchange.

This is not simply Mr. Matusko's opinion, rather it is the only conclusion that can be drawn from the sworn testimony of IRS-CI Special Agent Jeremiah Haynie. Special Agent Haynie confirms Mr. Matusko's Marketplace profile, his initial transfer of bitcoin, and ending credit of 48 bitcoin.  Special Agent Haynie explains that Marketplace users do not control the Bitcoin wallet and any transfer results in a "credit" that is assigned to a user's profile.  Further, Special Agent Haynie explains that no user owns any specific bitcoin held in the Silk Road wallet.  In fact, the bitcoin transfer to the Silk Road wallet is untraceable because Silk Road "tumbled" each transfer.  Finally, Special Agent Haynie explains that the hacked bitcoin were from a "general pool" that was "funded by … 3,014 [] deposit addresses for Silk Road users."

Those statements undercut the arguments against Mr. Matusko's standing and confirm his claim.  To this day, Mr. Matusko still has a financial interest in any and all bitcoin from the Marketplace to satisfy his 48 bitcoin credit.

Mr. Matusko requests the Court deny the motion to strike.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

This action seeks the forfeiture of approximately $3.3 billion of assets without providing notice to all but one interested party.  Silk Road had more than 100,000 users, with likely more than half residing overseas.  The government maintains the servers that contain information on every user and transaction.  While bitcoin is an emerging technology, it is still simply another manner to complete a financial transaction.  The government's motion focuses on Mr. Matusko's

**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

1    inability to proceed with his claims on the merits.  However, it has substantially larger

2    implications for the rights of millions and millions of cryptocurrency owners in future forfeiture

3    actions.

4          **A.**     **Bitcoin Wallets, Public Keys and Private Keys**

5         A Bitcoin wallet is comprised of two keys: a public key and a private key.  Declaration of

6    Christopher Wajda ("Wajda Decl."),  ¶ 33.  The wallet owner can use the public key to generate

7    to create hundreds, thousands of addresses in one wallet file " *Id.* ¶ 35 (*quoting* sworn testimony

8    of former FBI Special Agent Ilhwan Yum, January 29, 2015).  A Bitcoin address is public

9    information that allows a wallet owner to send or receive bitcoin to the wallet.  *Id.*  ¶¶ 32-8.  This

10   allows a wallet owner "to operate multiple Bitcoin addresses at any given time" and the wallet

11   owner can generate "a unique Bitcoin address for each transaction." *Id.* ¶ 35.

12        Each Bitcoin wallet's private key is a very secure passcode that is used to lock and unlock

13   the Bitcoin wallet.  *Id.*  ¶ 36.  The private key is necessary to send bitcoin from a wallet.  *Id.*

14   "Only the holder of a Bitcoin address' private key can authorize transfers of Bitcoin from that

15   address to other Bitcoin addresses." *Id.*  ¶ 46 (*quoting* Haynie Decl. dated July 27, 2021).  The

16   person who controls the private key is the person who controls the Bitcoin wallet and all

17   associated addresses.  In fact, holding the private key is critical.  Declaration of Jeremiah Haynie,

18   Dkt. No. 90-1, ¶ 17 ("Haynie Decl. dated July 13, 2021").  Indeed, there is a reason for the

19   phrase, 'not your keys, not your bitcoin,' because it "exemplifies the importance of actually

20   possessing the private key to a Bitcoin address to establish true ownership." *Id.*

21        "There is a significant distinction between a cryptocurrency wallet and an address.  A

22   wallet is a collection of private keys and corresponding addresses.  It is typically under the control

23   of a single private individual or service.  An address is a digital destination used to send and

24   receive cryptocurrency funds."  Declaration of Jeremiah Haynie, Dkt. No. 99-2, ¶ 22 ("Haynie

25   Decl. dated August 24, 2021").

26         **B.**     **Only Mr. Ulbricht Could Send or Withdraw Bitcoin from the Marketplace**

27        The Silk Road relied on two (2) computer servers. *Id.* ¶¶ 43, 46, 58.  One server operated

28   the market interface that users and vendors would see via the website (the "Marketplace Server").

**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

1    *Id.*  The second server contained the Marketplace's Bitcoin wallet and all addresses (the "Bitcoin

2    Server").  The Marketplace's wallet had more than 2.1 million Bitcoin addresses.  *Id.*  The

3    Bitcoin Server held all user bitcoin.  Together, these servers contained the bitcoin and the "entire

4    transaction history and users of the website." Reply Brief, Dkt. No. 99 at 3:10-11.

5              Upon a user registering via the website, the Marketplace assigned the user a Bitcoin

6    address.  *Id.* at 44.  A user "would send bitcoin to a Bitcoin address assigned to the [user] but

7    controlled by Silk Road."  Haynie Decl. dated August 24, 2021, Dkt. No. 99-2, ¶ 30.  Silk Road

8    then "tumbled" all user deposits.  *Id.*  As explained by Special Agent Haynie, "[p]ayments going

9    into Silk Road were tumbled so that the bitcoin could *not be traced back to a particular user*."

10   *Id.* (*emphasis* added).  This was possible because a key feature of bitcoin's functionality is

11   fungibility.  Wajda Decl. ¶ 39-46; *see* Satoshi Nakamoto, *Bitcoin: A Peer-to-Peer Electronic*

12   *Cash System,* BITCOIN.ORG (2009) https://bitcoin.org/en/bitcoin-paper; *Ox Labs, Inc. v. Bitpay,*

13   *Inc., No.* CV 18-5934-MWF (KSX), 2020 WL 1039012 (C.D. Cal. Jan. 24, 2020), *aff'd,* 848 F.

14   App'x 795 (9th Cir. 2021); *also see Commodity Futures Trading Comm'n v. McDonnell,* 287 F.

15   Supp. 3d 213 (E.D.N.Y.), *adhered to on denial of reconsideration,* 321 F. Supp. 3d 366

16   (E.D.N.Y. 2018).

17             Upon sending bitcoin to a Silk Road address, the user was never provided a private key

18   associated with the address.  Rather, the user's profile "would be credited with the requisite

19   amount of bitcoin."  Haynie Decl. dated August 24, 2021, Dkt. No. 99-2 ¶ 30.  The user could use

20   that credit to engage in a transaction with a Silk Road vendor.  *Id.*  "The actual bitcoin received

21   by the vendor was not the same bitcoin the [user] used to fund his account."  *Id.*  A user could

22   access the Marketplace but did not control the movement of bitcoin.

23             Mr. Ulbricht solely controlled the private keys associated with all addresses maintained on

24   the Bitcoin Server, including corresponding user addresses.  Wajda Decl. ¶ 50-5.  Users knew

25   their Bitcoin address only, and they did not have access to the associated private key.  *Id.* ¶ 56.

26   Only Mr. Ulbricht could send or spend bitcoin held by the Marketplace.  *Id.* ¶ 57-8.  His role was

27   to settle Marketplace transactions and collect commissions on each sale. *Id.* 22

28

-4-
**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

1

### C.     Mr. Matusko's and His Marketplace User Profile

2

Mr. Matusko is a German citizen residing in Berlin, Germany. Declaration of Ilija

3

Matusko ("Matusko Decl."), ¶ 1.  German is his first language. *Id.*  He has no legal education. *Id.*

4

¶ 2.  He has worked as a content editor since 2012 and he presently works for the German

5

newspaper "taz." *Id.* ¶ 3.  He has never been contacted by any US governmental official regarding

6

the Silk Road or his user profile. *Id.* ¶ 13.

7

In 2011, Mr. Matusko became curious about the Silk Road. *Id.* ¶ 6.  He discovered that the

8

Marketplace required a user profile to view the Marketplace website. *Id.* at ¶ 7.  This required him

9

to create a user profile and transfer bitcoin to the Marketplace's wallet.  He purchased 48 bitcoin

10

from a friend for EUR150 obtained from legal sources. *Id.* ¶¶ 3, 8.

11

He then set up a user profile, "hanson5" and sent the 48 bitcoin to the Bitcoin address

12

assigned by the Marketplace. *Id.* ¶ 8.  The government has verified the username, the timeline,

13

and the transfer of 48 bitcoin. Declaration of Jeremiah Haynie, Dkt. 95-1 ¶ 12 ("Haynie Decl.

14

dated July 28, 2021") ("A copy of the Silk Road server when it was seized in October 2013

15

showed that the hanson5 account received 47.52 bitcoin in December 2011.").  At no time did the

16

Marketplace provide, nor did Mr. Matusko know, the private key to access the Marketplace wallet

17

or thereafter control the 48 bitcoin. *See* Wajda Decl. ¶¶ 55-6.

18

Mr. Matusko accessed the Marketplace through his user profile a handful of times, but

19

never purchased anything. Matusko Decl. ¶ 9. Those 48 bitcoin remained in the Marketplace's

20

wallet until the government seized the Bitcoin wallet. Haynie Decl. dated July 28, 202 ¶ 13.

21

### D.     2013 Seizure and Notice of Earlier Forfeiture Action

22

As is well documented, the government seized the Marketplace Servers and Bitcoin

23

Servers on or about October 2, 2013. Reply Brief, Dkt. 99 at 3.  "The extent of the government's

24

investigation into [Silk Road] . . .  cannot be overstated. When the government seized the Silk

25

Road website in 2013, it preserved its servers, which contain the entire transaction history and

26

users of the website." *Id*.  This investigation led to the prosecution of Mr. Ulbricht and a related

27

forfeiture of the bitcoin seized in 2013.

28

The government falsely believes that "all of the bitcoin was tainted because it all came

**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

from individuals wishing to purchase illicit goods and services."  Haynie Decl. dated August 24, 2021, Dkt. No. 99-2 ¶ 30.  However, Silk Road was not exclusively used for the purchase of illicit goods and services. *Products,* Silk Road (marketplace), WIKIPEDIA https://en.wikipedia.org/wiki/Silk_Road_(marketplace) (last visited Aug. 25, 2021).  Rather, the Silk Road had some lawful goods and services, to include art, apparel, and books. *Id.*

The government, however, never notified any of the 100,000-plus Marketplace users by email, physical mail, or any other direct manner.  In seizing the Marketplace website, the government uploaded a seizure notice in English only. *See* Haynie Decl. dated July 28, 2021 ¶ 8. It did not provide a link to forfeiture.gov or otherwise provide information regarding affected users. *Id.*  It is therefore unsurprising that no Marketplace users filed a claim in that forfeiture action. *See* Filing History, *United States of America v. Ulbricht et al* (No. 13-cv-06919).

### E.      The Sources of the 1HQ3 Bitcoin

On May 6, 2012, a third party stole 70,411.62 bitcoin from "addresses controlled by Silk Road and transferred it to two Bitcoin addresses [1BAD] and [1BBq]." Haynie Decl. dated July 28, 2021, ¶ 9. IRS-CI Special Agent Jeremiah Haynie "personally conducted blockchain analysis of the bitcoin at issue in this case and was involved in the investigation from its inception to the present day."  Haynie Decl. dated August 24, 2021, Dkt. 99-2 ¶ 1.  This analysis includes Special Agent Haynie "personally conduct[ing] the tracing and analysis of the 1HQ3 Bitcoin address." Haynie Decl. dated August 24, 2021, Dkt. 99-2 ¶ 3.

Special Agent Haynie's sworn testimony initially indicates that "the transfers to 1BAD and 1BBq came from the general pool of Silk Road bitcoin and not from any particular user accounts." Motion to Strike, Dkt. 95-1, ¶ 9; Haynie Decl. dated August 24, 2021, Dkt. 99-2 ¶ 7. Special Agent Haynie, however, clarifies this analysis as follows:

> In this case, Individual X sent the stolen bitcoin to 1BAD and 1BBq in 54 separate transactions.  Each of those transactions was funded by multiple bitcoin addresses associated with Silk Road.  In total, 1BAD and 1BBq was funded by approximately 3,056 sending addresses … Of the 3,056 sending addresses, 3,014 were deposit addresses for Silk Road users.  I determined this by having an IRS-CI analyst compare each of the 3,056 addresses with the addresses stored in the data from the seized Silk Road servers.  This means that 98 percent of the sending addresses that funded 1BAD & 1BBq and therefore 1HQ3, were addresses used by Silk Road users . . .

Haynie Decl. dated August 24, 2021, Dkt. 99-2 ¶ 30.

**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

1

**F.     Mr. Matusko Acted Precipitously to File Verified Claim**

2       Mr. Matusko was unaware of either forfeiture action or his rights to file a claim.  In early

3    2021, a friend suggested that he consult German counsel, Tom Westermann ("Mr. Westermann").

4    Mr. Westermann began contacting counsel located in the United States.  Declaration of Tom

5    Westermann ("Westermann Decl.") ¶ 3.  On or about April 28, 2020, he contacted the

6    undersigned and inquired whether Mr. Matusko had any remedies at law. *Id.* ¶ 4. The undersigned

7    evaluated the underlying facts and determined that Mr. Matusko may have a viable claim.  The

8    undersigned contacted AUSA Countryman by telephone and email to discuss the matter.  AUSA

9    Countryman simply responded by email that the government viewed the claim to be untimely.

10   He did not return the phone call or request any additional information.  The undersigned worked

11   with Mr. Matusko and Mr. Westermann to formalize the engagement and verify facts.  Mr.

12   Matusko filed his verified claim on July 2, 2021. Verified Claim, Dkt. 87.

13   **III.    MR. MATUSKO'S CLAIM IS TIMELY AND THE GOVERNMENT HAS NOT**

14           **SATISFIED NOTICE REQUIREMENT FOR MARKETPLACE USERS**

15       Mr. Matusko is a potential known claimant, and his claim is timely.  It is the government

16   that has not met statutory requirements.  The government has information on every Silk Road

17   user to this day.  Despite available methods to link cryptocurrency transactions with individuals,

18   the government appears to have determined that notice was not required on the basis that "all

19   [seized] bitcoin was tainted because it all came from individuals wishing to purchase illicit goods

20   and services."  Haynie Decl. dated August 24, 2021, Dkt. No. 99-2 ¶ 30.  Consequently, it

21   apparently made no effort to notify users of either forfeiture action.  The government has not met

22   its initial notice requirements to proceed with the forfeiture.

23       Even if the Court concludes Mr. Matusko's claim is untimely, the facts demonstrate the

24   Mr. Matusko has acted in good faith and the government is not prejudiced by the filing of the

25   claim.

26       **A.     Forfeiture Statutes Are to be Strictly Construed Against the Government.**

27       It is well established that forfeiture statutes are strictly construed against the government

28   and not favored in the law. *United States v. $493,850.00 in U.S. Currency*, 518 F.3d 1159 (9th

**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

1    Cir. 2008; *citing $191,910.00 in U.S. Currency*, 16 F.3d 1051, 1069 (9th Cir. 1994)); *see also*

2    *United States v. Ritchie*, 342 F.3d 903 (9th Cir. 2003) ("[b]ecause forfeitures are disfavored, *see*

3    *United States v. One Ford Coach*, 307 U.S. 219 (1939)  forfeiture laws and their notice provisions

4    are 'strictly construed . . . against the government'" *citing United States v. Marolf*, 173 F.3d 1213

5    (9th Cir. 1999); *United States v. Real Properties located at 7215 Longboat Drive (Lot 24)*, 750

6    F.3d 968 (8th Cir. 2014) ("[o]ur circuit has noted that 'forfeitures are not favored' in the law"

7    *citing United States v. One 1980 Red Ferrari*, 875 F.2d 186, 188 (8th Cir.1989) (per curiam)).

8         The government asks this Court to construe forfeiture rules against a claimant who is an

9    innocent owner, who's property was acquired legally, and never used in any unlawful

10   transactions.  The strict construction the government advances should be rejected.

11        **B.       The Government Never Provided Adequate Notice To Known Claimants.**

12        Each Silk Road user is a known potential claimant.  The government did not provide Mr.

13   Matusko—or any Silk Road user—with direct notice here or in the 2013 forfeiture.  However, in

14   similar bitcoin forfeiture actions, the government traced all transactions on the bitcoin blockchain

15   and provided direct notice via certified mail and email to all potential users.  *United States v.*

16   *Twenty-Four Cryptocurrency Accts.,* 473 F. Supp. 3d 1 (D.D.C. 2020).

17        In a forfeiture action, the government must provide two (2) types of notice: (1) direct

18   notice to persons who reasonably appear to be a potential claimant, and (2) notice by publication.

19   Supp. R. G(4)(a)-(b).  To identify potential claimants, "reasonable efforts must be taken . . . to

20   identify any person or entity with a likely ownership interest" before a complaint is filed. Asset

21   Forfeiture Policy Manual (U.S. Department of Justice, 2021) at 86, n. 45.  Publication is typically

22   satisfied by posting notice on the government's website (forfeiture.gov). Asset Forfeiture Policy

23   Manual at 111; Supp. R. G(4)(a)(iv)(C).  However, if known potential claimants are in a foreign

24   country, then notice may need to be published in a newspaper of general circulation "in the

25   appropriate foreign language, in the country in which known potential claimants are located." *Id.*;

26   see Supp. R. G(4)(a)(iv).  These notice requirements give individuals whose property interest are

27   at stake due to governmental actions notice and opportunity to be heard, thereby satisfying

28   constitutional due process requirements.  *Dusenbery v. U.S.,* 534 U.S. 161, 167 (2002); U.S.

**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

1    CONST. Amend. V.  The Supreme Court has specified that due process is satisfied when the

2    government's effort is "'reasonably calculated' to apprise a party of the pendency of the action."

3    *Dusenbery*, 534 U.S. 161 at 170 (*quoting Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S.

4    306, 315 (1950)).

5         These notice principles have been applied to users of another illicit, internet marketplace

6    in *United States v. Twenty-Four Cryptocurrency Accts.*  In that case, the government seized

7    cryptocurrency accounts associated with a Tor-based website engaging in the sale of illicit

8    content. *Twenty-Four Cryptocurrency Accts.,* 473 F. Supp. 3d 1.  There, the government analyzed

9    the blockchain, transactions on the website, and other information to identify claimants.  *Twenty-*

10   *Four Cryptocurrency Accts.*, 473 F. Supp. 3d at 3.  The government then notified the users by

11   certified mail and email.  *Id.*  The D.C. District Court held that the government's efforts and

12   notice were appropriate when dealing with otherwise unidentified users of an online marketplace.

13   *Id.*

14        Here, the government knows and has information on thousands of Silk Road users both

15   domestic and abroad but chose to notify to Mr. Ulbricht only. Haynie Decl. dated July 28, 2021,

16   Dkt. 95-1 ¶ 4 ("purchases appear to have been filled by vendors located in over ten different

17   countries").  The government has made clear it can verify specific user transactions because it

18   verified that Mr. Matusko sent "47.52 bitcoin in December 2011" to the corresponding address in

19   the Silk Road wallet.  Mr. Matusko's user profile was credited with that amount and that credit

20   always remained . . . [and] had the same balance when the server was seized." *Id.* ¶ 12.  The

21   government offers no explanation why it did not analyze Silk Road users' transactions or other

22   data in an effort to notify known claimants as in *Twenty-Four Cryptocurrency Accts*.  The extent

23   of the government's investigation "can not be overstated".  Reply Brief, Dkt. No. 99 at 3.

24   However, it appears the government believes that Mr. Ulbricht—who's seized bitcoin was

25   primarily comprised of commission payments from brokering the sale of illegal goods—is the

26   only party entitled to direct notice, rather than numerous Silk Road users who engaged in no

27   illegal transactions.  Nonetheless, the government's conduct here is inconsistent with its effort to

28   notice individual users in *Twenty-Four Cryptocurrency Accts*.

Mr. Matusko is a known claimant in both relevant forfeiture proceedings.  The government has yet to demonstrate an attempt identify and notice potential claimants and did not follow proper procedure.  Rather, it looks to hold an innocent property owner accountable for their own failure.  Notice was given to one known potential claimant (Mr. Ulbricht) and then posted on a U.S. government website in English only – even though it was known potential claimants were located abroad, contrary to guidance published in the Forfeiture Policy Manual. Forfeiture Policy Manual at 111 ("Published notices on forfeiture.gov are limited to English at this time. . . depending on the facts of the case, it may be appropriate to publish notice in a newspaper of general circulation").  It is unclear why the government chose to disregard their own procedural requirements here, especially when they were dutifully observed in *Twenty-Four Cryptocurrency Accts*.  Now the government asks this Court to turn a blind eye to its inaction and—contrary to precedent—strictly construe these forfeiture rules against Mr. Matusko and an untold number of potential claimants who never received proper notice.  Indeed, the government's effort to notice potential claimants misses the mark of being "'reasonably calculated' to apprise a party of the pendency of the action."  *Dusenbery*, 534 U.S. 161 at 170.

If a court determines notice is insufficient, then the remedy is to void and vacate the original proceeding. *United States v. Marolf*, 173 F.3d 1213, 1217 (9th Cir. 1999) (denying forfeiture where government "erred" by failing to provide due notice to property owner); *see also Longenette v. Krusing*, 322 F.3d 758, 765 (3d Cir. 2003) ("Four appellate courts—the Courts of Appeals for the Second, Fifth, Ninths, and Tenth Circuits—have held that a forfeiture conducted without adequate notice is void *citing Alli–Balogun v. United States*, 281 F.3d 362, 370–71 (2d Cir.2002); *Kadonsky v. United States*, 216 F.3d 499, 506–07 (5th Cir. 2000); *United States v. Marolf*, 173 F.3d 1213, 1218–20 (9th Cir.1999); *Clymore v. United States*, 164 F.3d 569, 574 (10th Cir.1999)).

Here, since notice was inadequate, the forfeiture action is void.

**C.** **Relevant Factors Support Allowing Mr. Matusko's Claim to Proceed.**

In the event the Court finds Mr. Matusko's claim to be untimely, then Mr. Matusko requests the Court exercise its discretion to proceed on the claim's merits.  Mr. Matusko acted in

good faith, has demonstrated a direct interest in the subject property and has a right to due process.

In a civil forfeiture action, the court has discretion to hear a claim that is untimely filed. Rule G(5)(a)(ii)(A); *see United States v. Real Prop. Located at 17 Coon Creek Rd., Hawkins Bar California, Trinity Cty.,* 787 F.3d 968, 974 (9th Cir. 2015); *United States v. Real Property at 2659 Roundhill Dr., Alamo, Cal*., 194 F.3d 1020, 1024 (9th Cir. 1999) ("The plain language of Rule 6(C) provides that claims must be filed within ten days of service of process or 'within such additional time as may be allowed by the court.  Here, the district court exercised its discretion and allowed the late filings."); *see also United States v. 4492 S. Livonia Rd.*, 889 F.2d 1258, 1262 (2nd Cir. 1989) ("When, as here, a claimant has made a sufficient showing of interest in the property through filing with the court a motion and accompanying affidavits, technical noncompliance with the procedural rules governing the filing of claims may be excused."). The Ninth Circuit applies a factor test when evaluating whether to exercise discretion to let a late claim proceed:  Those factors are argued below in the same order as the government's Motion to Strike.  These twelve factors are taken from *United States v. $100,348.00 in U.S. Currency*, 354 F.3d 1110, 1118 (9th Cir. 2004)).

The government asks this court to ignore precedent to weigh forfeiture rules against the government and further ignores the facts, which demonstrate that these factors weigh in Mr. Matusko's favor.[2]

      i.     **Claimant was not aware that he had any rights in the seizure and his counsel informed the U.S. Attorney's office that he intended to make a claim even though he was not properly served (First and Sixth Factor).**

The first factor is when claimant became aware of the currency's seizure, and the sixth factor is whether the claimant informed the government and the court of its interest before the claim's deadline. *Id.*

The first factor should favor Mr. Matusko because he was not aware of the legal

---

[2] These factors are argued in the same order as the government presented them in their Motion to Strike.

**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

1    implications of the seizure when it occurred.  The sixth factor should favor Mr. Matusko because

2    he was never properly served and his counsel informed the U.S. Attorney's office that he intended

3    to make a claim.

4          The government argues that because Mr. Matusko was aware that the government shut

5    down Silk Road, he was similarly aware that the bitcoin in his user account had been seized,

6    which in turn should have put the Claimant on notice that he had certain legal rights to reclaim his

7    property. *See* Motion to Strike, Dkt. 95 at 19.

8          The government's argument that Mr. Matusko was aware of the seizure necessitates a

9    close examination of the relevant case law that established this factor, as well as the definition of

10   a "seizure." A claimant is "aware" as a matter of fact when the record reflects actual knowledge.

11   *United States v. $100,348.00 in U.S. Currency,* 354 F.3d 1110, 1117 (9th Cir. 2004).  There, the

12   claimant filed the claim months after submitting declaration supporting another claimant in the

13   same matter.  *Id.*  This demonstrated the claimants' actual knowledge of the forfeiture proceeding.

14         Here, Mr. Matusko filed a claim even though he did not receive direct notice as a known

15   potential claimant.  Mr. Matusko is a German citizen that resides in Berlin, Germany. Matusko

16   Decl. ¶ 1.  His first language is German. *Id.*  He has no formal knowledge of U.S. laws generally

17   or forfeiture actions. *Id.* ¶ 2.  Although Mr. Matusko was admittedly "generally aware" that Silk

18   Road has been seized by the FBI, he had no meaningful awareness of what this meant in terms of

19   his right to the bitcoin he sent to the Silk Road wallet.  After the Silk Road takedown and seizure,

20   Mr. Matusko assumed his was lost, and he had no notion that he had legal rights to recover his

21   property. Mr. Matusko did not realize that recovery was even a possibility until U.S. counsel,

22   contacted via German Counsel, investigated the circumstance. *Id.* ¶¶ 11-4.  It is not reasonable to

23   conclude Mr. Matusko—a foreign national residing in Berlin—was aware of the seizure and his

24   rights.  Also, the seizure notice published on the Silk Road website makes no mention of

25   forfeiture.gov and does not give any information regarding the rights innocent owners may have

26   to reclaim their property.

27         The government further argues that Mr. Matusko never informed the Court of his interest

28   in the Defendant Property before the claim deadline. Motion to Strike, Dkt. 95 at 19.  At stated in

**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

1  the analysis above. Mr. Matusko was wholly unaware of the forfeiture action prior to the claim

2  deadline.

3       This factor supports allowing Mr. Matusko's claim to proceed.

4      **ii.**     **The government disregarded procedural and notice requirements that**

5                **encouraged the delay in Mr. Matusko's claim (Second, Fourth, and Ninth**

6                **Factors).**

7       The second factor is whether the Unites States Attorney may have encouraged the delay;

8  the fourth factor is whether the claimant was properly served; and the ninth factor is whether the

9  government complied with its procedural rules. *$100,348.00 in U.S. Currency*, 354 F.3d 1110,

10  1118.

11       The government apparently made a unilateral determination that no Silk Road user

12  (except Ross Ulbricht) is entitled to notice.  It did not meet its statutory requirement to provide

13  notice that was reasonably calculated to notify known claimants, especially in light of the fact that

14  Mr. Matusko (and thousands of other users) reside outside of the United States.  As discussed

15  below, this factor supports allowing Mr. Matusko's claim to proceed to the merits.

16       The government had the resources to identify and notice known potential claimants.  Yet,

17  the government made no effort to identify known claimants in this action except only notifying

18  Mr. Ulbricht.  As a result, the government encouraged delay, failed to provide adequate notice,

19  and skirted procedural rules.  The government's failure here delayed Mr. Matusko's claim.  As a

20  known potential claimant, Mr. Matusko—along with all other users of the Silk Road—were

21  entitled to direct notice of the forfeiture action.  Simply publishing the notice on forfeiture.gov in

22  English does not follow the government's established procedural requirements to identify and

23  provide direct notice to potential claimants.  This factor supports the Court exercising its

24  discretion to allow the claim to proceed.

25      **iii.**    **Mr. Matusko had no health issues inhibited him from making a claim (Third**

26                **Factor).**

27       The third factor is whether the claimant's health prevented him from making a timely

28  claim. *$100,348.00 in U.S. Currency*, 354 F.3d 1110, 1118.

**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

1    Mr. Matusko did not have health issues that inhibited him from making a claim.

2    However, because Mr. Matusko was not properly served, this factor should not be weighed

3    against him and is not relevant in this matter.

4         iv.    **Mr. Matusko would be prejudiced with his claim were dismissed, not the**

5                **government (Fifth Factor).**

6    The fifth factor is whether there is any prejudice to the government in permitting the claim

7    to go forward. *Id.*

8    Dismissing the claim would substantially prejudice Mr. Matusko as his property rights

9    would be terminated without consideration of the claim's merits.  As previously discussed, Mr.

10   Matusko is a known potential claimant entitled to direct notice.  Mr. Matusko received no notice

11   in 2013 and no notice in this forfeiture action.  As such, he received no procedural protections and

12   stands in a state of severe prejudice: He has been divested of legally acquired property that is

13   presently worth over $2 million USD and was used for no illegal transaction.  Hearing Mr.

14   Matusko's claim will not prejudice the government.

15   The government suffers no prejudice if Mr. Matusko's claim is allowed.  Multiple claims

16   are still pending in this matter, and the government filed motions to strike to each verified

17   claim—both late-filed and timely-filed—on the same day.  Mr. Matusko's claim has not delayed

18   or otherwise impeded the government's forfeiture action.

19   The government points to bitcoin's volatility and argues that "Matusko's continued

20   participation in these proceedings would . . . complicate the matters before the Court . . . [and]

21   contribute to the uncertainty of the value of the Defendant Property." Motion to Strike, Dkt. 95 at

22   20.  This argument values the government's potential windfall over the due process rights of

23   property owners.[3]

24   The potential deprivation of Mr. Matusko's property rights far outweighs any speculative

25   prejudice claimed by the government.  This factor favors Mr. Matusko.

26   _____

27   [3] Since the government first took custody of the 69,370 Bitcoin from Individual X on November
     3, 2020, Bitcoin has increased in value from approximately $14,000 to consistently holding above
28   $30,000 since July 2021, this represents a nearly 100% increase from the subject property's
     seizure. Price of Bitcoin, COINDESK, https://www.coindesk.com/price/bitcoin (last visited Aug.
     25, 2021).

**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

1      ### v.    No trial date has been set (Seventh Factor).

2           The seventh factor is whether the claimant expended resources preparing for trial.

3      *$100,348.00 in U.S. Currency*, 354 F.3d 1110, 1118.

4           This factor is irrelevant because this matter is still in its early stages and has not been set

5      for trial.

6      ### vi.   Mr. Matusko's Reason For Delay Is Made In Good Faith (Eighth Factor).

7           The eight factor is the claimant's good faith. *Id.*

8           Mr. Matusko's late claim is made in good faith. Mr. Matusko has no prior training or

9      background in U.S. legal matters and had no reason to know he had the ability to make a claim.

10     He received no notice and had no knowledge that he could assert his right to the forfeited

11     property. Mr. Matusko believed that his property was lost.  Mr. Matusko learned he may have

12     legal recourse on in early 2021, he sought counsel in Germany contacted the undersigned counsel

13     to file the claim. Matusko Decl. ¶¶ 11-6.

14          The government suggests Mr. Matusko lacks good faith because he published two (2)

15     short articles on bitcoin and the Silk Road:  The government does not explain, however, how Mr.

16     Matusko's awareness of Silk Road's influence on bitcoin's 2013 zeitgeist demonstrates bad faith.

17     Mr. Matusko has never claimed that he was ignorant to Silk Road's shutdown and seizure.

18     Rather, Mr. Matusko asserts that he did not know he had any legal recourse to claim property

19     following the seizure.  Here, the government failed to give direct notice to Mr. Matusko as a

20     potential claimant on two separate occasions and now suggests he is acting in bad faith.  Here, the

21     government is the bad actor.

22     ### vii.  Mr. Matusko was unrepresented for two months before retaining counsel
23     ###       (Tenth Factor).

24          The tenth factor is whether the claimant is acting pro se. *$100,348.00 in U.S. Currency*,

25     354 F.3d 1110, 1118.

26          Mr. Matusko was unrepresented when the complaint was first filed in November 2020 and

27     until June 2021.  His claim was filed shortly after retaining local counsel to vet and prepare the

28     verified claim.  Mr. Matusko is not pro se, however, any delay resulted from his ignorance of the

-15-
**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

forfeiture action and his potential rights.

### viii. Mr. Matusko informally notified the government of the potential claim through counsel (Eleventh Factor).

The eleventh factor is whether the claimant petitioned for an enlargement of time. *$100,348.00 in U.S. Currency*, 354 F.3d 1110, 1118.

This factor should not be weighed against Mr. Matusko because he was never properly served. The undersigned contacted AUSA David Countryman by telephone and email to notify the government of a potential claim. AUSA David Countryman simply informed the undersigned that they would seek to have any "late" claims dismissed. Mr. Countryman did not express any interest in learning about the facts of the claim or related legal issues. Simply stated, the government was aware of the claim before it was filed and already knew that it intended to challenge the timeliness. This factor does not support the government.

### ix. Sufficient claim (Twelfth Factor).

The twelfth factor is the claim's sufficiency. *$100,348.00 in U.S. Currency*, 354 F.3d 1110, 1118.

As discussed below, Mr. Matusko's claim is sufficient and he has standing in this matter. The government argues that Mr. Matusko has no "real interest in the property" and observes that "[e]ntirely frivolous claims may be filed by people who have no connection with the forfeiture case, except that they read about it on the Internet." Motion to Strike, Dkt. 95 at 12. The suggestion that Matusko's claim is "frivolous" flies in the face of the government's own admissions. The government confirms Mr. Matusko's (1) Marketplace user profile, (2) that Mr. Matusko sent 48 bitcoin to the Silk Road wallet, and (3) that the Marketplace credited his user profile with that amount at all times relevant. Further, Mr. Matusko's account remained dormant and was never used any transaction – illicit or otherwise. And while the government has record of every transaction and user, it continues to imply that Mr. Matusko has unclean hands without factual support.

As is more thoroughly discussed below, the testimony of Special Agent Haynie undercuts the government's theories challenging standing. This factor supports Mr. Matusko.

**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

**IV.    MR. MATUSKO'S CLAIM, CONFIRMED BY THE GOVERNMENT, ASSERTS AN INTEREST IN THE BITCOIN**

Mr. Matusko's standing in this matter is undeniable.  The allegations in the verified claim assert a direct financial interest, let alone a colorable interest, in the property.  These allegations alone are sufficient to deny the government's motion[4].  However, Special Agent Haynie's statements in his declarations in this matter directly undercut the government's arguments against standing.  Finally, Mr. Matusko requests that the Court estop the government from arguing that this verified claim is precluded by the earlier forfeiture action.

Ultimately, the claim's material allegations as confirmed by the government demonstrate a colorable claim.  Mr. Matusko has standing and requests the Court deny the motion with prejudice.

**A.    Standing is Established By Asserting Financial Interest Under Civil Forfeiture's Forgiving Standards**

To satisfy standing in a forfeiture proceeding, a claimant must simply demonstrate "a colorable interest in the property" such as "title or financial stake." *United States v. Real Prop. Located at 475 Martin Lane, Beverly Hills, CA,*, 545 F.3d 1134, 1140 (9th Cir. 2008); *see also United States v. 5208 Los Franciscos Way*, 385 F.3d 1187, 1191 (9th Cir. 2004); *United States v. Real Prop. Located at 17 Coon Creek Rd., Hawkins Bar California, Trinity Cty.*, 787 F.3d 968, (9th Cir. 2015).  A claimant need not "definitively prove the existence of [his] interest.*" United States v. All Assets Held at Bank Julius Baer & Co.*, 959 F. Supp. 2d 81, 95 (D.D.C. 2013).  The requirements for a claimant to establish standing to contest a forfeiture are "very forgiving." *United States v. All Assets Held in Acct. No. XXXXXXXX in name of Doraville Properties* Corp., 299 F. Supp. 3d 121 (D.D.C. 2018) (quoting *United States v. Emor,* 785 F.3d 671, 676 (D.C. Cir. 2015)).

The term "standing" is something of a misnomer, as "courts have 'discretion to overlook

---

[4] The government's motion should be denied for failing to identify whether it seeks relief under Fed. R. Civ. P. 12(c) or 56.  It is curious that Mr. Matusko (and other claimants) are left to infer the applicable standard.  For this reason, the motion should be denied.  Nonetheless, Mr. Matusko will address the motion under both standards.

**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

1   the failure to conform to the requirements of [forfeiture claim rules].' " *United States v.*

2   *$11,500.00 in U.S. Currency*, 710 F.3d 1006, 1012 (9th Cir. 2013) (quoting *United States v. 2659*

3   *Roundhill Dr.*, 194 F.3d 1020, 1024 (9th Cir. 1999)) (alteration in original); *see also United*

4   *States v. 4492 S. Livonia Rd.*, 889 F.2d 1258, 1262 (2d Cir. 1989) (excusing technical

5   noncompliance with procedural rules governing filing of claims on ground that claimant made

6   sufficient showing of interest in property).

7       The precise "manner and degree of evidence required" to demonstrate standing will vary

8   according to the stage of litigation.  *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629,

9   637 (9th Cir. 2012) (*quoting Lujan*, 504 U.S. at 561, 112 S.Ct. 2130).  A claimant's unequivocal

10  assertion of ownership is sufficient, at the judgment on the pleadings stage, to establish statutory

11  standing in a civil forfeiture proceeding.  *U.S. v. Real Property Located at 17 Coon Creek Road,*

12  *Hawkins Bar California, Trinity County*.  787 F3d, 968 (9th Cir. 2015) (reviewing under the

13  judgment on the pleadings standard).

14      **B.**   **Mr. Matusko Alleged a Financial Interest in the Subject Property**

15      The allegations in the verified claim, accepted as true[5], establish Mr. Matusko's standing.

16  Mr. Matusko unequivocally asserted financial interest in the seized bitcoin.  He created a user

17  profile on the Marketplace, he sent 48 bitcoin to the Marketplace's Bitcoin wallet, and he has

18  always had a credit on the Marketplace for that amount.   Therefore, Mr. Matusko has asserted a

19  financial interest in bitcoin recovered by the government.

20      Further, the forfeiture complaint relies on the unlawful actions conducted on the

21  Marketplace as the legal basis for forfeiting the recovered bitcoin.  If not, the assets would be

22  returned to the Marketplace and its users would have right for the return of any credit.[6]  Thus, Mr.

23  _____

24  [5] The moving party must demonstrate is entitled to judgment as a matter of law.  Fed.R. Civ. P.
    12(c); *see Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*, 543 F.3d 586 (9th Cir.

25  2008). The non-moving party's allegations must be accepted as true, while the allegations of the
    moving party that have been denied are assumed false.  *Doleman v. Meiji Mut. Life Ins. Co.*, 727

26  F.2d 1480, 1482 (9th Cir. 1984).  Only if, on the facts so admitted, the moving party is clearly
    entitled to prevail can the motion be granted.  *Austad v. U.S.,* 386 F.2d 147, 149 (9th Cir. 1967).

27  Hence, the government motion must meet the high burden.

28  [6] And for reasons discussed below, the timing of the hack is irrelevant to Mr. Matusko's colorable
    claim.

-18-

**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

1 | Matusko has alleged colorable claim in the property.

2 | **C.** **Special Agent Haynie's Testimony Contradicts the Government's Theory**

3 | A challenge to a claimant's standing is appropriately addressed at the motion for summary

4 | judgment stage. *See US v. $133,420.00 in U.S. Currency*, 672 F3d 629, 639 (9th Cir. 2012). And

5 | certainly, the government's motion is supported by evidence in the form of declarations.

6 | Nonetheless, the government has fallen well short of its burden of demonstrating no material

7 | issue of fact.

8 | The thrust of the government's argument is that Individual X did not steal Mr. Matusko's

9 | bitcoin. Consequently, Mr. Matusko, the government reasons, has no interest in the subject

10 | property. Motion to Strike, Dkt. 95 at 2. It is essentially a tracing argument. In other words, Mr.

11 | Matusko lost "his" 48 bitcoin as a result of 2013 Silk Road takedown and seizure. This argument

12 | relies on flawed interpretations of how the Marketplace functioned and bitcoin generally.

13 | First, Marketplace users did not hold a right to any specific bitcoin. Fungibility is a

14 | fundamental aspect of how Bitcoin operates. A bitcoin is equivalent to any other bitcoin. This

15 | concept is demonstrated by the Marketplace's operation. Each bitcoin sent to the wallet was

16 | "tumbled" "so that the bitcoin could not be traced back to a particular user." Further, if a user

17 | engaged in a transaction, the "actual bitcoin received by the vendor was not the same bitcoin the

18 | [user] used to fund his account." Haynie Decl., Dkt. No. 99-2 ¶ 30.

19 | Thus, the concept that Mr. Matusko lost "his" bitcoin is flawed. It is impossible for a user

20 | to retrieve "his" bitcoin after sending it the Marketplace's wallet. When the government seized

21 | the Marketplace's bitcoin wallet, it also seized the bitcoin. This seizure, however, it did not affect

22 | any user's Marketplace credit. Therefore, any user with an outstanding credit has a financial

23 | interest the Marketplace's bitcoin, to include bitcoin the Marketplace lost as a result of the hack.

24 | Besides being fungible and untraceable, a Marketplace user lost any control of bitcoin sent

25 | to an address in the Marketplace's wallet. A user "would send Bitcoin to a bitcoin address

26 | assigned to the [user] but controlled by Silk Road." Haynie Decl., Dkt. No. 99-2 ¶ 30. There is a

27 | "significant difference" between a wallet and an address. A "wallet is a collection of private keys

28 | and corresponding addresses. It is typically under the control of a single private individual or

**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

service.  An address is a digital destination used to send and receive cryptocurrency funds."  Here, the single user was Mr. Ulbricht.

Mr. Matusko was only "assigned" a wallet address.  He never held the private keys and lost all control of the 48 bitcoin after sending it to the address.  Mr. Ulbrict alone controlled the movement of bitcoin in that address.  Again, "not your keys, not your bitcoin."  Thus, Mr. Matusko did not have private keys to send the bitcoin from the Marketplace wallet to a wallet that he controlled.

Finally, the government advances a factual assertion that that the hacked bitcoin came from a "general pool."  Specifically, the government motion states as follows:  "In fact, the BTC Individual X stole came from the general pool of Silk Road bitcoin and not from any particular user accounts, meaning that no user balances were impacted by the hack. Motion to Strike, Dkt. 95 at 2.

While this ignores the fungibility aspect and contrives the idea of specific user accounts, Special Agent Haynie's testimony regarding the "general pool's" composition directly contradicts that notion:

> In this case, Individual X sent the stolen bitcoin to 1BAD and 1BBq in 54 separate transactions.  Each of those transactions was funded by multiple bitcoin addresses associated with Silk Road.  **In total, 1BAD and 1BBq was funded by approximately 3,056 sending addresses … Of the 3,056 sending addresses, 3,014 were deposit addresses for Silk Road users.**  I determined this by having an IRS-CI analyst compare each of the 3,056 addresses with the addresses stored in the data from the seized Silk Road servers.  This means that 98 percent of the sending addresses that funded 1BAD & 1BBq and therefore 1HQ3, were addresses used by Silk Road users . . .

Haynie Decl., Dkt. 99-2 ¶ 30 (emphasis added).

While the government represents that "no user balances were impacted by the hack," Special Agent Haynie confirms that at least 3,014 user deposit addresses directly funded the wallets used to accomplish the hack.  The government's argument is directly contrary to its own agent's testimony.

Even if the Court concluded Mr. Matusko had to trace untraceable bitcoin from a wallet that he did not control to the hacked bitcoin, Special Agent Haynie's statements reflects that 3,014 user addresses were affected.  One of those addresses could have been assigned to Mr.

-20-

**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

Matusko.  This certainly raises a material dispute of fact and even confirms Mr. Matusko's colorable claim.  Again, the government is challenging Mr. Matusko's standing.  And that argument is dubious at best.

### D. The Government Should be Estopped From Challenging Mr. Matusko's Claim Because He Did Not Make Claim in the 2013 Forfeiture Action

The government attacks Mr. Matusko's standing because in the government's view Mr. Matusko should have filed a claim in the 2013 forfeiture.  This position should be viewed with skepticism as it challenges basic notions of due process.  Boiled down, the government is asserting that Marketplace user credits, including Mr. Matusko's 48 bitcoin credit, were seized and adjudicated in the earlier forfeiture action.  As discussed above, that contention is demonstrably incorrect.

Mr. Matusko was never afforded notice of that action.  This is in spite of the government's admission that it can and does connect wallet addresses to actual owners.  The government took no efforts to contact Mr. Matusko or any of thousands of other Marketplace users.  Put another way, the government denies any legal requirement to identify rightful owners of seized bitcoin.  It seems tangibly unfair to argue the claim is invalid simply because he should have filed a claim in an earlier action that the same government never provided notice.  Even more concerning it the complete lack of any indication that the government undertook any efforts to take reasonable steps to identify any Silk Road user in either action.  Consequently, the government should be estopped from relying on arguments that Mr. Matusko's only remedy was in the earlier forfeiture action.

//
//
//
//
//
//
//

**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**

**V.    <u>CONCLUSION</u>**

Mr. Matusko has standing and is a known potential claimant.  He received no direct notice as required by law.  The court should deny the government's Motion to Strike and allow further discovery in this matter.


DATED:        August 26, 2021              KUGELMAN LAW, P.C.



                                           By: ____*/s/ Alexander Kugelman*____

                                              ALEXANDER KUGELMAN
                                              Attorney for Claimant
                                              Ilija Matusko

**OPPOSITION TO MOTION TO STRIKE VERIFIED CLAIM OF ILIJA MATUSKO**