STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

DAVID COUNTRYMAN (CABN 226995)
CHRIS KALTSAS (NYBN 5460902)
CLAUDIA A. QUIROZ (CABN 254419)
WILLIAM FRENTZEN (LABN 24421)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-436-7428
    FAX: (415) 436-7234
    claudia.quiroz@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CV 20-7811 RS |
| Plaintiff, | **UNITED STATES' REPLY IN SUPPORT OF MOTION TO STRIKE THE VERIFIED CLAIM OF CLAIMANT ILIJA MATUSKO** |
| v. | |
| Approximately 69,370 Bitcoin (BTC), Bitcoin Gold (BTG), Bitcoin SV (BSV), and Bitcoin Cash (BCH) seized from 1HQ3Go3ggs8pFnXuHVHRytPCq5fGG8Hbhx | Hearing Date: September 30, 2021<br>Time: 1:30 p.m.<br>Court: Hon. Richard Seeborg |
| Defendant. | |
| ILIJA MATUSKO, | |
| Claimant. | |

**TABLE OF CONTENTS**

I. Introduction ................................................................................................................... 1

II. Argument ..................................................................................................................... 2

    A. Matusko Cannot Demonstrate Standing ................................................................ 2

        1. Neither Matusko nor Silk Road Account Holders Have a Legitimate Interest in the Defendant Property Because It Remained with Silk Road Until it was Forfeited in 2013 ...................................................................................................................... 2

        2. At Best, Matusko is an Unsecured Creditor ........................................................ 4

        3. Matusko Abandoned his Property ....................................................................... 4

        4. By Creating an Account with Silk Road and Willingly Depositing Bitcoin Into It, Matusko Knowingly Contributed to the Illegality of the Site .............................. 5

    B. Notice was Sufficient ............................................................................................. 7

    C. Matusko Cannot Overcome the Fact that his Claim is Unjustifiably Late ............ 13

        1. Matusko Improperly Misconstrues the Ninth Circuit's Factor's to Excuse His Untimeliness ...................................................................................................... 13

        2. Matusko's Arguments with Respect to the Other Factors Fail to Justify his Untimely Claim .................................................................................................. 14

III. Conclusion ................................................................................................................ 15

# TABLE OF AUTHORITIES

**Federal Cases**

*Covelo Indian Community v. F.E.R.C.*,
  895 F.2d 581 (9th Cir. 1990) .................................................................................................. 12, 14

*Dusenbery v. United States*,
  534 U.S. 161 (2002) ........................................................................................................................ 7

*In re Hewlett-Packard Co. Shareholder Derivative Litig.*,
  716 F. App'x 603 (9th Cir. 2017) .................................................................................................. 8

*In re Hewlett-Packard*,
  719 F. App'x At 608 ............................................................................................................ 12, 14

*Inc21.com Corp. v. Flora*,
  No. 08-CV-02967, 2008 WL 5130415 (N.D. Cal. Dec. 5, 2008) .......................................... 8

*Johnson v. United States*,
  No. 1:03 Civ. 00281, 2004 WL 2538649 (S.D. Ind. Oct. 22, 2004) ....................................... 9

*Mullane v. Central Hanover Bank & Tr. Co.*,
  339 U.S. 306 (1950) .............................................................................................................. passim

*Tulsa Professional Collection Servs., Inc. v. Pope*,
  485 U.S. 478 (1988) ...................................................................................................................... 12

*United States v. $100,348.00 in U.S. Currency*,
  354 F.3d 1110 (9th Cir. 2004) ..................................................................................................... 13

*United States v. $133,420. in U.S. Currency*,
  672 F.3d 629 (9th Cir. 2012) ......................................................................................................... 4

*United States v. 8 Gilcrease Lane*,
  641 F. Supp. 2d 1 (D.D.C. 2009) ............................................................................................. 4, 6

*United States v. 801 E. Franklin Ave.*,
  No. 13-CR-0117, 2013 WL 2948075 (S.D. Ala. May 17, 2013) ............................................ 4

*United States v. Ferro*,
  473 F. App'x 789 (9th Cir. 2012) ................................................................................................. 7

*United States v. Medina*,
  301 F. Supp 2d 322 (S.D.N.Y. 2004) .......................................................................................... 5

*United States v. One Hundred Thirty-Three U.S. Postal Money Orders*,
   496 F. App'x. 723 (9th Cir. 2012) .................................................................................... 4

*United States v. Twenty-Four Cryptocurrency Accounts*,
   473 F. Supp. 3d 1 (D.D.C. 2020) ....................................................................... 8, 9, 12, 13

**Statutes**

18 U.S.C. § 983(d)(6)(B)(i) ……………………………………………………………………….4

## I. INTRODUCTION

Ilija Matusko's opposition brief provides no justification for bringing a claim seven years late with no arguable standing. His arguments are based on a series of mistaken assumptions and unfounded premises—none of which enhances the validity of his claim.

First, Matusko lacks standing. Neither he nor his 100,000+ fellow Silk Road users have a financial interest in the bitcoins seized from Individual X. The Defendant Property was taken from a pool of bitcoins available to Ross Ulbricht for Silk Road's various expenses—Individual X did not steal from individual user accounts, which is why the theft did not affect any individual account balances. When law enforcement took down the website in 2013 and seized its servers, it also seized the bitcoins contained within them, which included those Matusko now claims. Indeed, it was at that point that Matusko and all other Silk Road users lost their ability to withdraw or use their bitcoins. The Defendant Property is thus separate from the 48 bitcoins (BTC) Matusko claims belong to him. Matusko is, at best, an unsecured creditor with no rights to the Defendant Property. Moreover, per his own admissions, he abandoned his property, thereby further rendering his claim meritless. In addition, Matusko is not an innocent owner of the bitcoin. It is undisputable that Silk Road was a website entirely built upon a criminal enterprise, and that the bitcoins seized from its servers constitute the proceeds of crime and money laundering. While he was purportedly unemployed and receiving limited government assistance, Matusko willingly surrendered twenty percent of his monthly income to a known criminal marketplace, seemingly aware of the risk that he might not get it back and without even attempting to do so, and kept it there even after he purportedly realized he did not want to engage in any criminal activity.

Second, Matusko cannot overcome the fact that his claim is unjustifiably, and overwhelmingly, late. The government's notices of the forfeiture actions were proper in both 2013 and 2020. Matusko argues that the government should have used available data and blockchain tracing technology to track down the identities of each of the over 100,000 Silk Road users in order to provide them with direct notice. But the blockchain analytics technology Matusko suggests the government should have used was simply unavailable in 2013, thereby rendering it impossible for the government to have identified and located each of the anonymous Silk Road account holders. With respect to the instant action, Ulbricht

received direct notice because he was the only person who reasonably appeared to be a potential claimant given that he personally absorbed the loss from the theft. Even assuming user balances were affected by it, the circumstances and peculiarities of the case rendered direct notice to over 100,000 unknown users impracticable and not reasonably calculated to reach them.[1] Notice by publication exists as an option precisely for cases like this one. This Court should not give Matusko a second chance in a case in which he has no standing. The Court should grant the government's motion to strike.

## II.     ARGUMENT

### A.     Matusko Cannot Demonstrate Standing

#### 1.     Neither Matusko Nor Any Silk Road Account Holders Have a Legitimate Interest in the Defendant Property Because It Remained with Silk Road Until it was Forfeited in 2013

Matusko argues that because his 48 BTC were pooled with all bitcoins held in Silk Road's bitcoin wallet, "every [Silk Road] user had and *still has* a financial interest in the bitcoin sent to the Marketplace's Bitcoin wallet and therefore an interest in both 2013 and 2020 seizures." Opp'n at 7 (emphasis in original). This is demonstrably false. No Silk Road user has a financial interest in the bitcoins seized in connection with this particular action. Individual X stole the bitcoin from the platform itself, not the accounts of individual Silk Road users. Declaration of Special Agent Jeremiah Haynie ("Haynie Decl.") ¶¶ 5, 7. As such, the theft did not affect the balances of individual Silk Road users, but it did affect the balance of bitcoin available for Ulbricht to use for the site's day-to-day operations. Ulbricht kept the fact that there was a vulnerability on the site quiet and absorbed the cost without announcing the theft. Accordingly, it was *Silk Road*'s—and, consequently, Ulbricht's—loss.

Matusko has never held an interest in the property at issue in this case. He unquestionably retained access to his bitcoins after Individual X's theft—he could have withdrawn them at any time up until the moment the government shut down the website. Haynie Decl. ¶¶ 9-10. Indeed, even after the takedown, Matusko could have asserted a claim to his bitcoin as part of the 2013 forfeiture proceeding in New York, as he has admitted he knew Silk Road was shut down. *See* Declaration of Ilija Matusko

---

[1] These circumstances include the large number of users, transactions, and bitcoin addresses; the limited information on each of them available on the Silk Road website; the anonymity protections associated with it; and the fact that Silk Road users spanned the entire globe.

1  ("Matusko Decl."), Dkt. No. 100-2 ¶ 11. Matusko's excuses for not pursuing the claim then are precisely
2  that—just excuses, not legitimate justifications that could overcome a seven-year late claim on a matter
3  that has been properly adjudicated. The most likely scenario is that given the low value of his BTC back
4  then compared to their worth today, Matusko chose not to pursue their recovery at that time—it was
5  probably not worth going through the trouble and decided to forego it.

6        Matusko incorrectly argues that the timing of Individual X's theft is irrelevant to his "colorable"
7  claim because the fungibility of Bitcoin means that he maintained his credit to his 48 BTC even after the
8  government shut down the website and seized its servers in 2013. Opp'n at 25. As stated above,
9  Individual X's theft was from the platform itself; no user account balances were affected, including
10 "hanson5," the moniker Matusko purportedly used on Silk Road. Haynie Decl. ¶¶ 7-8. In essence,
11 Matusko argues that his 48 BTC existed in two places at the same time: (1) in his Silk Road account
12 between Individual X's theft in May 2012 and the government's takedown in 2013; and (2) in the 1HQ3
13 bitcoin address for seven years following the theft by Individual X in 2012. Following his reasoning,
14 Matusko would retain ownership of his Bitcoin no matter what happened or how he lost access to it.

15       Bitcoin operates in novel and remarkable ways, but it is not magic. Like any other asset, when it
16 is lost, it is lost. Matusko's claim is akin to the following scenario: Individual A deposits money in a
17 bank. A year later, a robber walks into the bank and steals thousands of dollars. Individual A does not
18 find out about the robbery and his account balance is not affected by it because the bank absorbs the
19 loss. Individual A keeps his money in the bank for another year, able to withdraw it but choosing not to
20 do so. The bank then shuts down (due to any reason unrelated to the robbery) and Individual A loses his
21 money as a result. Seven years later, the bank robber is captured, and the police find the stolen money
22 untouched under his mattress. Individual A reads about it in the newspaper and makes a claim to the
23 money under the robber's mattress as part of the funds he lost when the bank went bust. This absurd
24 scenario is precisely what Matusko argues in his brief. Unfortunately, a person can lose his or her
25 bitcoin just like any other tangible assets, and it certainly cannot reside in multiple places at once. The
26 fact remains that Matusko could have withdrawn his 48 BTC (or made a purchase with them) at any
27 time after Individual X stole from Silk Road but chose not to do so. He cannot have it both ways.
28

U.S. REPLY IN SUPPORT OF MOTION TO STRIKE CLAIM OF ILIJA MATUSKO
CV 20-7811 RS

Matusko and the other 100,000+ Silk Road users lost any potential remaining interest in the bitcoins they held on the platform when the District Court in the Southern District of New York issued a default judgment against the bitcoins located on Silk Road's servers on January 15, 2014. Specifically, the court ordered that the government "shall have judgment by default against the Silk Road Hidden Website and the Silk Road Server Bitcoins" and that the website and "the Silk Road Server Bitcoins shall be, and the same hereby are, forfeited to the [government]." Declaration of Claudia Quiroz ("Quiroz Decl.") Ex. 2. When law enforcement shut down Silk Road and seized its servers, all user account balances were seized along with them and were the subject of a forfeiture proceeding. Thus, even after the takedown, claimants had the opportunity to appear and make claims in accordance with Rule G and all applicable forfeiture statutes. That forfeiture matter was properly and finally adjudicated in 2014. Accordingly, no Silk Road user retains a financial interest in the 2013 seizure, including Matusko. The Court should accordingly strike Matusko's claim.

### 2. At Best, Matusko is an Unsecured Creditor

When Matusko willingly deposited his bitcoin into a known criminal platform he became, at best, an unsecured creditor of Silk Road. But unsecured creditors do not have standing in civil forfeiture claims. *United States v. One Hundred Thirty-Three U.S. Postal Money Orders*, 496 F. App'x. 723, 724 (9th Cir. 2012) (citing 18 U.S.C. § 983(d)(6)(B)(i)). Unsecured creditors categorically lack the requisite "ownership interest or []possessory interest" in specific property. *Id.* (quoting *United States v. $133,420 in U.S. Currency*, 672 F.3d 629, 637-38 (9th Cir. 2012)); *see also United States v. 8 Gilcrease Lane*, 641 F. Supp. 2d 1, 5-6 (D.D.C. 2009) (concluding that unsecured creditors lack specific interest in a property sufficient to satisfy standing requirements). Because Matusko has no rights to the Defendant Property and no standing even as an unsecured creditor, the Court should strike his claim.

### 3. Matusko Abandoned his Property

Matusko abandoned his bitcoin, which deprives him of standing to bring a claim. A person "who abandons property and leaves it to the devices of those using it as an illegal drug operation and does nothing to try and stop it cannot be an innocent owner" for purposes of a civil forfeiture action. *United States v. 801 E. Franklin Ave.*, No. 13-CR-0117, 2013 WL 2948075, at *1 (S.D. Ala. May 17, 2013).

Indeed, individuals who abandon property generally forfeit their ability to challenge the government from seizing it at all. *See United States v. Medina*, 301 F. Supp 2d 322, 331 (S.D.N.Y. 2004).

Matusko claims that as soon as he saw the depth of illegal trades on Silk Road, he "decided against buying anything." Matusko Decl. ¶ 9. He nonetheless made the decision not to withdraw his bitcoins from the platform at that point even though he purportedly did not intend to use them. Moreover, although Matusko reportedly forgot his password to his hanson5 user account and lost his access to it, he seemingly made no effort to retrieve it.[2] *See* Matusko Decl. ¶ 10. In combination, these series of actions—or inactions—indicate an abandonment of his bitcoins. Matusko further abandoned his interest in his 48 BTC when he learned that law enforcement had intercepted Silk Road's illegal activities and took down the website. Yet, he did nothing to preserve his rights to his property. Matusko's abandonment vitiates his standing, and the Court should strike Matusko's claim accordingly.

**4.    By Creating an Account with Silk Road and Willingly Depositing Bitcoin into It, Matusko Knowingly Contributed to the Illegality of the Site**

There should be no dispute that Silk Road was a criminal site with a criminal purpose that sold criminal goods and services. The bitcoins seized from Silk Road and Ulbricht are criminal proceeds subject to forfeiture. This includes the bitcoins located in the Silk Road server when it was seized in 2013, the bitcoins found on Ulbricht's laptop when he was arrested, and the bitcoins Individual X stole from the platform in 2012. Matusko argues that not all bitcoins seized from Silk Road are subject to forfeiture because not everything associated with the site was illegal. *See* Opp'n at 12 ("Silk Road was not exclusively used for the purchase of illicit goods and services" because it also sold "art, apparel, and

---

[2] Due to the anonymity Silk Road provided to its users, Silk Road did not have an official password recovery option for its users. Haynie Decl. ¶ 10. However, Matusko could have tried to reset his password but seemingly chose to not even try. *Id.* Indeed, a Google search of "Silk Road password reset" leads to the following internet post dated June 7, 2013:

> *"If you forgot your password, unfortunately you will not be able to retrieve it. Some people have had success by creating a new account and messaging mods either on the forum or via the Road. If you can prove that you are the owner of the other account (By stating order history, bitcoin balance, pin code, etc.) then you **might** have some luck getting the account back."*

Haynie Decl. ¶ 10 (citing https://www.reddit.com/r/SilkRoad/comments/1fve2n/password_reset/).

books."). This flies in the face of the overwhelming evidence that Silk Road prosecutors presented at Ulbricht's trial demonstrating the site's criminality.[3] *See* Quiroz Decl. Exs. 8-10.

Matusko attempts to justify his involvement with Silk Road by treating it like a regular bank, where people deposit their funds for no illicit purpose. Silk Road was not a bank—it was a criminal marketplace. Matusko may not have purchased drugs or other illicit goods using his hanson5 account. However, by knowingly contributing funds to the marketplace and leaving them there for two years where his and other users' funds were pooled and available for Ulbricht to use as he wished—which may have included to further the website, for payroll, to pay himself commissions, to make refunds to the site's customers, and to commission murders in order to protect his interests in the site—Matusko indirectly, yet unquestionably, contributed to the operations and illegality of the Silk Road website.

Ross Ulbricht gave Silk Road life, yet the thousands of narcotics traffickers and consumers of illegal goods and services fueled its expansion and growth, resulting in massive drug distribution worldwide and the death of several individuals who overdosed using products sold on the site. That case was tried before a jury in New York in 2015. The government presented overwhelming evidence of the criminal activity that permeated the website and satisfied its burden beyond a reasonable doubt. As a result, Ross Ulbricht was sentenced to two life terms in prison. Ulbricht will spend the rest of his life in prison not because he sold books and art, but because he set up and managed an illegal online marketplace for drugs and criminal goods and services of unprecedented scope.

By willingly opening an account with the website, depositing funds in it, and leaving them there, Matusko was complicit—albeit in a small scale—in the operations of Silk Road. Matusko was not required to deposit Bitcoin to open an account on the site[4]—he chose to do it. In one of his forum posts

---

[3] In an Opinion & Order denying Ross Ulbricht's Motion for New Trial, Hon. Katherine B. Foster noted that at trial, the jury "heard extensive testimony that Silk Road was a website used to buy and sell narcotics and other illicit goods and services. . . . saw printouts from the website showing advertisements for a variety of such narcotics, and heard testimony from a law enforcement agent who had seized a large volume of narcotics purchased through Silk Road." *United States of America v. Ross William Ulbricht*, Case No. 1:14-cr-99968-KBR, Dkt. No 237 at 5 (S.D.N.Y. April 27, 2015). The jury "also saw documents which demonstrated that the Dread Pirate Roberts attempted to protect his interests in Silk Road by commissioning the murder of several individuals . . . ." *Id.* at 5-6.

[4] In his declaration, Christopher Wajda states that the "final stage in opening the user profile on the Silk Road Marketplace was to fund the profile with Bitcoin(s)." Dkt. No. 100 ¶ 8. Users were not required to deposit bitcoin or pay a fee to register an account on Silk Road, however. Haynie Decl. ¶ 2.

U.S. REPLY IN SUPPORT OF MOTION TO STRIKE CLAIM OF ILIJA MATUSKO
CV 20-7811 RS

to the Silk Road community on January 10, 2012, Ulbricht told the site's users that "[w]hether you like it or not, I am the captain of this ship. You are here Voluntarily and if you don't like the rules of the game, or you don't trust your captain, you can get off the boat." Quiroz Decl. Ex. 6. Matusko was on the site voluntarily and chose to stay on it and contribute to it until the site was taken down in 2013.

### B. Notice was Sufficient

Matusko argues that the government should have provided him (and thousands of Silk Road users) with direct notice of the forfeiture action, asserting that it was not only possible in 2020, but that it was also possible in 2013 in connection with the Southern District of New York's forfeiture case. Opp'n at 14-15. Preliminarily, putative claimants without standing are not due notice of a pending forfeiture action. *United States v. Ferro*, 473 F. App'x 789, 790 (9th Cir. 2012). As Matusko lacks standing, he was not due direct notice. But even assuming the Court concludes that Matusko does have standing, Matusko had sufficient notice of the pending action in both 2013 and 2020.

Rule G specifically provides that the government must send direct notice "to any person who reasonably appears to be a potential claimant on the facts known to the government before the end of the time for filing a claim under Rule G(5)(a)(ii)(B)." Fed. R. Civ. P. Supp. G(4)(b)(i). This language generally tracks the due process requirements set forth by the Supreme Court of the United States for the adequacy of notification in *Dusenbery v. United States*, 534 U.S. 161 (2002). In *Dusenbery*, the Court determined the extent of process due to a prisoner whose property was subject to an administrative forfeiture proceeding. 534 U.S. at 164-65. The Court relied on the test articulated in *Mullane v. Central Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950), in determining "the adequacy of the method used to give notice" for forfeiture claims. *Id.* at 167-68. In short, *Mullane* and *Dusenbery* require the government to ensure that notice is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* at 168 (quoting *Mullane*, 339 U.S. at 314, 319). "The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Id.* (quoting *Mullane*, 339 U.S. at 315). Those means, however, do not require the government to accomplish actual

1  notice; the government must only attempt to provide it. *Dusenbery*, 534 U.S. at 169-70.

2  These cases do not prescribe any particular method of service. Rather, service must be provided in a manner that is "practicable," with "due regard for the practicalities and peculiarities of the case." *Mullane*, 339 U.S. at 314, 317. Thus, in cases where individuals with potential claims are "missing or unknown," the application of indirect notification procedures, such as notice by publication, are constitutionally permissible. *Id.* at 317; *see also In re Hewlett-Packard Co. Shareholder Derivative Litig.*, 716 F. App'x 603, 608 (9th Cir. 2017) (mail notice is required for due process where "'practicable,' and depending on the circumstances."); *Inc21.com Corp. v. Flora*, No. 08-CV-02967, 2008 WL 5130415, at *6 (N.D. Cal. Dec. 5, 2008) (citing *Mullane* to approve notice by publication).

Matusko asserts that the government "knows and has information on thousands of Silk Road users both domestic and abroad" and thus had the ability to link cryptocurrency transactions with individuals and provide direct notice to all Silk Road users. *See* Opp'n at 13, 15. To support his argument, Matusko cites to *United States v. Twenty-Four Cryptocurrency Accounts*, 473 F. Supp. 3d 1 (D.D.C. 2020) (hereinafter "*Welcome To Video*").[5] Opp'n at 15. He specifically asserts that, because the government was able to provide direct notice to potential claimants in that case, the government should have done the same here. *Id*. Matusko further asserts that because the government was able to verify the transfer of bitcoin to his Silk Road moniker, "hanson5," the government should have been able to determine that this transfer originated from Matusko. These arguments lack merit.

This case differs in critical respects from *Welcome To Video*, primarily with respect to the location from where the different cryptocurrencies were seized and the manner in which the investigations were conducted (guided by the goals of each investigation)—both of which allowed greater access to information in the *Welcome to Video* case. In that case, the government seized funds from 24 accounts at specific cryptocurrency exchanges, some of which were held in the names of the individuals that were noticed.[6] Accordingly, the exchanges provided Know Your Customer ("KYC")

---

[5] Welcome to Video was a Tor-based Internet site that hosted and distributed images and video files depicting child pornography. *Id.* at 3. Customers received content from the site by redeeming "points," which could be obtained by, among other things, paying Bitcoin. *Id.*

[6] In *Welcome to Video*, two potential claimants were not provided direct notice—one who provided no email or mailing address to the exchanges and another who provided no mailing address

information, which consisted of either actual names for the individuals whose cryptocurrency was seized or the email/physical addresses where notices could be sent. *See* 473 F. Supp. 3d at 3, 5-6. In Silk Road, the 2013 seizures of funds were from the Silk Road servers and Ulbricht's personal laptop. In 2020, it was from a well-known bitcoin address in an unhosted wallet[7] that sat untouched for five years. None of these sources of information—Ulbricht's personal laptop, the Silk Road servers, and the unhosted wallet—had the same identifying information available to the prosecutors in *Welcome to Video*. Moreover, the accounts at the exchanges in *Welcome to Video* were identified as potentially linked to targets of the criminal investigation.[8] Haynie Decl. ¶¶ 12-13. In other words, the information that was used to provide direct notice was obtained as part of the investigation itself, not through the forfeiture process, and occurred before the forfeiture complaint was even filed. *Id.*

The impracticability of providing direct notice to Silk Road users is further compounded by the fact that the entire premise of Silk Road was to provide an anonymous platform for its users. Ulbricht went to great lengths to ensure that buyers and sellers on Silk Road were able to operate anonymously. The subtitle of Silk Road was "anonymous market." *Id.* ¶ 2. Consistent with the operation of an anonymous market, Silk Road users were required to provide little identifying information. *Id.* Users that registered with Silk Road were required to provide a username and a password, but notably were not required to provide identifying information such as a real name, physical address, social security number, date of birth, email address, or phone number. *Id.* This applied to the hanson5 account as well. *See id.* ¶ 4. Ulbricht went so far as to create a Silk Road "Buyer's Guide" for the site's users, which

---

and a defunct email address. 473 F. Supp. 3d at 6. The court found that for those two individuals the government was unable to reach directly, notice via publication satisfied the government's obligations. *Id.* (*citing See Johnson v. United States*, No. 1:03 Civ. 00281, 2004 WL 2538649, at *4 (S.D. Ind. Oct. 22, 2004) (citing *Mullane*, 339 U.S. at 317–319) (finding publication of a forfeiture notice satisfies due process requirements where "the government does not know or reasonably cannot discover the [claimants'] whereabouts"). The court thus found that the government had met the notice requirements of Supplemental Rule G. *Id.*

[7] "An unhosted wallet is not hosted by a third-party financial system. It can be very difficult or impossible to determine who is accessing or in control of the use of cryptocurrencies in an unhosted wallet. Unhosted wallets allow for anonymity and concealment of illicit financial activity." https://home.treasury.gov/system/files/136/2020-12-18-FAQs.pdf

[8] Over 300 people were arrested and at least 23 children were rescued from their abusers in connection with the *Welcome to Video* case.

1    emphasized the site's anonymity and stated that users "*are totally anonymous on Silk Road . . .*" and
2    "[w]e do everything we can to protect your anonymity . . . ." *See* Quiroz Decl., Ex. 3 at 2 (emphasis
3    added). From its inception, the "idea was to create a website where people could buy anything
4    anonymously, with no trail whatsoever that could lead back to them." *See* Quiroz Decl., Ex. 7 at 2.

5        Ascertaining the identities of Silk Road account holders to provide direct notice of the 2013
6    forfeiture action would have been impossible for the simple reason that blockchain tracing technology
7    did not exist at the time.[9] *See* Haynie Decl. ¶ 15. Notice by publication was thus entirely appropriate.

8        With respect to the 2020 seizure at issue in this case, notice by publication was also appropriate
9    for two main reasons. First, as noted above, Ulbricht absorbed the loss of Individual X's theft, as no user
10   account balances were impacted by it. Thus, pursuant to Rule G, the government sent direct notice to the
11   person who "reasonably appear[ed] to be a potential claimant on the facts known to the government
12   before the end of the time for filing a claim under Rule G(5)(a)(ii)(B)." Fed. R. Civ. P. Supp. G(4)(b)(i).
13   Second, assuming Silk Road users had been impacted by the theft, direct notice would not have been
14   practicable given the "peculiarities of the case," *Mullane*, 339 U.S. at 314, 317, or "reasonably
15   calculated to reach the potential claimant," Fed. R. Civ. P. Supp. R. G(4)(b)(i), (iii)(A). Matusko argues
16   that the government should have analyzed "Silk Road users' transactions or other data in an effort to
17   notify known claimants as in [*Welcome to Video*]. Opp'n at 15. Matusko avers that "the government
18   knows and has information on thousands of Silk Road users both domestic and abroad" and that the
19   government can verify specific user transactions "because it verified that [] Matusko sent '47.52 bitcoin
20   in December 2011' to the corresponding address in the Silk Road wallet. . . .'" *Id.* As a preliminary
21   matter, these statements are based on the incorrect assumption that the government identified hanson5 as
22   Matusko.[10] The government has never said that. The government confirmed that "hanson5" had a Silk

---

[9] The leading companies providing blockchain analytics and cryptocurrency tracing technology include Chainalysis (founded on October 1, 2014), Elliptic (founded on October 1, 2013), Ciphertrace (founded on May 30, 2015), Elementus (founded in 2018), and Coin Metrics (founded in 2017). Haynie Decl. ¶ 15.

[10] Matusko asserts the following: "The government has made clear it can verify specific user transactions because it verified that Mr. Matusko sent '47.52 bitcoin in December 2011' to the corresponding address in the Silk Road wallet. Mr. Matusko's user profile was credited with that amount and that credit always remained . . . [and] had the same balance when the server was seized.'" Opp'n at 15 (citing and quoting paragraph 12 of the Declaration of Jeremy Haynie in support of the government's

1  Road account with 47.52 BTC in it, but it never linked that moniker with Matusko. The government has
2  taken the assertion that Matusko created the hanson5 account as true for purposes of his claim, but he
3  very well may be someone else. Indeed, Silk Road had no identifying information on hanson5 other than
4  the moniker, the number of bitcoins available, and the user's general location ("Germany," which was
5  not independently verified).  *See* Haynie, Ex. 2.  Accordingly, it is inaccurate to argue that because the
6  government linked hanson5 and Matusko, it can link all Silk Road users with actual people.

7        Moreover, given the "practicalities and peculiarities" of this case, it simply would not have been
8  practicable to identify over 100,000 individuals just to provide them with direct notice, particularly
9  because nobody other than Ulbricht reasonably appeared to be a potential claimant based on the facts
10 known to the government during the 69,370 BTC seizure investigation—which centered on identifying
11 the person responsible for stealing bitcoin from Silk Road in 2012. *See* Haynie Decl. ¶ 13. To determine
12 real-life identities for over 100,000 Silk Road users, the government would have had to conduct tracing
13 analysis on each of the bitcoin transactions of those users.[11] With modern bitcoin tracing tools and old-
14 fashioned investigative techniques, the government has had success in the past identifying owners of
15 bitcoin addresses; however, these types of investigations require significant time and resources to
16 identify one user, let alone more than 100,000. Moreover, such an attempt would have been entirely
17 conjectural as there would have been no guarantee that such an investigation would yield potential
18 claimants given the intensive security measures taken by Silk Road users. And to the extent this process
19 revealed any contact information that could be used to send notices, that information is seven years old.
20 Accordingly, when considering "all the circumstances," this exceedingly burdensome and extensive

---

motion to strike Matusko's claim). Matusko's citation is plainly misleading. Nowhere in paragraph 12 of SA Haynie's declaration does he reference "Matusko"—he says "hanson5."

[11] According to the criminal complaint against Ulbricht "[a]s of July 23, 2013, there were approximately 957,079 registered user accounts reflected on the server . . . this volume of user accounts indicates that the site has been visited by hundreds of thousands of unique users." *See* Ninth Circuit appellate record, Case No. 15-1815, Dkt. No. 31-1 at 72." Moreover, "[a]ccording to the country-location information provided by these users upon registering, 30 percent represented they were from the United States, 27 percent chose to be 'undeclared,' and the remainder claimed to hail from countries across the globe . . . ." *Id.*  In addition, "[f]rom February 6, 2011 to July 23, 2013, there were approximately 1,229,465 transactions completed on the site, involving 146,946 unique buyer accounts, and 3,877 unique vendor accounts." *Id.* Indeed, even Wajda acknowledges the large number of Bitcoin addresses associated with Silk Road—"2,105,527 Bitcoin addresses to be exact." Wajda Decl. ¶ 47.

1    endeavor would not have been "reasonably calculated . . . to apprise interested parties of the pendency of
2    the action." *See Dusenbery,* 534 U.S. at 164-65 (quoting *Mullane*, 339 U.S. at 314, 319).

3        Matusko has not cited to a single case with facts like this one where direct notice was required.
4    Indeed, he cannot—courts only require the government to issue direct notice in cases where potential
5    claimants are "reasonably ascertainable." *Covelo Indian Community v. F.E.R.C.*, 895 F.2d 581, 587 (9th
6    Cir. 1990). Reasonableness and practicality are the touchstones of determining when direct notice is
7    required; in situations like these, where the investigation of over 100,000 users would: (1) potentially
8    yield little information; (2) require multiple forms of international notice likely to be ineffective; and (3)
9    likely run into false identities and addresses created solely to assist in international drug trafficking,
10   notice by publication is more than sufficient precisely because the identities of putative claimants are not
11   reasonably ascertainable. *See In re Hewlett-Packard*, 719 F. App'x at 608 (direct notice required in
12   cases only where such notice is "practicable"); *Covelo Indian Community*, 895 F.2d at 587-88
13   (concluding that notice by publication is appropriate when dealing with claimants whose interests *might*
14   be affected by government action); *Tulsa Professional Collection Servs., Inc. v. Pope*, 485 U.S. 478, 487
15   (1988) (actual notice is required when the identities of those due notice are reasonably ascertainable).
16   Cases like these illustrate why notice by publication exists and is essential in forfeiture matters. If that
17   option does not apply to a situation like this one, where a dark net marketplace holds little or no
18   identifying information on thousands upon thousands of users whose identities cannot be reasonably
19   ascertained without going on a wild goose chase for each one of them without any certainty that the
20   information obtained (if any) is accurate, then it does not apply in any situation.

21       Matusko further argues that the fact that nobody came forward to make a claim in 2013 proves
22   that the government's notice was deficient. Opp'n at 12 (stating that the government "never notified any
23   of the 100,00-plus Marketplace users by email, physical mail, or any other direct manner. . . . It is
24   therefore unsurprising that no Marketplace users filed a claim in that forfeiture action.") It is telling that
25   in the same case Matusko cites where the government provided direct notice, no claimants came forward
26   either.[12] 473 F. Supp. 3d at 4. The fact that individuals involved in criminal activity in dark web

---

[12] And by the same token, the fact that several individuals have come forward and made a claim in this action further demonstrates that the notice was in fact proper.

U.S. REPLY IN SUPPORT OF MOTION TO STRIKE CLAIM OF ILIJA MATUSKO
CV 20-7811 RS

marketplaces—whether it is narcotics trafficking or child pornography and exploitation—do not come forward to claim seized property is not a product of the adequacy or the sufficiency of the notice. The more logical explanation is that thousands of drug traffickers and purchasers of illicit goods and services did not come forward and expose their criminal activity because protecting themselves from criminal prosecution and likely incarceration is more valuable than the number of bitcoins in their accounts.

Matusko's arguments that the government failed to provide proper notice are woefully inadequate and should be disregarded. The Court should strike Matusko's claim.

### C. Matusko Cannot Overcome the Fact that his Claim is Unjustifiably Late

#### 1. Matusko Improperly Misconstrues the Ninth Circuit's Factors to Excuse His Untimeliness

Matusko acknowledges that the first factor articulated by the Ninth Circuit as set forth in the government's opening brief is when the claimant became aware of the currency's seizure. Opp'n at 17-18. Yet, Matusko gives this factor an enhanced interpretation. Specifically, he complains that the government argues that because law enforcement shut down Silk Road and he became aware that the account had been seized, this should have put him "on notice that he had certain legal rights to reclaim his property." Opp'n at 18. He also argues that "[i]t is not reasonable to conclude that [he]—a foreign national residing in Berlin—was aware of the seizure *and his rights*." *Id.* (emphasis added). This is not what the government has argued, however, and improperly morphs the requirement into an awareness "of the legal implications of the seizure when it occurred." Opp'n at 17-18. What the Ninth Circuit requires is for the court to determine when a claimant becomes aware that a seizure occurred. In this case, Matusko and his counsel concede that Matusko was aware of the seizure of Silk Road as early as 2013. Opp'n at 18; Matusko Decl. ¶ 11.

As for the sixth factor—whether the claimant informed the government and the court of its interest *before the claim deadline*—Matusko argues that he informed the U.S. Attorney's office that he intended to make a claim. That occurred *after* the deadline, however, and at no point has Matusko petitioned the Court for an extension of time to file his claim. He could have done so immediately after conferring with the government while he prepared his claim but failed to do so.

### 2. Matusko's Arguments with Respect to the Other Factors Fail to Justify his Untimely Claim

Matusko's arguments with respect to the other factors concerning timeliness similarly fail. *See United States v. $100,348.00 in U.S. Currency*, 354 F.3d 1110, 1118 (9th Cir. 2004). As noted above, despite Matusko's assertions to the contrary, no Silk Road user was due notice as their respective claims to Silk Road bitcoin expired with the entry of default judgment in 2014 in the Southern District of New York. Moreover, as further detailed above, there were no procedures with respect to Silk Road users that would have yielded a list of "reasonably ascertainable" claimants on a reasonable basis. *See In re Hewlett-Packard*, 719 F. App'x at 608; *Covelo Indian Community*, 895 F.2d at 587-88. With respect to prejudice, *all* parties would be prejudiced by the extraordinary volatility of the Defendant Property; Bitcoin experiences massive fluctuations in value and accordingly it is exceedingly important to resolve claims as quickly as possible, especially when the proposed claimants lack standing.

The government further contests Matusko's good faith. Matusko readily admits that he was aware that Silk Road, and his bitcoin, were subject to seizure as early as 2013. Matusko Decl. ¶ 11. Matusko, while unaware of his rights, did not seek to *become* aware of his rights until 2021, when he realized the immense value Bitcoin had accrued over the previous seven years. *Id.* ¶ 13.

Matusko asserts that the Court should forgive his failure to file a motion to enlarge the time to file a claim because of the government's failure to properly serve him. Opp'n at 22. Matusko's arguments in this respect lack merit in light of the above—notice by publication was more than warranted in this case, and in any event, Matusko was aware of the downfall of Silk Road and accompanying ramifications as early as 2013. Matusko Decl. ¶ 11. The fact that Matusko sought informal counsel from the government does not support Matusko, and in fact weighs against him as he *still* failed to file a motion to enlarge time, even after learning his claim was late.

Finally, as indicated above, Matusko's claim lacks merit as he has no standing because he has no ownership or possessory interest in the Defendant Property. The remaining factors have little bearing on the Court's decision because of their inapplicability, such as Matusko's health, his representation, and the lack of trial date. The factors weigh heavily in favor of the Court striking Matusko's claim for its

untimeliness.

### III. CONCLUSION

Matusko's claim fails because he lacks both standing and a justification for filing a late claim. Matusko offers no valid ownership or possessory interest—his interest in Silk Road Bitcoin was extinguished upon the entry of default in the Southern District of New York in 2014. The Defendant Property contains none of the property to which Matusko lays a claim; instead, the Defendant Property represents an entirely distinct pool of Bitcoin that is completely independent of any ownership interest by users of Silk Road apart from Ross Ulbricht, who alone bore the loss associated with the theft. At best, Matusko is an unsecured creditor, divesting him of any standing. In addition, he abandoned his interest in his Bitcoin. Regardless, the Court should strike his claim for lack of standing.

Even assuming Matusko has standing, the noticing procedures in this case were proper. There was no reasonable manner through which to ascertain the identities of any potential claimants. Notice by publication exists for cases just like these, where any investigation produces, at best, conjectural claimants whose identities might be false.

Finally, Matusko's claim is unjustifiably late. None of the factors he cites weigh in his favor; instead, he admits to knowing about Silk Road's downfall since 2013 and declining to do anything about it until 2021, when the value of Bitcoin happened to skyrocket. His attempts at morphing the requirements to suit his needs do little to justify his blatant tardiness, and indeed, cuts against him at times. Despite knowing he was late, he failed to file a motion to enlarge time with the Court.

Matusko lacks standing and has filed an inexcusably late claim. The Court should strike his claim accordingly.

DATED: September 9, 2021                                Respectfully submitted,

                                                        STEPHANIE M. HINDS
                                                        Acting United States Attorney

                                                        /s/ Claudia A. Quiroz
                                                        DAVID COUNTRYMAN
                                                        CHRIS KALTSAS
                                                        CLAUDIA A. QUIROZ
                                                        WILLIAM FRENTZEN
                                                        Assistant United States Attorneys

U.S. REPLY IN SUPPORT OF MOTION TO STRIKE CLAIM OF ILIJA MATUSKO
CV 20-7811 RS

15