UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>APPROXIMATELY 69,370 BITCOIN (BTC), BITCOIN GOLD (BTG) BITCOIN SV (BSV) AND BITCOIN CASH (BCH), et al.,<br><br>Defendants. | Case No. 20-cv-07811-RS<br><br>**ORDER GRANTING MOTIONS TO STRIKE CLAIMS, DENYING MOTION TO INTERVENE** |

## I. INTRODUCTION

This is a civil forfeiture action arising from the seizure of approximately 69,370 Bitcoin, Bitcoin Gold, Bitcoin SV, and Bitcoin Cash ("Bitcoin") allegedly derived from certain unlawful activity. The Bitcoin was stolen by "Individual X" from addresses at "Silk Road," which is described by the government as having been "the most sophisticated and extensive criminal marketplace on the Internet, serving as a sprawling black market bazaar where unlawful goods and services, including illegal drugs of virtually all varieties, were bought and sold regularly by the site's users." In 2013, law enforcement seized and shut down Silk Road.

In 2020, further investigation revealed that Individual X had hacked into Silk Road and through 54 transactions sent a total of over 70,000 Bitcoin to two addresses he controlled. The bulk of that Bitcoin was later transferred to another address, from which it was ultimately seized. Individual X and the creator and owner of Silk Road have both consented to the forfeiture of the

seized Bitcoin.

Several entities and individuals have now come forward asserting that the seized Bitcoin, may include Bitcoin in which they have ownership rights. The government moves to strike three such claims. A fourth potential claimant moves to intervene in this action, which the government opposes. All four motions will be decided in the government's favor as none of the claimants offer anything more than implausible speculation that any of the seized Bitcoin is their property.

## II. BACKGROUND[1]

According to the government, from 2011 until October 2013, when it was seized by law enforcement, Silk Road was utilized by thousands of drug dealers and other vendors to distribute hundreds of kilograms of illegal drugs and other unlawful goods and services to well over 100,000 buyers, and to launder hundreds of millions of dollars derived from these illegal transactions.

The only form of payment accepted on Silk Road was Bitcoin. During its operation, Silk Road generated sales revenue totaling over 9.5 million Bitcoin, and collected commissions from these sales totaling over 600,000 Bitcoin. Silk Road used a so-called "tumbler" to process Bitcoin transactions in a manner designed to frustrate the tracking of individual transactions through the Blockchain and thereby assist with the laundering of criminal proceeds.

The creator of Silk Road, Ross Ulbricht was arrested in San Francisco on October 1, 2013, and charged in the Southern District of New York with narcotics trafficking conspiracy, computer hacking conspiracy, and money laundering conspiracy. That same day, law enforcement took down the Silk Road website and seized its servers, including all Bitcoins contained in wallets residing within them. The following day, the government filed  a civil action in the Southern District of New York seeking, among other things, forfeiture of the Silk Road hidden website, any and all Bitcoins contained in wallet files residing on Silk Road Servers, and all property traceable

---

[1] The general background and basic facts as alleged by the government in the forfeiture complaint and presented in its briefs and declarations are not disputed by any of the claimants except as noted in the discussion.

Case No. 20-cv-07811-RS

United States District Court
Northern District of California

1    thereto. A judgment and order of forfeiture was entered in that action in 2014.

2         In February of 2015, a federal jury convicted Ulbricht on seven counts including

3    conspiracy to distribute narcotics and money laundering. He was ultimately sentenced to double

4    life imprisonment plus forty years, without the possibility of parole.

5         In 2020, law enforcement officers used a third-party bitcoin attribution company to analyze

6    Bitcoin transactions executed by Silk Road. They saw that on May 6, 2012, 54 transfers were

7    made from Bitcoin addresses controlled by Silk Road to two Bitcoin addresses, abbreviated  as

8    1BAD and the 1BBq. These 54 transactions were not noted in the Silk Road database as vendor or

9    Silk Road employee withdrawals and therefore appeared to represent Bitcoin that was stolen from

10   Silk Road.

11        Nearly a year later, most of the Bitcoin at 1BAD and 1BBq was transferred to an address

12   abbreviated as 1HQ3. Other than a relatively small transfer out in 2015, the nearly 70,000 Bitcoin

13   remained at 1HQ3 until its seizure by the government in late 2020. During that time, its value

14   grew from approximately $14 million to over $3.5 billion.

15        According to an investigation conducted by the Criminal Investigation Division of the

16   Internal Revenue Service and the U.S. Attorney's Office for the Northern District of California,

17   Individual X was the individual who hacked into Silk Road and moved the cryptocurrency to

18   1BAD and 1BBq, and subsequently to 1HQ3. The investigation further revealed that Ulbricht

19   became aware of Individual X's online identity and threatened Individual X for return of the

20   cryptocurrency to Ulbricht. Individual X did not return the cryptocurrency.

21        In November of 2020, Individual X signed a Consent and Agreement to Forfeiture with the

22   U.S. Attorney's Office, Northern District of California in which he or she consented to the

23   forfeiture of the subject Bitcoin. That same day, the government took custody of the Bitcoin from

24   1HQ3. Ulbricht has also admitted that the Bitcoin is subject to forfeiture and has consented to its

25   forfeiture.

26

27

28

United States District Court
Northern District of California

42

United States District Court
Northern District of California

1   ownership and interest any time after a claim is filed. *United States v. $133,420 in U.S. Currency*,

2   672 F.3d 629, 642 (9th Cir. 2012) ("The issue of standing is subject to adversarial testing under

3   Supplemental Rule G(6)(a), which gives the government the right to question the claimant

4   regarding the 'claimant's identity and relationship to the defendant property,' and to 'gather

5   information that bears on the claimant's standing") (internal citations omitted).

6            To contest a forfeiture, a claimant must demonstrate both statutory and Article III standing.

7   *United States v. $1,181,895.00 in U.S. Currency*, 2015 WL 631394, at *2 (C.D. Cal. Feb. 12,

8   2015). "A claimant bears the burden of establishing Article III standing, the threshold function of

9   which is to ensure that the government is put to its proof only where someone acting with a

10   legitimate interest contests the forfeiture . . . . A claimant must therefore demonstrate that he has a

11   sufficient interest in the property to create a case or controversy." *United States v. $41,471.00 in*

12   *U.S. Currency*, 2016 WL 337380, at *1 (C.D. Cal. Jan. 6, 2016).

13            In a civil forfeiture proceeding, standing is satisfied if the claimant can show "a colorable

14   interest in the property, for example, by showing actual possession, control, title, or financial

15   stake." *United States v. Real Prop. Located at 475 Martin Lane*, 545 F.3d 1134, 1140 (9th Cir.

16   2008). To collect evidence on the issue of standing, Rule G(6) "broadly allows the government to

17   collect information regarding the claimant's 'relationship to the defendant property'" through the

18   use of special interrogatories, and "contemplates that the government may seek information

19   beyond the claimant's identity and type of property interest." *$133,420.00*, 672 F.3d at 642. Rule

20   G(8)(c)(1) provides that the government may move to strike a claim for failing to comply with

21   Rule G(5) or (6), or because the claimant lacks standing. *17 Coon Creek Rd*, 787 F.3d at 973; *see*

22   *also*, *United States v. $333,806.93 in Proceeds*, 2010 WL 3733932, at *1 (C.D. Cal. Aug. 30,

23   2010) (striking claim under "strict compliance" standard for failure to respond to Special

24   Interrogatories served pursuant to Supplemental Rule G(6)); *$133,420.00 in U.S. Currency*, 672

25   F.3d at 635 (emphasizing that pursuant to Rule G(8)(c), at any time before trial, the government

26   may move to strike the claimant's claim or answer if the claimant has not responded to special

27   interrogatories propounded pursuant to Rule G(6)(a), or if the claimant lacks standing).

28

1   Here, the government contends Hossain's claim should be stricken because he refuses to

2   provide substantive interrogatory responses and/or because he has failed to establish standing.

3   Hossain insists that he has adequately pleaded his interest in the property, and that striking a claim

4   for insufficient discovery responses is not warranted unless a party has been given opportunity to

5   cure and has violated a court order to provide further responses. Hossain also points out that the

6   government has independently been able to identify his Mt. Gox account, rendering at least that

7   aspect of the interrogatories moot.

8   Hossain's conclusory allegations that his stolen Bitcoin forms a part of what was seized

9   from the 1HQ3 wallet, however, are insufficient. Hossain has not pointed to a single fact

10   supporting his assertions that his Bitcoin was stolen from Mt. Gox and transferred to Silk Road,

11   and then stolen *again* and transferred ultimately into the 1HQ3 wallet. To the contrary, Mt. Gox

12   records show that on February 8, 2013, and February 9, 2013, there was a transfer of 200 BTC and

13   45.92 BTC out of Hossain's Mt. Gox account for a total of 245.92 BTC. This matches exactly the

14   amount Hossain claimed was stolen from his Mt. Gox account. These transfers took place nine

15   months *after* the subject Bitcoin was stolen from Silk Road.

16   Hossain's only response is that Mt. Gox is known to have been falsifying its records to

17   coverup the fact that losses were occurring. Whatever other irregularities there may have been,

18   Hossein cannot escape the fact that his Bitcoin was available for him to withdraw from Mt. Gox

19   until February of 2013, and therefore cannot be part of the Bitcoin that was stolen from Silk Road

20   that is the subject of this case.

21   Even apart from the timing, Hossein would have nothing other than pure speculation to

22   suggest that his Bitcoin was transferred to Silk Road. Again, the actual evidence is that the Bitcoin

23   stolen from Mt. Gox accounts was transferred to various places other than Silk Road.

24   In essence, Hossain has done nothing more than show that he owned some Bitcoin that was

25   stolen from him, and then baldly claimed that even though the seized Bitcoin was stolen from

26   somewhere else, some of it must be his. The timing proves otherwise, but even in the absence of

27   the government's showing on that point, Hussain has not met his burden to show a colorable

28

United States District Court
Northern District of California

interest in the property. The motion to strike is granted.

B.  Illija Matsuko

Many months after the deadline for filing claims in this matter, Illija Matsuko, a citizen of Germany filed a verified claim alleging he held at least 48 Bitcoin[3] at Silk Road under his user name "hanson5." Matsuko asserts he had deposited the Bitcoin but had never purchased any items, legal or illegal, from the Silk Road website. The Bitcoin "remained idle" in his account.

Matsuko acknowledges he was "generally aware" of the seizure and shutdown of Silk Road in 2013, "as it made headlines worldwide" and that he "most likely lost access to the user account and that he most likely lost access to his bitcoins." Matsuko contends, however, that he was "unaware of any third-party rights under U.S. law to make a claim for his legally obtain[ed] bitcoins."

Matsuko asserts that due to the rapid increase in value of Bitcoin, in May of 2021, he sought advice from counsel in Germany about the possibility of recovering the 48 Bitcoins "from the original United States Law Enforcement take down of the Silk Road marketplace." Matsuko eventually retained U.S. counsel and learned of this action, and filed his claim shortly thereafter.

Even assuming Matsuko should be relieved from the filing deadline in this action, he has not presented a colorable claim to any of the seized Bitcoin. Matsuko does not dispute that his Bitcoin remained in his account at Silk Road and available for his use or withdrawal at all times up until the 2013 government seizure and shut down. Accordingly, it forms no part of the Bitcoin stolen from Silk Road in 2012 that was later seized in this action.

Matsuko insists that because Bitcoin held at Silk Road was treated as fungible, he has a viable claim to the seized Bitcoin. The argument is not persuasive, however, because it would in effect mean that Matsuko's Bitcoin was simultaneously held at Silk Road *and* in the 1HQ3 wallet.

Finally, Matsuko's complaint that he was not given proper direct notice of his right to

---

[3] Matsuko has since acknowledged the exact figure is 47.52.

1   assert a claim at the time of the 2013 seizure is not relevant to this proceeding. There is no basis to

2   use this case as a collateral attack on the judgment and forfeiture order entered in New York many

3   years ago. The motion to strike is granted.

4

5          C.   Battle Born Investments Company, et al.

6          Approximately six weeks after the filing deadline, Battle Born Investments Company,

7   LLC; First 100, LLC; and 1st One Hundred Holdings, LLC (collectively "Battle Born"), filed a

8   verified claim asserting ownership of the entire 1HQ3 wallet that was seized. The claim alleges

9   that Battle Born obtained a judgment for more than $2.2 billion against a person it believed was

10  either Individual X or was associated with Individual X. The judgment was against Raymond

11  Ngan, who the parties now agree is *not* Individual X.

12         Ngan filed a bankruptcy petition. Battle Born entered into an agreement to purchase all

13  assets of the bankruptcy estate from the Chapter 7 bankruptcy trustee. These assets included all

14  disclosed and undisclosed property interests of the bankruptcy debtor, "wherever located and by

15  whomever held." The sale was approved by the bankruptcy court. The order designated Battle

16  Born a good faith purchaser of all assets of the bankruptcy estate, whether or not disclosed in

17  Ngan's bankruptcy schedules and statements, pursuant to 11 U.S.C. section 363(m).

18         In a forensic review of Ngan's laptop computer, Battle Born discovered email

19  correspondence regarding a proposed sale of Bitcoin by Ngan. When the prospective purchaser

20  inquired as to where the Bitcoin would come from, Ngan sent an image of the 1HQ3 page on the

21  website, blockchain.com, which is a recognized means for Bitcoin users (and anyone else) to view

22  the current contents and entire transactional history of a given Bitcoin wallet.

23         It is reasonable, of course, to take Ngan's conduct as a representation by him that he owned

24  the 1HQ3 wallet. It is not, however, sufficient to create a colorable claim by Battle Born to the

25  seized Bitcoin. Apart from sheer speculation that Ngan may have had some association with

26  Individual X, Battle Born can offer nothing to suggest how Ngan would have come into ownership

27  of the Bitcoin in 1HQ3 wallet, much less lawful ownership that would have made the Bitcoin part

28

United States District Court
Northern District of California

of the bankruptcy estate. Although Battle Born insists the question of Ngan's ownership goes to the merits and is not properly resolved by a motion to strike under either summary judgment or judgment on the pleadings standards, it is Battle Born's burden to make out a colorable claim. Because it has not pleaded facts—as opposed to conclusions—that plausibly put the 1HQ3 wallet into the bankruptcy estate it purchased, the motion to strike must be granted.

D. Kobayashi

Nobuaki Kobayashi is the appointed Foreign Representative in the case of *In re: MtGox Co., Ltd. (a/k/a MtGox KK)*, U.S. Bankruptcy Court for the Northern District of Texas, Dallas Division, Case No. 14-31229. Kobayashi moves to be permitted "direct access" pursuant to 11 U.S.C. § 1509, or to intervene under Rule 24 of the Federal Rules of Civil Procedure.

Kobayashi is tasked with overseeing the collection of any U.S.-sited assets in which Mt. Gox had or has property interests in for their transfer and distribution to Mt. Gox's creditors in the Foreign Main Proceeding in Japan. Kobayashi seeks "direct access" or intervention because he speculates some of the Bitcoin stolen from Mt. Gox could have gone to Silk Road and ultimately to the 1HQ3 wallet. Particularly in light of the government's showing that the thefts from Mt. Gox did *not* go into Silk Road, such conjecture is not sufficient to support either direct access or intervention. The motion is denied.

IV. CONCLUSION

The claims of Hossain, Matsuko, and Battle Born are stricken. Kobayashi's motion for direct access or to intervene is denied.[4]

---

[4] The government's sealing motion (Dkt. No. 73) submitted in connection with its opposition to Kobayashi's motion is granted.

**IT IS SO ORDERED**.

Dated: March 25, 2022

RICHARD SEEBORG
Chief United States District Judge

United States District Court
Northern District of California